# Exhibit



## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HELENA AGRI-ENTERPRISES, LLC,

       Plaintiff,

v.

GREAT LAKES GRAIN, LLC; BOERSEN
FARMS AG, LLC, A MICHIGAN LIMITED
LIABILITY COMPANY, BOERSEN
FARMS, INC. A MICHIGAN
CORPORATION, BOERSEN AG
PARTNERS, LLC, A MICHIGAN LIMITED
LIABILITY COMPANY, DENNIS
BOERSEN,  ARLAN BOERSEN, SANDRA
BOERSEN,

       Defendants.

CASE NO. 1:18-CV-00963-RJJ-RSK

Honorable Chief Judge Robert J. Jonker

**PROPOSED REPLY BRIEF IN SUPPORT
OF PLAINTIFF'S MOTION TO COMPEL
BOERSEN DEFENDANTS TO EXECUTE
AUTHORIZATIONS REQUIRED FOR
PRODUCTION OF DOCUMENTS
SUBPOENAED FROM GREAT
AMERICAN INSURANCE GROUP**

---

Sheryl L. Toby (P39114)
Mark J. Magyar (P75090)
Dykema Gossett PLLC
Attorneys for Plaintiff
300 Ottawa Ave. N.W. Suite 700
Grand Rapids, Michigan  49503
stoby@dykema.com
mmagyar@dykema.com
616-776-7500

Ronald J. VanderVeen (P33067)
Cunningham Dalman, PC
Attorneys for Defendants
321 Settlers Road
Holland, MI 49423
rjvv@cunninghamdalman.com
616-392-1821

---

## ARGUMENT

    Defendants misconstrue and misinterpret the basis for Plaintiff's Subpoenas and the great relevance of the requested information to the pending claims in this dispute, so much so that a reply is needed to accurately state the facts currently before this Court.  Further, Defendants entirely ignore Plaintiff's well-establish authority that permits this Court to compel execution of the requested authorizations.

Notably, from a timing perspective, Plaintiff's Motion to Compel was filed on March 3, 2020, almost one month ago. If Defendants had executed the requested authorizations (or even contacted Plaintiff's counsel to negotiate language for the authorizations), Plaintiff would likely already be in possession of the Great American Insurance documents[1] to which it is entitled and this Court would not have to resolve the issues raised in Plaintiff's Motion to Compel.

The crop insurance documents from Great American play an important role in framing the potential claims that remain pending in this case. This is a dispute between agricultural companies. Defendants may attempt to minimize the role that crop insurance plays in *their* business, but countless cases[2] show that crop insurance, and the production history insurers use for the underwriting process to approve or issue crop insurance, is a valuable asset to farmers across the country. If fact, so valuable that many farmers across the country have been convicted or held liable for falsifying crop insurance applications or abusing the process.[3]

Plaintiff timely issued the subpoenas before discovery closed and Defendants have not put forth any legitimate basis to refuse Plaintiff's request for these documents. Accordingly, Plaintiff's Motion to Compel should be granted and Defendants should be compelled to execute the requested authorizations.

---

[1] Great American's in-house counsel and outside counsel informed Plaintiff in January that the documents were ready to produce and that they just needed the Defendants' authorizations to release them.

[2] *See, e.g.*, *United States v. Kuehnemund*, 208 F. App'x 371, 372-73 (6th Cir. 2006) (farmer convicted for making false statements to various reinsurers working on behalf of the USDA's Federal Crop Insurance Corporation); *United States v. Larry Reed & Sons, P'ship*, 280 F.3d 1212, 1214 (8th Cir. 2002) (partnership found liable for submitting false crop insurance claims); *United States v. John Hudson Farms, Inc.*, No. 7:18-CV-7-FL, 2018 U.S. Dist. LEXIS 148030, at *1–6 (E.D.N.C. 2018) (family farming entity found to have falsely purported to be separate, individual farming operation in numerous forms and applications provided to the USDA Risk Management Agency's FCIC).

[3] *See id.*

A.    **Contrary to Prior Testimony and Judicial Admissions, Defendants Now Admit to Using Actual Production History From Prior Boersen Entities.**

Defendants' Response judicially admits that "[New Heights Farm I] was assigned the APH for Boersen Farms Grain." *See* Response, Dkt. 158, p. 3.  Defendants have previously judicially admitted that New Heights Farm I and New Heights Farm II can use the APH for Boersen Farms Grain because "an owner of [New Heights Farm I and New Heights Farm II] had an interest in [Boersen Farms Grain] and was involved in the actual production of crops". *See* Defendants' Brief Opposing Plaintiff's Motion for Discovery Dkt. 150, p. 6.  And yet, Stacy Boersen testified at her deposition that she was not involved in the farming operation of Boersen Farms Grain and did nothing more than small tasks:

```
13   Q.   But you didn't manage --
14   A.   No.
15   Q.   -- Boersen Farms Grain?  You didn't do the farming
16        work, right?  Other than I think we talked about
17        the -- was there corn --
18   A.   Yeah.
19   Q.   Yeah.
20   A.   And, you know, I might have ran parts to the field or
21        also, maybe a seed tender, that kind of thing.

 2   Q.   So whether we're talking about the farm -- a defined
 3        Boersen party or any other entity on earth, it would
 4        be the same testimony; that you weren't the manager or
 5        owner or controller or farmer of that entity, because
 6        you start with Great Lakes Grain in 2018; is that
 7        right?
 8   A.   Just what my involvement was in the Boersen Farms
 9        Grain.
10   Q.   Right, which we've talked about.
11   A.   But I wasn't a manager, no.
12   Q.   Of any farm?
13   A.   I -- I -- yeah, I performed small farming functions
14        for Boersen Farms Grain.
```

*See* Deposition of Stacy Boersen, 50:13 – 51:14, attached hereto as Exhibit 1.

Nicholas Boersen testified that he does not know which of the Boersen entities he worked for in any capacity due to the manner in which the businesses were run:

```
 5   Q.   Okay.  Were you -- did you ever work for Great Lakes
 6        Grain in any capacity?
 7   A.   I really don't know where the companies kind of fell
 8        in line.  I stopped getting paid after Boersen Farms
 9        Ag, basically.  So I don't really know where the
10        companies ever switched hand, because I never kept
11        track of that.
```

*See* Deposition of Nicholas Boersen, 16:5 – 11, attached hereto as Exhibit 2.  Based on his judicial admissions in the Response, it appears that sometime between Nicholas Boersen's deposition on January 15, 2020 and the date of the Response on March 17, 2020, Nicholas Boersen learned that New Heights Farm II utilized the APH information of Boersen Farms Ag, LLC.  The fact that Nicholas had no knowledge of that fact a mere sixty days prior is evidence of the exact "sleight of hand" that Helena has been seeking to uncover throughout this litigation.

Notably, neither Nicholas nor Stacy were able to provide any details at their depositions about whether or how New Heights Farm I, New Heights Farm II or any of the Great Lakes Grain entities were qualified under the requisite federal regulations to utilize any of the other Boersen entities' APH.  If Defendants are going to stand firm on their argument that the New Heights Farm and Great Lakes Grain entities were authorized to utilize other Boersen entities' APH under the pertinent federal regulations, Helena is entitled to understand how and why the Successor Defendants are qualified to do so.

This is especially in this case where the legitimacy of the divisions and transactions between the Judgment Defendants and Successor Defendants is vitally important.  As further described in Plaintiff's Motion the law closely scrutinizes transactions between family members

when the rights of creditors are involved. If APH information was improperly used between Boersen entities, such use would not only be a violation of federal regulations, it also would serve as evidence for Plaintiff's claim in this proceeding that Defendants are operating as a mere continuation of the Judgment Boersen entities.

Finally, in response to Defendants' assertions that APH is not an asset, the authority Plaintiff has provided this Court establishes that APH is considered a valuable asset for any grower because the higher a farmer's APH, the better insurance coverage that farmer can obtain. Defendants have not provided any authority to the contrary and their mere "ipse dixit" stating otherwise is not sufficient.

> **B.  If Defendants' Use of Another Boersen Entity's APH Occurred Without Meeting all the Requirements, Defendants Violated Federal Law.**

Nicholas Boersen testified that New Heights Farm II qualified under what he called the "Young Farmer" program, which presumably is the Beginning Farmer and Rancher Program. *See* Deposition of Nicholas Boersen, Ex. 2, 8:6 – 23.  Nicholas, however, was unable to identify how or why New Heights Farm II qualified for this program.  *See id.*

The federal regulations related to Beginning Farmer and Rancher Benefits for crop insurance are very specific and abundantly clear.  Further, false representations in crop insurance applications is a violation of federal criminal law. Promulgated by the Risk Management Agency, the crop insurance regulations require the following to qualify for Beginning Farmer or Rancher status:

- The farmer must be an individual. Business entities qualify only if all of the individuals with a 10 percent or more interest are beginning farmers or ranchers.

- o For example, if a son moves home and forms a corporation with a parent who has had an insurance interest in crops or livestock for more than five years, the entity cannot receive Beginning Farmer and Rancher benefits.
- The farmer must not have actively operated or managed a farm or ranch anywhere with an insurance interest in any crop or livestock for more than five years.

Participation in the Beginning Farmer and Rancher Benefits provides substantial benefits designed to help new farmers start their operations.  These benefits include:

- Exemption from paying the certain insurance administrative fees;
- Additional 10 percentage points of premium subsidy for additional coverage; and
- An increase in the substitute Yield Adjustment, which allows the new farmer to replace a low yield due to an insured cause of loss, from 60 to 80 percent of the applicable transitional yield (T-Yield).

*See* 7 CFR § 400, et. al.  The details of this program are important because, contrary to Defendants' continued assertions otherwise, the Beginning Farmer and Rancher Program provides obvious financial benefits both in exemption from fees and in additional and better insurance coverage based on the use of another entity's production history.  Accordingly, it is entirely incorrect for the Defendants to assert that APH is not a valuable asset and Defendants, as experienced growers from a farming family, should know better.  And yet, Defendants continue to claim that the use of another entity's APH provided no value to them.

Additionally, through their testimony and judicial admissions, Nicholas and Stacy Boersen have both denied the requisite participation in the Legacy Boersen entities needed to legitimately use the Legacy Boersen entities' APH information under the Beginning Farmer and Rancher Program.  Accordingly, the question remains about whether or not Defendants

submitted the false information and abused the federal crop insurance program to continue the Boersen family farming enterprise.

The process to qualify for the Beginning Farmer and Rancher Program requires a farmer to submit all of the required information to the crop insurance company prior to submission of the farmer's crop insurance application.  If the information is not provided as required, the farmer is not qualified to be part of the Beginning Farmer and Rancher program and therefore cannot use another entity's APH information without violating the federal crop insurance regulations.  The subpoenas to Great American that require Defendants' executed authorizations include requests for the crop insurance applications and other documents that would show whether Nicholas Boersen or New Heights Farm II provided false information when they submitted their crop insurance applications for the Great Lakes Grain and New Heights Farm entities.

Stacy Boersen specifically denied that New Heights Farm I and Great Lakes Grain utilized the Beginning Farmer and Rancher Program.  *See* Deposition of Stacy Boersen, Ex. 1, 57:18 – 22.  She was unable to testify, however, as to why New Heights Farm I and Great Lakes Grain would have qualified to use the APH information from another Boersen entity.  *See id.*, 56:55:12 – 56:21.  Accordingly to her testimony, she just trusted her agent to secure the crop insurance and submit whatever she needed to submit to accomplish the task.  *See id.*   And yet, Defendants' Response contains a judicial admission that New Heights Farm I was assigned the APH for Boersen Farms Grain without any explanation or why or how New Heights Farm I would have qualified to use the APH information.

Based on Defendants' judicial admissions and testimony from Nicholas and Stacy Boersen, there already exists a question about whether or not Defendants made

misrepresentations to the Risk Management Agency in their crop insurance applications or have received the Beginning Farmer and Rancher Program benefits or any other program benefits without properly qualifying for the programs.  The documents Plaintiff timely subpoenaed from Great American will provide additional detail about these facts that relate specifically to Plaintiff's current claims against Defendants. If Defendants represented themselves to the Risk Management Agency as a mere continuation of the Legacy Boersen entities and were able to utilize the APH information on that basis, such evidence goes directly to Plaintiff's claim that Defendants are operating as a mere continuation of the Legacy Boersen entities.  Plaintiff is entitled to discovery such knowledge.

### C.    The Information Requested in the Subpoenas Are Relevant to Plaintiff's Claims In this Dispute.

As further described in Plaintiff's Motion to Compel, the scope of discovery under the Federal Rules of Civil Procedure is "quite broad."  *See Sharper v. Wal-Mart Stores, Inc.*, No. 17-12980, 2018 U.S. Dist. LEXIS 74023, at *1 (E.D. Mich. 2018) (citing *Lewis v. ACB Bus. Servs.*, 135 F.3d 389, 402 (6th Cir. 1998)).  In construing the scope of discovery, courts are encouraged to permit all relevant evidence which bears upon any part of the controversy or dispute.  *See Fischer v. Cirrus Design Corp.*, No. 5:03-CV-0782, 2005 U.S. Dist. LEXIS 31353, at *25 (N.D.N.Y. 2005).  "Mutual knowledge of all relevant facts gathered by both parties is essential to proper litigation."  *See Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

Based on the broad scope of relevance under the federal rules and authority from this Circuit, there can be no question that the documents Plaintiff subpoenaed from Great American are relevant to Plaintiff's claims in this dispute.

Due to federal regulations, Great American is required to obtain authorizations or an order from a Court to provide the documents requested by Plaintiff. There is support for

8

requiring parties, such as Defendants, to provide a signed authorization in order to give another party, such as Plaintiff, access to relevant discovery materials.  *See Fischer*, 2005 U.S. Dist. LEXIS 31353, at *22.   Despite such authority, Defendants continue to refuse to provide the authorizations that are inarguably relevant to Plaintiff's claims and discoverable in this dispute.

> **D.      Plaintiff's Subpoenas Were Timely.  It is Defendants' Failure to Cooperate Has Caused the Delay**.

Defendants' assertion that Plaintiff's Motion should be denied merely because discovery is closed in wholly inapplicable to the analysis based on the procedural history of this case.  At the outset, the Subpoenas were issued in November 2019 before discovery closed.  The fact that it is now March and we are still fighting about authorizations is now the fault of Defendants, not Plaintiff.

As Plaintiff has demonstrated in its prior pleadings, including its Brief in Support Plaintiff's Motion to Amend the Case Management Order (RE 128) (the "Motion"), Plaintiff has been diligently working over the past six months to discover the relevant facts related to Plaintiff's claims, including obtaining documents from government agencies to whom Defendants report crop information to determine whether Plaintiff may have claims related to Defendants' reporting or lending practices or against other third parties.

Throughout this entire discovery process, Defendants have wholly refused to comply with Plaintiff's requests to make the process more efficient or timely. For example, Plaintiff waited two weeks without any response from Defendants for authorizations to be executed to obtain documents from the Risk Management Agency ("RMA") and Farm Services Agency ("FSA").  Plaintiff did not receive the authorizations until after Magistrate Judge Kent required Defendants to sign the documents in order to expedite the process. Despite the fact that Defendants have been previously instructed to provide authorization, Defendants are refusing to

do so again now.  As to documents relevant to crop insurance, Plaintiff respectfully disagrees with Defendants' contention that they have been cooperating with discovery and that it has been Plaintiff who is the source of the delay.  This is just flat wrong.

## CONCLUSION AND PRAYER

Plaintiff Helena Agri-Enterprises, LLC respectfully requests that this Court: (1) grant Helena's Motion and compel Defendants to execute the authorizations necessary for Plaintiff to obtain documents from Great American Insurance; (2) grant leave for Plaintiff to extend the discovery deadline for the purpose of obtaining documents from Great American Insurance Group if its Motion to Amend the Third Case Management Order is denied and for any additional discovery that is necessary based on its review of those documents; and (3) grant such further relief as the Court deems just.

Dated:  March 31, 2020

10

Respectfully submitted,

**DYKEMA GOSSETT PLLC**
By: */s/ Mark J. Magyar*
Sheryl L. Toby (P39411)
Mark J. Magyar (P75090)
300 Ottawa Ave. N.W., Suite 700
Grand Rapids, MI 49503
stoby@dykema.com
mmagyar@dykema.com

**JACKSON WALKER LLP**
By: */s/ Robert L. Soza, Jr.*
Robert L. Soza, Jr. (admitted *pro hac vice*)
Texas State Bar No. 18869300
112 E. Pecan, Suite 2400
San Antonio, Texas  78205
rsoza@jw.com

**ATTORNEYS FOR PLAINTIFF**

11

# Exhibit



**In the Matter Of:**

HELENA AGRI-ENTERPRISES, LLC vs vs GREAT LAKES GRAIN, LLC, ET AL.

STACY BOERSEN

January 15, 2020

*Prepared for you by*



**Bingham Farms/Southfield  •  Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

**BOERSEN, STACY**
01/15/2020                                                                                                          Pages 1–4

Page 1

```
1                    UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF MICHIGAN

3                         SOUTHERN DIVISION

4

5   HELENA AGRI-ENTERPRISES, LLC,

6   a Delaware limited liability

7   company,

8                    Plaintiff,

9          vs.                Case No. 1:18-cv-00963-RJJ-RSK

10                                Hon. Robert J. Jonker

11  GREAT LAKES GRAIN, LLC, a

12  Michigan limited liability

13  company; GREAT LAKES GRAIN II,

14  LLC, a Michigan limited

15  liability company; GREAT LAKES

16  III, LLC, a Michigan limited

17  liability company; GREAT LAKES

18  IV, LLC, a Michigan limited

19  liability company; NEW HEIGHTS

20  FARM I, LLC, a Michigan limited

21  liability company; NEW HEIGHTS

22  FARM II, LLC, a Michigan limited

23  liability company; STACY BOERSEN,

24  individually and as putative

25  member of the Great Lakes Grain
```

Page 2

```
1   defendants and New Heights Farm I,

2   LLC; and NICHOLAS BOERSEN,

3   individually and as putative

4   member of New Heights Farm, II, LLC,

5                    Defendants.

6   _____

7

8

9       The Deposition of STACY BOERSEN,

10      Taken at 321 Settlers Road,

11      Holland, Michigan,

12      Commencing at 9:01 a.m.,

13      Wednesday, January 15, 2020,

14      Before Peggy S. Savage, CSR-4189, RPR.

15

16  APPEARANCES:

17

18  MARK J. MAGYAR

19  Dykema Gossett, P.L.L.C.

20  300 Ottawa Avenue, N.W.

21  Suite 700

22  Grand Rapids, Michigan 49503

23  (616) 776-7500

24  mmagyar@dykema.com

25      Appearing on behalf of the Plaintiff.
```

Page 3

```
1   RONALD J. VANDER VEEN

2   Cunningham Dalman, P.C.

3   321 Settlers Road

4   Holland, Michigan 49423

5   (616) 392-1821

6   rjvv@cunninghamdalman.com

7       Appearing on behalf of the Defendants.

8

9   ALSO PRESENT:

10  Nicholas Boersen

11  Robert Soza (via telephone)

12  Amanda Crouch (via telephone)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
1                    TABLE OF CONTENTS

2

3   WITNESS                             PAGE

4   STACY BOERSEN

5

6   EXAMINATION BY MR. MAGYAR             5

7

8                    EXHIBITS

9

10  EXHIBIT                             PAGE

11  (Exhibits attached to transcript.)

12

13  DEPOSITION EXHIBIT 1                  15

14  DEPOSITION EXHIBIT 2                  17

15  DEPOSITION EXHIBIT 3                  53

16  DEPOSITION EXHIBIT 4                  64

17  DEPOSITION EXHIBIT 5                  69

18

19

20

21

22

23

24

25
```

BOERSEN, STACY
01/15/2020

Page 5

1  Holland, Michigan
2  Wednesday, January 15, 2020
3  9:01 a.m.
4
5              STACY BOERSEN,
6    was thereupon called as a witness herein, and after
7    having first been duly sworn or affirmed to testify to
8    the truth, the whole truth and nothing but the truth,
9    was examined and testified as follows:
10              EXAMINATION
11 BY MR. MAGYAR:
12 Q.  Good morning.
13 A.  Good morning.
14 Q.  My name is Mark Magyar.  We just met each other before
15    we went on the record, right?
16 A.  Yes.
17           MR. MAGYAR:  A couple of preliminary
18    matters for the record.  One, Ron, you and I can
19    probably fight about this later, but just for the
20    record, we're waiting on a subpoena we've done to your
21    insurance, Great American Insurance Company, some
22    documents we've requested.  We had proposed that we
23    postpone these depositions if we could get an
24    agreement that they could be conducted even after
25    discovery period.  We did not reach that agreement.

Page 6

1  We're reserving the right to seek to redepose the
2  deponents today, if necessary, based on not being able
3  to reach that agreement.  You may have an opposition
4  to that, but I just want to put that on the record.
5           The other objection I just want to place on
6  the record is I would note for the record that two
7  parties are here.  Both are listed to be deponents
8  today -- one in the morning; one in the afternoon --
9  Defendants Stacy Boersen and Nicholas Boersen.  I
10 understand counsel's position from conversations
11 before going on the record that because they're
12 parties, they can be present.  I've advised them that
13 I believe that the testimony and the nature of the
14 issues that overlap that it would not be appropriate
15 to have one party listening to the other party's
16 testimony and then giving testimony.  Counsel has
17 refused to have Nicholas Boersen leave the room, and
18 so I'm placing my objection to that on the record now.
19           With that, I think we're ready to get
20 started.
21           THE WITNESS:  Sure.
22           MR. VANDER VEEN:  Just one other
23 preliminary matter, and that is that Stacy reserves
24 the right to review the transcript and to sign off on
25 it once it's been prepared.

Page 7

1  BY MR. MAGYAR:
2  Q.  Have you been deposed before?
3  A.  No.
4  Q.  No?  A couple of real quick, general guidelines for a
5     deposition.
6           Every response has to be oral and spoken so
7     that the court reporter can take it down.  She can't
8     really do shrugs or nods or mmm-hmm, so just make
9     everything an oral statement.
10          Do you understand?
11 A.  I do.
12          MR. VANDER VEEN:  I always like it when
13    they answer that question with nodding their head.
14          MR. MAGYAR:  Exactly.  That was my fault.
15    I didn't actually finish with a question.
16 BY MR. MAGYAR:
17 Q.  And then if you have any questions or you don't
18    understand what question I've asked at any time, you
19    can clarify.  You can ask to speak with your counsel
20    if you need a break.  The only kind of rules of the
21    road when it comes to that is if I have a question
22    pending, you should answer it before taking any breaks
23    or leaving the room.
24          Does that make sense?
25 A.  Yes.

Page 8

1  Q.  Standard deposition question -- I think I'm going to
2     take it out of my repertoire.  It's so ridiculous.
3     But are you on any like medication or drugs or
4     anything else that would inhibit you from providing
5     accurate or truthful testimony or recalling things
6     today?
7  A.  No.
8  Q.  I think that's about it.  The only other thing is your
9     counsel may lodge objections today, which is perfectly
10    normal and he's entitled to do that.  Only if he tells
11    you not to answer, which is usually only based on a
12    privilege objection, should you not answer.
13    Otherwise, he's only making his objections for the
14    record, but then you still answer my question.
15          Does that make sense?
16 A.  Yes.
17 Q.  Okay.  So you understand, you're here today in some
18    litigation that's pending to which you're a party;
19    my -- my client is the plaintiff, Helena
20    Agri-Enterprises, LLC, right?
21 A.  Yes.
22 Q.  And that's -- not that you have it memorized, but Case
23    Number 1:18-cv-963, in the Western District of
24    Michigan.
25          There was a mediation, and I think you

BOERSEN, STACY
01/15/2020

Page 9

1   attended yesterday; is that right?
2   A.   I can -- I attended a mediation.  I don't know the
3        case number.
4   Q.   And do you understand that the parties, among others,
5        in that case include yourself personally, your son
6        Nicholas Boersen, Great Lakes Grain, LLC -- well,
7        let's take it one at a time.
8             Yourself personally?
9   A.   I understand.
10  Q.   And your son Nicholas --
11  A.   Yes.
12  Q.   -- who's here?
13            Great Lakes Grain, LLC?
14  A.   Yes.
15  Q.   And entities having similar names by II, III, and IV,
16       Great Lakes Grain, LLC?
17  A.   Yes.
18  Q.   As well as New Heights Farms I, LLC?
19  A.   Yes.
20  Q.   And New Heights Farm II, LLC?
21  A.   Yes.
22  Q.   And you understand that those are the parties in this
23       action that there is currently no judgment against;
24       the litigation is proceeding with?
25  A.   That's correct.

Page 10

1   Q.   Okay.  Do you also understand that in the same
2        litigation, there are -- or were other defendants that
3        have consented to judgment?
4   A.   Yes.
5   Q.   And, I guess, we can do it in the same manner with
6        those parties.
7             Those would include Boersen Farms, Inc.,
8        correct?
9   A.   Yes.
10  Q.   And Dennis Boersen?
11  A.   Yes.
12  Q.   And is that your husband?
13  A.   Yes.
14  Q.   Okay.  And Arlan Boersen?
15  A.   Yes.
16  Q.   And who is Arlan?
17  A.   My father-in-law.
18  Q.   So Dennis' father?
19  A.   Yes.
20  Q.   Okay.  And Sandra Boersen?
21  A.   My -- yes.
22  Q.   Okay.
23  A.   My mother-in-law, Dennis' mom.
24  Q.   Dennis' mom.
25            Okay.  And then I don't want to get these

Page 11

1   names wrong, so I'm going to find the exact paragraph.
2   So in addition to Boersen Farms, Inc. that we already
3   talked about, there's Boersen Farms Ag, LLC?
4   A.   Yes.
5   Q.   And Boersen Farms Partners, LLC?
6   A.   Yes.
7   Q.   And Boersen -- let's see.  Boersen Farms Properties,
8        LLC?
9   A.   Yes.
10  Q.   And do you understand that each of those -- and if
11       it's okay with you, do you understand if I refer to
12       all of those -- Dennis, Arlan, Sandra, Boersen Farms,
13       Inc. -- all of those Boersen corporate entities that
14       we've just talked about, as the Boersen parties?  Will
15       you understand what I mean?
16  A.   I will, as long as it excludes New Heights I and II.
17  Q.   It does.
18  A.   And Great Lakes Grain.
19  Q.   Under that definition --
20  A.   Okay.
21  Q.   -- just the parties that have stipulated to a judgment
22       in this lawsuit.
23  A.   Mmm-hmm.
24            MR. VANDER VEEN:  Just a second here,
25       though.  You did talk over each other at one point as

Page 12

1   she said "Great Lakes Grain."  Did you get that down
2   as part of her answer?
3             MR. MAGYAR:  Now, I'm sorry, I don't
4        understand that.  I'm not including Great Lakes Grain
5        in my question.  I'm only including the parties that
6        have stipulated to a judgment in this case.
7             THE WITNESS:  Okay.
8             MR. MAGYAR:  That's what I mean by "Boersen
9        parties."
10            MR. VANDER VEEN:  No, you had asked her
11       about the parties, and she said as long as it doesn't
12       include New Heights Farm I and II, and then you
13       started another question while she started finish- --
14            MR. MAGYAR:  Well, I think I just
15       clarified --
16            MR. VANDER VEEN:  Yeah.
17            MR. MAGYAR:  -- because Great Lakes Grain
18       hasn't stipulated to a judgment.
19            MR. VANDER VEEN:  Right.
20            MR. MAGYAR:  Okay.
21            MR. VANDER VEEN:  But her answer included
22       Great Lakes Grain.  I just want to make sure the
23       record is accurate on that.
24  BY MR. MAGYAR:
25  Q.   So if I refer to the "legacy Boersen parties," it's

BOERSEN, STACY
01/15/2020                                                                    Pages 13–16

1    the same as the Boersen parties, just those ones that
2    have stipulated to judgment.  Does that --
3  A.  **Okay.**
4  Q.  -- make sense?
5         Okay.  All right.  What is your involvement
6    or what was your involvement, if any, in the Boersen
7    corporate parties?  I'm not talking about, obviously,
8    individuals, like Arlan, Sandra, and Dennis, but the
9    Boersen property entities that we just defined.
10 A.  **So I worked for them for probably ten years.  I**
11    **started just doing some basic cleaning, the offices,**
12    **opening mail, basic payroll duties, and that really**
13    **never changed.  Did some bookkeeping for them as far**
14    **as entering bills, that kind of thing.**
15 Q.  Okay.  Did you ever manage any of those entities?
16 A.  **No.**
17 Q.  Did you ever perform any of the, I guess, manual or
18    farming labor for any of those entities?
19 A.  **Not -- I dried some corn for them.**
20 Q.  Okay.  For --
21 A.  **Just checking dryers during the night.**
22 Q.  For all of them or any in particular?
23 A.  **Boersen Farms Grain.**
24 Q.  Okay.  Which I don't know that that's even one of the
25    parties.

1  A.  **It's not.**
2  Q.  Okay.  And so I've just asked you about your
3    involvement with those entities.
4         On the inverse, what is any Boersen party's
5    involvement with, let's say, New Heights Farms I, LLC?
6  A.  **None.**
7         MR. VANDER VEEN:  And just to be clear,
8    "Boersen party," you mean Arlan, Sandy, and Dennis
9    again?
10        MR. MAGYAR:  Yes.
11        MR. VANDER VEEN:  Okay.  Thank you.
12        MR. MAGYAR:  Yep.
13        **THE WITNESS:  None.**
14        MR. MAGYAR:  None.
15 BY MR. MAGYAR:
16 Q.  And what about, if you know, New Heights Farms II,
17    LLC?
18 A.  **None.**
19 Q.  And what about Great Lakes Grain IV, LLC?
20 A.  **None.**
21 Q.  And Great Lakes Grain III, LLC?
22 A.  **None.**
23 Q.  And Great Lakes Grain II, LLC?
24 A.  **None.**
25 Q.  And Great Lakes Grain, LLC?

1  A.  **Dennis was 10 percent owner of Great Lakes Grain.**
2  Q.  Okay.  Now, besides Dennis' 10 percent, any other
3    involvement or ownership or control of Great Lakes
4    Grain, LLC by any of the Boersen parties besides
5    Dennis Boersen?
6  A.  **No.**
7  Q.  Okay.  And just to kind of finish up on what we're --
8    well, maybe not finish, but to further what we're
9    talking about, I'm going to show you what you had
10    previously filed as your affidavit on May 21, 2019.
11        MR. MAGYAR:  I guess we can mark that as
12    Exhibit 1.
13            MARKED FOR IDENTIFICATION
14            DEPOSITION EXHIBIT 1
15            9:10 a.m.
16 BY MR. MAGYAR:
17 Q.  Let me know when you've had a chance to look through
18    that.
19        MR. MAGYAR:  Can we go off the record for
20    just one second?
21        (Off the record at 9:11 a.m.)
22        (Back on the record at 9:12 a.m.)
23 BY MR. MAGYAR:
24 Q.  So you've had a chance to review the affidavit?
25 A.  **I did.**

1  Q.  Okay.  And this is an affidavit you submitted in this
2    litigation on or about May 21st of 2019?
3         I'm just looking at the file date.  It
4    looks like maybe you signed it on the 14th.
5  A.  **Yes, it's signed on the 14th.**
6  Q.  And as I understand this affidavit, it relates to all
7    of the Great Lakes Grain entities other than the
8    original Great Lakes Grain, LLC; is that right?
9  A.  **That's correct.**
10 Q.  Okay.  And you say in it that these three entities
11    were organized at your direction with the intent to
12    seek financing, at least part of what they were
13    organized for; is that right?
14 A.  **That's correct.**
15 Q.  And what was the financing you were seeking with those
16    entities, even whether or not it came to fruition?
17 A.  **I was seeking a line of credit to be able to do**
18    **farming operations.**
19 Q.  Okay.  And that was for what year?
20 A.  **2018, I believe.**
21 Q.  Well, I think the original Great Lakes Grain received
22    financing and farmed for 2018; is that correct?
23 A.  **We didn't receive financing.**
24 Q.  No.  Did Great Lakes -- the original Great Lakes Grain
25    ever receive any financing?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

BOERSEN, STACY
01/15/2020                                                                    Pages 17–20

Page 17

1  A.  No.
2  Q.  Did it farm?
3  A.  Yes.
4  Q.  For what year?
5  A.  2018.
6  Q.  All right.  And how was it able to do that?
7  A.  There was an agreement with Farmland Capital
8      Solutions.
9  Q.  Okay.  Well, I guess while we're talking about that,
10     let me see if we're talking about the same agreement.
11            MR. MAGYAR:  I'm marking Exhibit 2.
12            MARKED FOR IDENTIFICATION
13            DEPOSITION EXHIBIT 2
14            9:14 a.m.
15 BY MR. MAGYAR:
16 Q.  I've marked Exhibit 2, which is a document labeled
17     "Agreement" at the top, and it says that it's made as
18     of May 29, 2018, as the effective date.
19            Do you see that?
20 A.  Yes.
21 Q.  Is this the agreement you're talking about, in terms
22     of an agreement with Farmland Capital Solutions, that
23     the original Great Lakes Grain was entered into to be
24     able to farm for 2018?
25 A.  That's correct.

Page 18

1  Q.  Okay.  Well, let's look at the first paragraph of who
2      the parties are to this agreement.
3            Boersen Farms, Inc., right?
4  A.  Correct.
5  Q.  And Boersen Farms Properties, LLC, right?
6  A.  Yes.
7  Q.  And Boersen Farms Ag, LLC, right?
8  A.  Yes.
9  Q.  And those first three that we've named are part of
10     what we already defined as the Boersen parties who
11     have stipulated to judgment in this case, right?
12 A.  Correct.
13 Q.  And then there's also a Boersen Farms Grain?
14 A.  Yes.
15 Q.  And a Boersen Land Company, LLC?
16 A.  Yes.
17 Q.  And a Boersen Transport, Inc.?
18 A.  Yes.
19 Q.  Then it goes on to some individuals.  There's Arlan
20     Boersen, correct?
21 A.  Yes.
22 Q.  And Sandra Boersen?
23 A.  Yes.
24 Q.  And those two, as we've discussed, are also Boersen
25     parties that have stipulated to judgment in this case?

Page 19

1  A.  Yes.
2  Q.  Sandy Boersen?
3  A.  Yes.
4  Q.  Who's Sandy Boersen?
5  A.  It says Sandra L. Boersen, also known as Sandy.
6  Q.  Oh, okay.  Thank you for clarifying that.  I was
7      making sure -- I didn't know who it was -- I wasn't
8      missing somebody.
9            And then Dennis Boersen is a party, right?
10 A.  Yes.
11 Q.  And he's also one who stipulated to judgment in this
12     case?
13 A.  Yes.
14 Q.  And Ross Boersen is a party?
15 A.  Yes.
16 Q.  And then Great Lakes Grain, LLC is a party?
17 A.  Yes.
18 Q.  And Zeeland Property Investments, LLC is a party?
19 A.  Yes.
20 Q.  And Ceres Farms, LLC is a party, right?
21 A.  Yes.
22 Q.  Who is Ceres Farms, LLC?
23 A.  Ceres Farms is part of the Farmland Capital Solutions.
24     They are a company that buys land and rents it to
25     several different farmers.

Page 20

1  Q.  Okay.  And I believe this agreement sets out just what
2      you just said, that Farmland Capital Solutions is --
3      or Ceres Farms, LLC is an owner or the sole member of
4      Farmland Capital Solutions; is that accurate?
5  A.  To the best of my knowledge.
6  Q.  Okay.  And how was it, generally, that this agreement
7      made it so that Great Lakes Grain could farm the 2018
8      crop year without independent financing?
9  A.  Generally, the agreement gave Great Lakes Grain the
10     ability to farm the acres available from Ceres, and
11     they held their rent until the end of the year so that
12     we could farm those acres.
13 Q.  Okay.  Now, on the recitals here, in Recital D, it
14     says:  Great Lakes Grain, LLC is a recently organized
15     Michigan limited liability company, which is owned
16     and/or controlled by some or all of the Boersen
17     parties.  Do you see that?
18 A.  Yes.
19 Q.  And the Boersen parties are defined, up in that first
20     paragraph that we went through, as basically every --
21     every person or entity with the name Boersen in it; so
22     not including Great Lakes Grain, LLC or Zeeland
23     Property Investment, LLC or Ceres Farms, LLC; is that
24     right?
25 A.  Well, it says "by some or all," so ...

BOERSEN, STACY
01/15/2020

Page 21

1   Q.   I just asked who -- when it says "Boersen parties" in
2        Recital D, it's referring to every Boersen entity
3        listed or individual listed in that first paragraph,
4        right?
5   A.   I -- I don't believe so.  I don't read it that way.
6   Q.   All right.  Well, let's look at that first paragraph,
7        kind of in the middle, right -- right before it says:
8        Great Lakes Grain, LLC.
9   A.   Mmm-hmm.
10  Q.   Do you see where it says:  Boersen parties, in
11       parentheses?
12  A.   Yes.
13  Q.   And it's saying that the foregoing parties are
14       collectively referred to as the Boersen parties?
15  A.   The foregoing.
16  Q.   Right.
17  A.   Great Lakes Grain is listed after that.
18  Q.   I'm asking about just anything that says "Boersen" in
19       it --
20  A.   Okay.
21  Q.   -- in this first paragraph, whether it's a person or
22       an individual -- not Great Lakes Grain, not Zeeland
23       Property, not Ceres -- that's who the Boersen parties
24       are?
25  A.   Correct.

Page 22

1   Q.   Okay.  So going back down to Recital D, I do -- I
2        understand that Dennis Boersen, under your testimony,
3        was a 10 percent minority owner in the original Great
4        Lakes Grain.
5             Who else are the some or all of those
6        Boersen parties, if any, that own or control Great
7        Lakes Grain, LLC?
8   A.   None.
9   Q.   So -- so your testimony is that Recital D could have
10       said, instead of what it says, instead of some or all,
11       it could have just said:  Only Dennis and Stacy
12       Boersen own or control Great Lakes Grain, LLC?
13  A.   I would agree.
14  Q.   That would have been more accurate?
15  A.   Yes.
16  Q.   Did you tell anyone that that should be clarified?  It
17       might give the wrong impression that there's more
18       involvement by Boersens than just you and Dennis?
19  A.   I did not.
20  Q.   But you signed this agreement, right?
21  A.   Correct.
22  Q.   And then in Recital F, second -- next page of the same
23       document, it says:  The Boersen parties, Great Lakes
24       Grain, LLC -- well, I'm sorry.  Let's move up to
25       Recital E.  I don't want to skip over.

Page 23

1             The same page, just right above that
2        Recital F, on Recital E, it says:  Zeeland Property
3        Investments, LLC -- and then it uses the same language
4        as the paragraph we just looked at -- is a recently
5        organized Michigan limited liability company, which is
6        owned and controlled by some or all of the Boersen
7        parties.
8             Is that paragraph also inaccurate?
9             MR. VANDER VEEN:  Objection.  You said
10       "inaccurate"?  The other paragraph was not inaccurate.
11       She's testified that it was accurate.
12            MR. MAGYAR:  You can object.  We don't need
13       speaking objections, and especially if you're leaving
14       in two hours, but you can object.
15            MR. VANDER VEEN:  I'm not leaving in two
16       hours.  The deposition is going to be adjourned in two
17       hours.
18            MR. MAGYAR:  Well, there's going to be a
19       two-hour break.
20            MR. VANDER VEEN:  Right.
21            MR. MAGYAR:  So I'd rather limit the
22       speaking objections so I can get through my
23       questioning.
24            MR. VANDER VEEN:  But you need to
25       accurately state what the --

Page 24

1             MR. MAGYAR:  Make an objection --
2             MR. VANDER VEEN:  I did.
3             MR. MAGYAR:  -- without speaking, okay?
4        Thanks.  Because I disagree with you.
5             THE WITNESS:  What was the question?
6   BY MR. MAGYAR:
7   Q.   The question was, with the objection on the record, is
8        Recital E inaccurate, as well?
9   A.   I don't know.
10  Q.   All right.  Who are the Boersen -- the some or all of
11       the Boersen parties who own or control Zeeland
12       Property Investments, LLC?
13  A.   I don't know.
14  Q.   What is Zeeland Property Investments, LLC?
15  A.   I don't know.
16  Q.   So you wouldn't be one of the owners or controllers of
17       that entity?
18  A.   I don't believe so.
19  Q.   Okay.  And the next paragraph, the next recital
20       paragraph F, it says:  The Boersen parties, the Great
21       Lakes Grain, LLC and Zeeland Property Investments, LLC
22       desire and have requested that Ceres enter into a
23       number of leases with Great Lakes, which will allow
24       Great Lakes to lease and farm certain farms owned by
25       Ceres.  And I'll just stop there, because there's a

BOERSEN, STACY
01/15/2020

Page 25

1     semicolon there.
2         Is it your understanding that those
3     entities all desired and were seeking these leases so
4     that Great Lakes could farm certain farms?
5 **A.**  **That all the parties were trying to lease the land; is**
6     **that what you're saying?**
7 Q.  Well, it's saying that Boersen Farms --
8 **A.**  **I know that my -- my part, the Great Lakes Grain,**
9     **desired to lease the property from Ceres, correct.**
10 Q.  Okay.  Do you have any insight as to why all of these
11     Boersen parties desired to have Ceres enter into the
12     leases with Great Lakes?
13 **A.**  **I can't speak for the other parties, no.**
14 Q.  Have you spoken to anyone about this agreement that
15     was a Boersen party?
16 **A.**  **No.**
17 Q.  Did you speak with your husband about this agreement?
18     He's a Boersen party, right?
19 **A.**  **Correct.**
20 Q.  Okay.  So you have no idea why any of the Boersen
21     parties would indicate their desire for this agreement
22     that's listed here in Recital F?
23 **A.**  **Besides Dennis, as part of Great Lakes Grain.**
24 Q.  Right.  But where it says, "the Boersen parties
25     desire," amongst the others who desired, you don't

Page 26

1     know why they desired that?
2 **A.**  **No.**
3 Q.  And just to confirm, when we looked at the back of
4     this agreement, that is signed by all the Boersen
5     parties, right?
6 **A.**  **Yes.**
7 Q.  What benefit would a Boersen party receive out of
8     signing on to this agreement?
9 **A.**  **None.**
10 Q.  Were any debts owed by Boersen parties being paid to
11     Ceres as a result of this agreement?
12 **A.**  **I don't believe so.**
13 Q.  Were any revenue as a result of crops farmed by Great
14     Lakes Grain, LLC, in 2018, used under this agreement
15     to pay Ceres for debts owed by Boersen parties?
16 **A.**  **No.**
17 Q.  If you flip ahead to the same agreement, now I'm on
18     paragraph 14 called "Equipment."
19         Go ahead and take -- it's kind of a lengthy
20     paragraph that goes just a little bit onto the next
21     page.  So go ahead and take a moment, if you would, to
22     read that.  Let me know when you've had a chance.
23 **A.**  **Okay.**
24 Q.  First sentence says that:  Ceres and/or Farmland
25     Capital has security interest in security equipment

Page 27

1     owned by some or all of the Boersen parties.
2         Do you see that first sentence?
3 **A.**  **Yes.**
4 Q.  Do you -- do you have any knowledge about that being
5     the case in terms of Ceres having some security
6     interests of equipment owned by any Boersen party?
7 **A.**  **I don't have knowledge of that, no.**
8 Q.  Okay.  So you wouldn't know, when it says "some or
9     all," once again, what Boersen parties we're talking
10     about?
11 **A.**  **No.**
12 Q.  But you have some leases with Boersen parties to lease
13     some equipment, right?
14 **A.**  **For '18 and '19, we did, yes.**
15 Q.  But you don't know whether any of that equipment
16     you're leasing is the same equipment that's being
17     talked about here?
18 **A.**  **I do not know.**
19 Q.  The second sentence talks about financial
20     accommodations that Ceres is giving the Boersen
21     parties under this agreement.
22         Do you see that?
23 **A.**  **Yes.**
24 Q.  What -- what are those financial accommodations?
25 **A.**  **I can speak as to Great Lakes Grain.**

Page 28

1 Q.  I'd like you to speak as a party to this contract that
2     you signed, if you would.
3 **A.**  **My only part in this contract was under Great Lakes**
4     **Grain.  So I can speak to the knowledge I know about**
5     **my company, Great Lakes Grain.**
6 Q.  All right.  Does it tell me somewhere in here that
7     you're only signing and you can only speak about an
8     agreement you're signing as to only portions of it?
9         MR. VANDER VEEN:  You're talking about like
10     the signature line?
11         MR. MAGYAR:  I'm asking if there's a
12     portion in the contract that the witness can point to
13     me that disclaims or -- or makes her a party to only
14     portions of it.
15         **THE WITNESS:  Well, I mean, I signed for**
16     **Great Lakes Grain.  I did not sign for any of the**
17     **other Boersen parties.  Great Lakes Grain is all I**
18     **signed for.**
19 BY MR. MAGYAR:
20 Q.  Okay.  But you're a party to the entire agreement,
21     right?
22 **A.**  **I am a party to the agreement, yes.**
23 Q.  And those other parties that we're talking about
24     included your husband and your mother-in-law and your
25     father-in-law, right?

BOERSEN, STACY
01/15/2020                                                                    Pages 29–32

Page 29

1   A.   Yes.
2   Q.   And if we go back to Recital F, which was the second
3        page of the document, it again talks about to provide
4        the Boersen parties and Great Lakes -- this is the
5        second to the last line -- certain financial
6        accommodations which will allow Great Lakes to produce
7        farm crops on such farms in 2018.
8             Do you see that?
9   A.   Yes.
10  Q.   So I would ask you again if you understand, based on
11       being a party to this contract, what is meant by
12       "financial accommodations"?
13  A.   I understand what is meant by financial accommodations
14       to Great Lakes Grain, which was postponing rent due
15       that year so that we were able to farm, and so I was
16       able to farm in 2018.
17  Q.   And why was Ceres agreeing -- or what consideration
18       was Ceres getting for the postponement of rent?
19  A.   What consideration?
20  Q.   Yeah.
21  A.   I mean --
22  Q.   Why did Ceres agree to postpone to make that, as it
23       says, financial accommodation?
24  A.   I guess that would be a question for them.
25  Q.   You don't have an understanding as being a contracting

Page 30

1        partner with them in this agreement?
2             MR. VANDER VEEN:  Objection, characterizes
3        her as a partner with Ceres, and she's not a partner
4        in Ceres.
5             MR. MAGYAR:  I don't need -- I said
6        "contracting partner," not a partner in Ceres, and
7        your objection alone will do.  Thank you.
8             THE WITNESS:  Can you repeat the question,
9        please?
10  BY MR. MAGYAR:
11  Q.   So you don't understand, as a party to this agreement,
12       what would have motivated Ceres to make that financial
13       accommodation?
14  A.   I just know that I met with them.  It was a lot of
15       ground, for them, to stand idle in the year if -- if I
16       did not farm it, and so that was -- they were going to
17       get paid no matter what on the land rent, because they
18       had a lien on my crop.  And so I'm assuming that
19       rather than having their land stand idle for 2018,
20       that many acres, that is why they chose to
21       postpone rent.
22  Q.   Okay.  So what's the point of the Boersen parties
23       being signatories to this agreement?
24  A.   I don't know.
25  Q.   Now, back to that paragraph 14 that we started to look

Page 31

1        at regarding equipment.
2             Do you know whether Ceres -- and I'm
3        looking in the second sentence -- Ceres or Farmland
4        ever released or paid over proceeds from the sale of
5        any equipment that it had a security interest on?
6   A.   I don't know.  Great Lakes Grain never owned
7        equipment.
8   Q.   What equipment did Great Lakes Grain use?
9   A.   It rented equipment.
10  Q.   From who?
11  A.   From Boersen Farms & Affiliates.
12  Q.   So if we looked at those leases, you would have
13       knowledge of that as one of the -- from Great Lakes
14       Grain's perspective, the party renting the equipment,
15       right?
16  A.   I had a lease with Great -- or with Boersen Farms &
17       Affiliates to rent equipment.
18  Q.   And we're just talking about for Great Lakes Grain,
19       right, right now?
20  A.   (Nodded head.)
21             MR. VANDER VEEN:  You have to answer
22        verbally.
23             THE WITNESS:  Yes.  Sorry.
24  BY MR. MAGYAR:
25  Q.   So let's move beyond the 2018 crop year.

Page 32

1             Has Great Lakes Grain, the original, farmed
2        in any subsequent year?
3   A.   After 2018?
4   Q.   Right.
5   A.   There was maybe around 2,000 acres of winter wheat
6        that was planted in 2018.  Technically, the profit
7        comes in in 2019.
8   Q.   Okay.  Was the actual farming done in 2018?
9   A.   The actual planting of the crop?
10  Q.   Yeah.  Yeah.
11  A.   It's harvested in the spring, though, of 2019.
12  Q.   Okay.  After that, anything more by Great Lakes Grain?
13  A.   No.
14  Q.   And why not?
15  A.   We -- I mean, we couldn't get financing in Great Lakes
16       Grain.  I could not secure a finance year in Great
17       Lakes Grain.
18  Q.   And was that based on this lawsuit, is that why, or
19       are there other reasons?
20  A.   Yeah, some -- yeah.  Yes.
21  Q.   And was that -- we talked earlier about the Great
22       Lakes Grain II, III, and IV entities.
23  A.   Yes.
24  Q.   Was that how they came into the mix, to try to obtain
25       the financing that the original Great Lakes Grain

**BOERSEN, STACY**
01/15/2020

Pages 33—36

Page 33

1  wasn't obtaining?
2  A.  Yeah.  I started those companies in order to hopefully
3      get a line of credit but was unable to.
4  Q.  Okay.  And why were those parties not able to?
5  A.  Part because of the lawsuits.
6  Q.  Were they too --
7  A.  Or this lawsuit.
8  Q.  Did anyone tell you that it was too similar to the
9      original Great Lakes Grain that was a party to the
10     suit or anything like that?
11  A.  Not that I recall.
12  Q.  So why were they unsuccessful, those entities, the
13     Great Lakes Grain II, III, IV, in getting the
14     financing?
15  A.  I would say partly because of this lawsuit.
16  Q.  Okay.  But if it's because of this lawsuit but not
17     because they sound like the defendant Great Lakes
18     Grain, then why do you think it's because of this
19     lawsuit?
20  A.  Because, I mean, that's a huge lawsuit on a new
21     company, 15 million dollars.
22  Q.  Right.  But I think what I'm understanding you saying
23     is that these were new companies; they weren't the
24     original Great Lakes Grain, right?
25  A.  That's correct.  I owned them solely myself.

Page 34

1  Q.  Okay.  And so you're saying it's because of this
2      litigation that they couldn't get financing.
3          Is it because they were too close sounding
4      in name to the original Great Lakes, or why -- why
5      would this lawsuit impede Great Lakes Grain II, III,
6      and IV from getting financing?
7  A.  Well, because it's my name on the lawsuit.  You're
8      suing me personally.
9  Q.  Well, I'm talking about at the time you were trying to
10     get financing.  So I think we need to have a time
11     frame here.  I don't think you were a party to the
12     suit at that time, right?
13  A.  Not personally, but Great Lakes Grain was.
14  Q.  Okay.  But I think you just --
15  A.  You added II, III, and IV maybe later.
16  Q.  Right.
17  A.  Mmm-hmm.
18  Q.  Okay.  And your testimony, while -- while you were not
19     a party to the suit and only the original Great Lakes
20     Grain was a party to the suit --
21  A.  Mmm-hmm.
22  Q.  -- you attempted to get financing by Great Lakes Grain
23     II, III, or IV --
24  A.  That's correct.
25  Q.  -- and you said you couldn't because -- partly because

Page 35

1      of this lawsuit, right?
2  A.  Correct.
3  Q.  And I'm trying to understand why, then, this lawsuit
4      impeded those which were not, at the time, yet parties
5      to the case and nor were you, why -- why you believe
6      that impeded them from getting financing?
7  A.  I can only speak as to the lender, potential lender,
8      said because of the lawsuits.  So that is all I can
9      speak to.  He did not say whether it was related to
10     the sounding of the name, like you're suggesting, or
11     anything like that.  He did not say.
12  Q.  Okay.  So if we move forward then, you were able to
13     create an entity that did get financing called New
14     Heights Farms I, LLC, right?
15  A.  That is correct.
16  Q.  What do you believe is the basis for New Heights being
17     able to get financing where Great Lakes Grain II, III,
18     and IV had previously been unsuccessful?
19  A.  Well, I think we just found somebody that fit our
20     portfolio better.  You know, Nick and I decided to go
21     off on our own.  We did this on our own.  Got our own
22     financing.  These people that we are financed with, Ag
23     Resource Management, they are known for wanting to
24     help first-time farmers.
25  Q.  Okay.  So they were not the ones who denied Great

Page 36

1      Lakes Grain II, III, and IV?
2  A.  No.
3  Q.  Okay.  What, in your mind, was the motivation to, I
4      guess, go through the rigamarole of a whole new entity
5      in New Heights rather than, say, take Great Lakes
6      Grain II, III, or IV on the road; after you were
7      unsuccessful with one, take them to this other lender
8      that you were successful with who wants to help new
9      entities?  What made you think you needed a new entity
10     at that time?
11  A.  So my son came to me after his first semester of
12     college, and it looked like he did not like school.
13     And he came to me and asked me if -- all he wanted to
14     do was farm.  So we sat down and we brainstormed, and
15     I said I would help him any way I could.
16          And we went out and got our own financing
17     with ARM.  Him and I sat down and brainstormed for a
18     name; had really nothing to do with trying not to use
19     Great Lakes Grain or anything like that, but we -- we
20     came up with the name together.
21  Q.  Okay.  So you didn't -- I mean, but, presumably, at
22     the time, you still had these, for lack of a better
23     word, shell companies that were already created and in
24     existence, just sitting there doing nothing, right?
25  A.  Correct.

BOERSEN, STACY
01/15/2020                                                                 Pages 37–40

Page 37

```
1    Q.   So did you discuss with Nick at all --
2              MR. MAGYAR:  Do you go by Nick or Nicholas?
3              MR. BOERSEN:  Nick.
4    BY MR. MAGYAR:
5    Q.   -- Nick just using one of those, or you --
6    A.   I really didn't discuss that with him.
7    Q.   Do you have to pay a fee to organize an LLC?
8    A.   No.
9    Q.   No?
10             All right.  I want to talk about crop
11        insurance.  Great Lakes Grain, the original for the
12        2018 year, when it had the arrangement with Ceres to
13        defer the rent, that was insured, right?  It had crop
14        insurance?
15   A.   Correct.
16   Q.   And who was that through?
17   A.   Great American Crop Insurance.
18   Q.   Okay.  And what did you have to do to obtain that crop
19        insurance?
20   A.   I called Chris Shellenbarger, who was my insurance
21        agent, and she set it all up for me.
22   Q.   Okay.  And do you remember what she had to do to set
23        it up?
24   A.   I don't know what she did to set it up, no.
25   Q.   And what's your understanding of the purpose of crop
```

Page 38

```
1         insurance?
2    A.   It's to cover for crop disaster.  It can cover for --
3         for low yields, hail, rain, replants.
4    Q.   And what is your understanding of the types of crop
5         insurance, or is that basically what you just
6         described?
7    A.   Yeah, basically.
8    Q.   I mean, are there different types for -- depending on
9         what type of disaster you just mentioned?
10   A.   I mean, you can buy -- it's just like -- you can buy
11        all different types of crop insurance.  As far as, you
12        know, maybe you only buy crop insurance for a replant
13        if you have too much rain; or you buy crop
14        insurance -- you can buy all the way up to losing
15        yields.
16   Q.   And what did -- what did Great Lakes Grain have for
17        2018?
18   A.   It was just a basic municipal policy.
19   Q.   And what about New Heights Farms I, LLC for 2019, what
20        insurance did it have, if any?
21   A.   We have Great American Crop Insurance and ARMtech.
22   Q.   And does the policy -- are those two different
23        policies then?
24   A.   Correct.
25   Q.   And what did those cover?  I think you described the
```

Page 39

```
1         basic nature of the Great Lakes Grain.  Is it
2         different for these policies?
3    A.   So the -- the ARMtech is an added-on policy, and it's
4         a band coverage; so it covers your yield, things like
5         your test weights.  It's -- it's just -- it's like an
6         addition to your --
7    Q.   And what --
8    A.   -- regular crop insurance.
9    Q.   Okay.  And what about that regular policy?
10   A.   It would be for the same -- all the same.
11   Q.   As what the -- as what the Great Lakes Grain was for
12        2018?
13   A.   That one, I think New Heights II differs -- or New
14        Heights Farms differ a little bit from what Great
15        Lakes Grain is, but I would have to look at the
16        policies exactly.
17   Q.   But you think it may have some differences; pretty
18        similar, though?
19   A.   Yes.
20   Q.   And you obtained a lender for New Heights for the 2019
21        crop year, right?
22   A.   Yes.
23   Q.   Who is that?
24   A.   Ag Resource Management.
25   Q.   And they, presumably -- we'll get into documents
```

Page 40

```
1         later.  But just as a general matter, they have a
2         security interest or a lien on the 2019 crop as part
3         of that loan arrangement, right?
4    A.   The crop and the crop insurance.
5    Q.   And when you say that, you mean if you did have to
6         make a claim because of some disaster, this lender
7         would be entitled to the proceeds, the payout of the
8         insurance; is that right?
9    A.   Correct, until they're paid off in full.
10   Q.   And I know you already said it, but I just want to
11        make sure I understand it, who is your crop insurance
12        company?
13   A.   Great American.
14   Q.   And your broker?
15   A.   Chris Shellenbarger.
16   Q.   Is that the same for both Great Lakes Grain, the
17        original, and New Heights Farms I?
18   A.   Yes.
19   Q.   Okay.  What about New Heights Farms II?
20   A.   Are you asking me is it the same crop insurance?
21   Q.   Yes.
22   A.   Correct.
23   Q.   And are you an owner or manager of New Heights Farms
24        II?
25   A.   No.
```

**BOERSEN, STACY**
01/15/2020                                                          Pages 41–44

Page 41

1  Q.  But it sounds like you have knowledge of the workings
2      of that entity?
3  A.  Yes.
4  Q.  Okay.  And that's based on your collaboration with
5      your son or discussions with your son?
6  A.  Correct.
7  Q.  How were you introduced to Great American as -- as an
8      insurance company?
9  A.  Chris was doing insurance for Dennis for years; and so
10     when I took on Great Lakes Grain, I went to her.
11 Q.  Okay.  So that was a relationship for insurance that
12     existed prior to Great Lakes Grain with the Boersen
13     parties?
14 A.  Yes.
15 Q.  Okay.  Where are their offices, this Great American?
16 A.  I don't know where their office is.  She's from like
17     Petoskey or some area.
18 Q.  Okay.  What was your mode of communication, mostly?
19     Would you email?  Call?
20 A.  I just pick up the phone and call her and ask -- you
21     know, told her to put the policies together and in
22     place.  And for New Heights, then she worked pretty
23     directly with ARM to get the coverage that they
24     required for our line of credit.
25 Q.  Okay.  And so with her being up there and you guys

Page 42

1      talking by phone a lot, when she would need
2      information, documents, anything she may need for
3      the -- for the application process for the insurance,
4      how would you communicate that to her?
5  A.  Probably by email.
6  Q.  Now, I know you testified regarding this add-on
7      coverage for New Heights.  Other than that, have you
8      worked with any other crop insurance companies?
9  A.  No.
10 Q.  But that is a separate company, this ARMtech, than --
11 A.  Yeah.  I mean, Chris -- I mean, it's separate from the
12     Great American.  It's called ARMtech.
13 Q.  Do they kind of specialize on these --
14 A.  Band coverage, correct.
15 Q.  Okay.  Are you familiar with Actual Production
16     Histories?
17 A.  APHs, yes.
18 Q.  Sorry.  I should have just said it that way.  At least
19     we have, for the record, what that stands for.
20         How is that information collected?  Well,
21     actually, let's even scratch that question.
22         What is an APH?
23 A.  It's the history of a certain amount of bushel that's
24     produced on a certain piece of property or farm.
25 Q.  And how is that information collected?

Page 43

1  A.  It's reported to the crop insurance every year.
2  Q.  How do you collect it in order to be able to report
3      it?
4  A.  We have monitors that we can monitor what's going into
5      the combine on the properties, and we pull that data.
6  Q.  And I think you just answered my next question.  To
7      whom is it reported?  It's to the insurer.  Anybody
8      else?
9  A.  I think the counties probably can have record to that,
10     too, the FSA offices.
11 Q.  And what effect, if any, does a farmer's APH have on
12     the ability to get crop insurance?
13 A.  None.
14 Q.  Will it affect the rates?
15 A.  The rates of the crop insurance?
16 Q.  Yeah.
17 A.  No.
18 Q.  So what is the -- if it doesn't affect the ability to
19     obtain rates, what is the purpose of the requirement
20     of APH?
21 A.  So an APH would be set on a field.  So let's say I'm
22     farming a particular acre or farm, and the APH is,
23     just say, 180, which would be 180 bushel per acre.  So
24     if I come in under that, then that would -- on that --
25     on that farm, then that would trigger payment from the

Page 44

1      crop insurance.
2  Q.  All right.  Well, then, I guess, maybe I'm getting
3      ahead of myself.
4          Do you have to establish that that 180 is a
5      reasonable number or likely to be obtained in order
6      for an insurance company to say, you know, "Okay,
7      we'll pay you if you don't make it," or they just take
8      your word for it?
9  A.  I guess I don't understand your question.
10 Q.  Well, you said if you fall short of what your -- are
11     you saying that you basically have sort of estimates
12     of what's going to happen in the year for -- for your
13     crop; is that what you're saying when you talked about
14     the 180?  An anticipated yield?
15 A.  Yeah, I mean, we always have anticipated yield.
16 Q.  I mean, I don't want to put words in your mouth.  Help
17     me understand what you meant by the example with the
18     180.
19 A.  So, in other words, if -- if for some reason our
20     bushel on those acres fell below a certain percent of
21     what the APH is, then that would trigger a possible
22     loss on your crop insurance.
23 Q.  Okay.  So the APH, when you talk about the 180, you're
24     talking about that was -- and, you know, usually
25     actual production history -- that was like the

BOERSEN, STACY
01/15/2020                                                                                    Pages 45–48

1     previous year of production?
2  A.  Usually, it goes back, I believe, three -- three to
3     five, but you can -- yeah.
4  Q.  How much APH did you have to submit, for example, for
5     Great Lakes Grain for the 2018 year?
6  A.  I didn't submit any APHs.
7  Q.  How did you get insurance for Great Lakes Grain?
8  A.  I called Chris.
9  Q.  Okay.  And how did she get -- how did your agent, as
10    your agent, get Great Lakes Grain insurance for 2018?
11  A.  I don't know how she did.
12  Q.  Well --
13  A.  She filled out the application.  I reviewed and
14    signed.
15  Q.  All right.  Would it be fair to say, based on your
16    knowledge of the industry and working in it, that in
17    order to obtain insurance, you have to submit a
18    certain number of years' worth of this production
19    history?
20  A.  No.
21  Q.  Okay.  So, I mean, it's -- did Great Lakes Grain have
22    to submit some of the Boersen entities' prior
23    production history as part of this crop insurance
24    endeavor for Great Lakes Grain?
25  A.  I did not submit anything to Chris.  Like I said, I

1    picked up the phone and I called her and she did
2    the -- she did the application.
3  Q.  But I think we said earlier that she was the one
4    already -- she already had all that information and
5    did all the work for the Boersen parties before that,
6    right?
7  A.  I would assume so.
8  Q.  All right.  So what kinds of documents, if any, did
9    Chris need from you to put together these
10    applications?
11  A.  I called her.  She filled out the application.  The
12    only thing I provided her with was the list of the
13    farms that I was going to be farming.
14  Q.  That's for Great Lakes Grain?
15  A.  Great Lakes Grain.  Also, New Heights I and II.
16  Q.  Okay.  Were you the point person or was it Nicholas
17    for -- or Nick, for New Heights Farm II, LLC, when
18    having these dealings with Chris?
19  A.  We both met with Chris.
20  Q.  Okay.  Or responded to any questions she had or
21    provided --
22  A.  Correct.
23  Q.  -- that information, just whoever she could reach?
24  A.  Mmm-hmm.  Yes.
25  Q.  So besides -- well, would APH be some of the

1    information you need to get to Chris?
2  A.  No.
3  Q.  What -- what would you give to her?  I'm sorry if you
4    just said it, but ...
5  A.  I gave her the list of farms that we would be farming.
6  Q.  And that's it?
7  A.  Yes.
8  Q.  Were any of the farms on that list farms that no
9    Boersen entity had ever farmed?
10  A.  I -- no.
11  Q.  So if Chris had the records from her prior work for
12    these Boersen entities, she would have them for every
13    piece of track/property/land that Great Lakes Grain or
14    New Heights Farm was farming; is that accurate?
15  A.  I would assume so.
16  Q.  Are you familiar with the beginning farmer/rancher
17    rules that apply to crop insurance?
18  A.  Some.
19  Q.  Is that what you were farming as under Great Lakes
20    Grain, a beginning farmer?
21  A.  No.
22  Q.  Okay.  What about New Heights Farms I or II?
23  A.  New Heights Farms II.
24  Q.  Was a beginning farmer?
25  A.  Mmm-hmm.

1  Q.  What was Great Lakes Grain farming as?
2  A.  I mean, I -- I don't understand the question, I guess.
3  Q.  If not a beginner, what was it farming?
4  A.  Not a beginner.  I don't know what they would call
5    that.
6  Q.  Okay.  And that's the same for New Heights I?
7  A.  Correct.
8  Q.  Before moving on that line of questioning, because we
9    were just talking about your agent Chris, you don't
10    know one way or the other whether she used Boersen
11    properties' information -- or any Boersen party's APH
12    or historical data in doing the applications for
13    Great Lakes Grain or New Heights I?
14         MR. VANDER VEEN:  Just to clarify, the
15    Boersen parties, you're talking about the Boersen
16    parties that are parties to this suit --
17         MR. MAGYAR:  Correct.
18         MR. VANDER VEEN:  -- that you identified
19    earlier?
20         MR. MAGYAR:  Correct.
21         THE WITNESS:  You would have to ask her.  I
22    don't know.
23         MR. MAGYAR:  You don't know.
24  BY MR. MAGYAR:
25  Q.  So, presumably, if she did, but you don't know, she

BOERSEN, STACY
01/15/2020                                                                                          Pages 49–52

1    would have had to have sought their permission to use
2    their -- to submit their information with somebody
3    else's application?
4  A.  I don't know.
5  Q.  Okay.  So for any Boersen party for which they used
6    Chris as their agent for insurance, do you know which
7    Boersen entities used Chris and -- and Great American?
8  A.  I know Boersen Farms Grain did.
9  Q.  Okay.
10  A.  I believe probably all the entities did for crop
11    insurance that had crop insurance.
12  Q.  And I think you already testified, so I can probably
13    skip this one, but just to confirm, you weren't
14    involved in the farming operation of any of those
15    Boersen parties --
16  A.  No.
17  Q.  -- correct?
18                And you didn't participate in the operation
19    or establishment of the yield production for the
20    acreage for those Boersen parties?
21  A.  No.
22  Q.  Did you have a share of the crop on the acreage from
23    any Boersen party?
24                MR. VANDER VEEN:  Again, just to be clear,
25    we're talking about the Boersen companies that are

1    listed on the caption, right?
2                MR. MAGYAR:  Well, I'll open it up.  That's
3    a good clarification.
4  BY MR. MAGYAR:
5  Q.  How about any of the Boersen parties listed in that
6    agreement that we -- we looked at with Ceres,
7    Exhibit 2, that we talked about the definition of the
8    Boersen parties in there?
9  A.  I believe, at some point, I had a small share in
10    Boersen Farms Grain.
11  Q.  Okay.  What was your share?
12  A.  I don't -- I don't even know off --
13  Q.  But you didn't manage --
14  A.  No.
15  Q.  -- Boersen Farms Grain?  You didn't do the farming
16    work, right?  Other than I think we talked about
17    the -- was there corn --
18  A.  Yeah.
19  Q.  Yeah.
20  A.  And, you know, I might have ran parts to the field or,
21    also, maybe a seed tender, that kind of thing.
22  Q.  Okay.  And, I guess, to sort of note that
23    clarification that counsel made, other than Great
24    Lakes Grain -- well, is Great Lakes Grain, the
25    original, your first farming entity, so to speak?

1  A.  Yes.
2  Q.  So whether we're talking about the farm -- a defined
3    Boersen party or any other entity on earth, it would
4    be the same testimony; that you weren't the manager or
5    owner or controller or farmer of that entity, because
6    you start with Great Lakes Grain in 2018; is that
7    right?
8  A.  Just what my involvement was in the Boersen Farms
9    Grain.
10  Q.  Right, which we've talked about.
11  A.  But I wasn't a manager, no.
12  Q.  Of any farm?
13  A.  I -- I -- yeah, I performed small farming functions
14    for Boersen Farms Grain.
15  Q.  Okay.  Okay.  I just want to make sure there's not
16    some oddball, outlier company that we're just totally
17    overlooking or not talking about, so --
18  A.  No.
19  Q.  Okay.  And does Great Lakes Grain, the original, the
20    2018 one, does that exist as a company anymore in
21    terms of being active with the State of Michigan as a
22    limited liability company?
23  A.  I don't know if it's active right now.  I know that
24    it's not performing any crops --
25  Q.  Okay.

1  A.  -- in 2019, besides to finish that winter wheat in the
2    spring.
3  Q.  Why did Dennis have a 10 percent minority interest in
4    the original Great Lakes Grain?  Dennis Boersen.
5  A.  What do you -- I guess I don't understand the
6    question.  Why?
7  Q.  Yeah.  What was -- I mean, I think you said he doesn't
8    have any interest in New Heights I --
9  A.  No.
10  Q.  -- or New Heights II.
11  A.  No.  So him and I were going to go, you know, into
12    business together to do Great Lakes Grain, and we were
13    hoping to continue farming in 2019, with Great Lakes
14    Grain, and years beyond.
15  Q.  But now you're not in business with him?
16  A.  No.
17  Q.  So if that was the hope, what changed?
18  A.  What changed?
19  Q.  Yeah.  You hoped to go into business together; now
20    you're not.
21  A.  Because my son came to me, and we had a unique
22    business opportunity to start together.
23  Q.  So it had nothing to do with Dennis having other
24    creditors, judgments?
25  A.  Absolutely it did, yes.

BOERSEN, STACY
01/15/2020

Pages 53–56

Page 53

1  Q.  In your, I mean, I guess, relatively brief experience
2      with at least the new entities getting insurance,
3      Great Lakes Grain and New Heights I, have you -- has
4      the amount of coverage varied?
5  A.  **Well, this year, we bought extra coverage in order to**
6      **keep our line of credit happy --**
7  Q.  Right, the --
8  A.  **-- with the amount, the band coverage, yes.  So that**
9      **was something brand-new for me to see.**
10 Q.  Because, for instance, in one of the documents we just
11     received in your production, there was a payment of --
12     I can submit it if you want me to, but --
13             MR. MAGYAR:  I guess we can just mark it as
14     an exhibit, but it's really just to help with the
15     questioning.
16             MARKED FOR IDENTIFICATION
17             DEPOSITION EXHIBIT 3
18             10:00 a.m.
19 BY MR. MAGYAR:
20 Q.  It looks like that was a payment of $70,737 in
21     September of 2019, to Great Lakes Grain from Great Lakes
22     Grain [sic]; is that right?
23 A.  **No.  That was -- yeah, from Great American to Great --**
24     **Great Lakes Grain, yes.**
25 Q.  Okay.  And what was that for?

Page 54

1  A.  **That was for an insurance claim on the winter wheat.**
2  Q.  And that winter wheat is what you were talking about
3      was the last thing that went into 2019, right, from --
4  A.  **Correct.**
5  Q.  -- from Great Lakes Grain?
6             And what became of those proceeds; were
7      they applied under that agreement we looked at earlier
8      to Ceres, or what happened with that money?
9  A.  **No.  This money went to pay Logan Agri-Services.**
10     **Great Lakes Grain owed him a little bit of money for**
11     **seed, fertilizer, and chemicals from 2018.**
12 Q.  So Logan was like, basically, the input provider, the
13     lender for that?
14 A.  **Yes, the input provider.  Mmm-hmm.**
15 Q.  Okay.  And how much in total was Logan owed?  Did --
16     did Logan get paid off in full?
17 A.  **Yes.  I don't know what the total amount was.**
18 Q.  It was something more than this insurance amount?
19 A.  **Yes.**
20 Q.  And that was based on revenue from the GLG -- or the
21     Great Lakes Grain crop --
22 A.  **Yes.**
23 Q.  -- year?
24             MR. MAGYAR:  Let's take maybe a five-minute
25     break.  I'm going to use the restroom and talk with my

Page 55

1      co-counsel, so maybe it will be ten minutes.  Is that
2      all right?
3             MR. VANDER VEEN:  Sounds good.
4             (Off the record at 10:02 a.m.)
5             (Back on the record at 10:13 a.m.)
6  BY MR. MAGYAR:
7  Q.  All right.  We spoke earlier, a little bit of detail
8      about your insurance agent Chris -- and what was her
9      last name?
10 A.  **Shellenbarger.**
11 Q.  Shellenbarger.
12             And I think I understood from the
13     testimony, tell me if it's wrong, that, essentially,
14     you asked her to submit what you need to to obtain
15     crop insurance for Great Lakes Grain in 2018, right?
16 A.  **Yes.**
17 Q.  And same for New Heights I in 2019?
18 A.  **Yes.**
19 Q.  Okay.  Did you have to ultimately sign the documents,
20     the application?
21 A.  **Yes.**
22 Q.  Okay.  Did you read it when you had to sign it?
23 A.  **I looked it over.**
24 Q.  All right.  So you were -- in other words, you were
25     authorizing your agent to do what was necessary to

Page 56

1      procure the insurance, right?
2  A.  **Correct.**
3  Q.  And you understand when signing and submitting, then
4      you're making a representation to the federal
5      government that it's true and accurate?
6  A.  **Yes.**
7  Q.  So you're saying if Chris had used APH data from
8      Boersen parties, you didn't appreciate it, maybe, or
9      you didn't realize it if this happened, but she was
10     authorized to do it, as far as you were concerned?
11 A.  **I didn't say that I did not appreciate it.**
12 Q.  I mean appreciate in terms of understand, not like
13     appreciate in the common sense like --
14 A.  **I understand that I trusted her to secure the crop**
15     **insurance for me for what I needed for both Great**
16     **Lakes Grain and New Heights I and II for him.  And,**
17     **yeah, I mean, I know she did her job good.**
18 Q.  All right.  So if that included submitting APH data
19     based on the same lands having been farmed by prior
20     Boersen parties, then she was authorized to do that?
21 A.  **Absolutely.**
22 Q.  And that would have been part of what you were signing
23     off on?
24 A.  **Yes.**
25 Q.  Okay.  And you understand under -- that if that's what

**BOERSEN, STACY**
01/15/2020

Pages 57–60

Page 57

1    Chris did in terms of using another prior -- another
2    production history of a prior entity, then that would
3    make Great Lakes Grain or New Heights I a transferee
4    of that data in terms of applying for crop insurance;
5    do you understand that?
6  A.  **No, I do not understand that.**
7  Q.  Okay.  Have you looked at any of the -- at the
8    handbooks governing this kind of insurance?
9  A.  **No, I have not.**
10  Q.  Okay.  Like the 2019 Crop Insurance Handbook issued by
11    the United States Department of Agriculture, Federal
12    Crop Insurance Corporation/Risk Management Agency?
13  A.  **I have not seen that, no.**
14  Q.  So on signing the application, you would be relying on
15    what -- what Chris did in terms of whether you were
16    submitting proper information to the government?
17  A.  **Yes.**
18  Q.  But you're certain, at least -- not talking about New
19    Heights II, but for New Heights I and Great Lakes
20    Grain -- that you were not operating under the --
21    under a beginning farmer method, right?
22  A.  **I don't believe so.**
23  Q.  Okay.  Would it be you or Nick, or either one, to be
24    the best person to talk to about seeking insurance as
25    a -- as a new farmer for New Heights II?

Page 58

1  A.  **Either one.**
2  Q.  What's your understanding of how the application
3    process -- or the application or the ability to obtain
4    insurance differs for a, you know, new farmer versus a
5    non-new farmer like Great Lakes Grain or New Heights
6    I?
7  A.  **Again, Chris did that offer for him that --**
8  Q.  So when I asked a moment ago --
9  A.  **So I -- all I know -- all I know of -- the only**
10    **advantage I know of him is the crop insurance is a**
11    **little bit cheaper.**
12  Q.  So, really, it's -- it's Chris I would need to talk
13    to --
14  A.  **Yes.**
15  Q.  -- if I was going to talk about the ins and outs about
16    applying for insurance, right?
17  A.  **Yes.**
18  Q.  Okay.  Or look at the documents that we have
19    subpoenaed from Great American, but I haven't
20    received, right, in terms of --
21  A.  **I don't know that you haven't received them.  I don't**
22    **know.**
23  Q.  Well, I'm telling you I haven't received them.
24  A.  **Okay.**
25  Q.  Have you ever met with Chris in person, your agent?

Page 59

1  A.  **Yes.**
2  Q.  Where at?
3  A.  **At the farm office.**
4  Q.  Where -- where is that at?
5  A.  **6241 Ransom Street.**
6  Q.  Okay.  And when was the last time you met with Chris?
7  A.  **Oh, I would say this fall, maybe November she came to**
8    **see me, on a Saturday, when I was drying corn.**
9  Q.  Was it in connection with any insurance application?
10  A.  **I don't know.**
11  Q.  Well, I mean, she's from Petoskey, right, you said?
12  A.  **I don't -- is it?  I think that's where the Great**
13    **American is located, but I don't know for sure where**
14    **she's from.  Like the, gosh, Lansing area, maybe.**
15  Q.  Do you know what the nature of her visit was the last
16    time you saw her; do you remember?
17  A.  **I don't recall.**
18  Q.  Have you had any in-person meetings with her
19    specifically related to applying for crop insurance?
20  A.  **Well, back in 2019, when I applied for crop insurance,**
21    **I called her, I told her what we needed, and then she**
22    **came in with the paperwork, and we signed.**
23  Q.  Okay.  So you called her?  I said, in the question,
24    in-person meetings.
25  A.  **Okay.  In-person meetings regarding crop insurance?**

Page 60

1  Q.  Yes.
2  A.  **She came, and we signed the crop insurance.**
3  Q.  Okay.  And when she came and you signed, what did she
4    have with her?
5  A.  **She had the crop insurance application.**
6  Q.  Okay.  And how many pages are we talking?
7  A.  **I signed probably -- I don't recall how many pages it**
8    **was.**
9  Q.  Was it a voluminous document?  Was it just a few pages
10    with signature lines?
11  A.  **I don't recall.**
12  Q.  When we talk about these APHs, were those included
13    with the application?
14  A.  **I don't recall.**
15  Q.  The documents, were they half-an-inch thick; do you
16    remember?
17  A.  **No.**
18  Q.  Less?
19  A.  **Less.**
20  Q.  So in terms of like the documents sitting in front of
21    you that's been previously marked as Exhibit 2 called
22    "Agreement," do you think the documents that Chris
23    brought to you --
24  A.  **No.**
25  Q.  -- were less than that?

BOERSEN, STACY
01/15/2020                                                                    Pages 61–64

1   A.   Yes.
2   Q.   Let me see that exhibit.
3              MR. MAGYAR:  For the record, I'm not saying
4        that the witness said any specific number of pages,
5        but this document is one, two --
6              THE WITNESS:  Can I make a correction on
7        that?  Because I signed with a finger on a notepad or
8        her -- now I recall that.
9              MR. VANDER VEEN:  Kind of like a tablet,
10       when you say "notepad"?
11             THE WITNESS:  Correct.  Yes.
12  BY MR. MAGYAR:
13  Q.   All right.  Exhibit 2 is 15 pages.  But I think what
14       you just testified is that you -- did you have any
15       hard copy documents?
16  A.   I don't believe so.
17  Q.   Okay.  So it was all on tablet?
18  A.   Correct.
19  Q.   And when you looked at the tablet, it was for a
20       finger, electronic signature?
21  A.   Yes.
22  Q.   Did it have pages electronically to scroll through?
23  A.   Yes.
24  Q.   So you could have viewed the entire application?
25  A.   Correct.

1   Q.   Including any documents submitted with the
2        application?
3   A.   I assume so.
4   Q.   And did you do that at that time?
5   A.   I looked at the document, and I signed the document.
6   Q.   And this was 2019, for New Heights I, is what we're
7        talking about?
8   A.   Yes.
9   Q.   Did you have a similar meeting for Great Lakes Grain
10       insurance?
11  A.   Yes.
12  Q.   And would all the same sort of structure apply:  You
13       met in person, you used a tablet, you signed
14       electronically, it was --
15  A.   I don't recall if that was electronic or not.
16  Q.   Okay.  So let's talk about that then.  When would
17       you --
18  A.   And --
19  Q.   Would you -- I'm sorry, go ahead.
20  A.   Go ahead.
21  Q.   Would you have met with Chris personally for the Great
22       Lakes Grain insurance application to sign it?
23  A.   Dennis and I did.
24  Q.   Okay.  And was it hard copy or electronic?
25  A.   I don't recall.

1   Q.   So you don't know if you put pen to paper?
2   A.   I couldn't tell you.
3   Q.   So you wouldn't remember, then, if it was on a tablet
4        or a voluminous document?
5   A.   That's correct.
6   Q.   How old is Nick?
7   A.   Nineteen.
8   Q.   Nineteen.  So born in 1990?
9   A.   2000.
10  Q.   I'm sorry, 2000.  Shows you how old I am.  Yeah,
11       because I'm a lot older than that.
12            Did he work for like the family farming
13       prior to New Heights?
14  A.   Yes.
15  Q.   What -- so that would have been with Great Lakes Grain
16       and prior Boersen parties?
17  A.   Yeah, I guess.  Not really Great Lakes Grain.
18  Q.   Okay.  Well, again, let's limit it then to any Boersen
19       party.  What kind of activities?
20  A.   Since he was 14, he's been driving tractors,
21       combining, planting, field cultivation.
22  Q.   All right.
23  A.   And probably before that, ten years old, I think was
24       the first time he was in a tractor.
25  Q.   All the stuff I would have expected you to say.

1             But, again, to get into any kind of
2        discussion about what, if any, impact that would have
3        on then becoming a new farmer for his own company
4        would be questions for Chris, in terms of applying for
5        insurance?
6   A.   Correct.
7             MR. MAGYAR:  I'll mark this as the next
8        exhibit.  We're on 4 now.
9             MARKED FOR IDENTIFICATION
10            DEPOSITION EXHIBIT 4
11            10:26 a.m.
12  BY MR. MAGYAR:
13  Q.   Go ahead and take a look at that document.  Let me
14       know when you've had a chance.
15  A.   Yeah.
16  Q.   Okay.  What is this document?
17  A.   This is a creditor -- creditor agreement with Logan Ag
18       Services and Great Lakes Grain.
19  Q.   It looks like --
20  A.   And -- go ahead.
21  Q.   Go ahead.  No, please finish.
22  A.   No, that's what it is.
23  Q.   Okay.  And Ceres is a party here, too?
24  A.   That's correct.
25  Q.   And it's as of June 6 of 2018?

BOERSEN, STACY
01/15/2020

Pages 65–68

Page 65

1  A.  Yes.
2  Q.  And I see it's called "Creditor Agreement."
3  A.  Mmm-hmm.
4  Q.  Can you describe for me what the main subject of the
5     agreement is, what's the purpose of it?
6  A.  The purpose of it?  So Logan Ag provided inputs for
7     2018 to Great Lakes Grain, and Ceres provided the land
8     to Great Lakes Grain, you know, as far as the rent.
9  Q.  Okay.
10 A.  And this is just -- I believe it's just pretty much
11    saying that Great Lakes Grain would use its crops to
12    pay the debt owed under Great Lakes Grain to both
13    Logan Ag and Ceres.
14 Q.  All right.  And then it looks like in the second
15    "Whereas" paragraph on the front page there --
16 A.  Yes.
17 Q.  -- it has an Exhibit A, and it's saying that it's
18    talking about the -- certain leases whereby Ceres has
19    leased farm to tenant defined as Great Lakes Grain; do
20    you see that?
21 A.  Yes.
22 Q.  So if we flip back to Exhibit A, I'm looking at a
23    list.  It looks like it's right after --
24         MR. VANDER VEEN:  How far back in the
25    document is it?

Page 66

1         MR. MAGYAR:  It's about midway through,
2     after the last signature page.
3         THE WITNESS:  There's all kinds of
4     Exhibit As in here.
5         MR. MAGYAR:  Yeah.  Those are legal
6     descriptions, it looks like.
7         MR. VANDER VEEN:  Here we go.
8         THE WITNESS:  Right here.
9  BY MR. MAGYAR:
10 Q.  So would you agree with -- agree with me that that's
11    at least a list that appears to be referenced in the
12    front page that we were just looking at?
13 A.  Yes.
14 Q.  And are these -- it looks like they're numbered 34 --
15    the 34 leased farms or properties that Ceres is
16    leasing to Great Lakes Grain?
17 A.  That's correct.
18 Q.  Okay.  And it looks like we just mentioned that a lot
19    of the pages following this, a lot of them have the
20    word "Exhibit A" on them, but it looks like it's
21    intended to be the legal descriptions of each of these
22    properties that are -- that are listed on the list, or
23    do you think --
24 A.  Yes, I believe that's the intention.
25 Q.  Okay.  And I think we said earlier -- or you testified

Page 67

1     earlier that there's no property of these 34 on this
2     list of lands that Great Lakes Grain was going to
3     lease -- or, yeah, lease to farm that hadn't
4     previously been farmed by a Boersen party; is that
5     right?
6  A.  I don't know for sure if there is new farms that I
7     picked up in '18 or not.
8  Q.  Do you think there were any new ones?
9  A.  I don't believe so.
10 Q.  Do you know whether Ceres -- whether any Boersen party
11    ever owned any of these farms prior to Ceres owning
12    it?
13 A.  Yes.
14 Q.  Which ones?
15 A.  Denniston Farm.  Marshall Farm.  The Book Farm.  I
16    don't know if there's any more on there, to tell you
17    the truth, but I know all those --
18 Q.  What about the Stamp Farms from 22 to 33?
19 A.  I can't be 100 percent sure.
20 Q.  For any -- for any farm that a Boersen entity may have
21    owned before Ceres, what's your understanding of how
22    Ceres came to be the owner?
23 A.  I -- I don't know.  I just know that -- I don't know
24    how they became the owner.  I can't speak to that.
25 Q.  Do you know whether they're buy/sells?  Foreclosures?

Page 68

1  A.  I don't know.
2  Q.  Dennis would know?
3  A.  Dennis would know.
4  Q.  Before we look at some equipment leases, I just want
5     to close the loop on your agent, since it sounds like
6     we're going to need to talk to her.
7            So you talked about a fall meeting last
8     year for New Heights I, where she came and saw you;
9     may or may not have been about crop insurance; you
10    just remember you saw her at your office.
11 A.  (Nodded head.)
12 Q.  When was the meeting where you did the electronic
13    signature?
14 A.  That was in the spring.
15 Q.  Okay.  And where -- where was that?
16 A.  I believe she came to the office then, too.
17 Q.  Okay.
18 A.  6241 Ransom.
19 Q.  Okay.  And when you would need to supply her with
20    anything, did -- did that ever happen, you sent her --
21 A.  I sent her a land list of what the acres was going to
22    be for New Heights I and New Heights II.
23 Q.  What form did you send that in?  Email?  Mail?
24 A.  It would have been an email.
25 Q.  And where did you send it to?  I know you thought

BOERSEN, STACY
01/15/2020                                                          Pages 69–72

Page 69

1    maybe she's in Lansing, but you thought --
2  A. I would have emailed it to her.
3  Q. And you thought --
4  A. To Chris's email.
5  Q. -- she's in Lansing?
6  A. She's around that area.  Charlotte, maybe.  I don't
7     know.
8  Q. And tell me again, just because I can't remember what
9     you said, where you think Great American, as an
10    entity, is located.
11 A. I don't know.  I thought I seen once a Petoskey
12    address, but I don't know for sure.
13 Q. Okay.  Well, I see on some of their paperwork that --
14    that you produced for your declaration of coverage,
15    there's a Peoria, Illinois, address for Great American
16    Insurance Company.
17          Do you recall ever seeing that on -- on
18    your papers?
19 A. I can't say I took notice of the address, no.
20 Q. So, for instance --
21          MR. MAGYAR:  We'll just mark this as an
22    exhibit.
23          MARKED FOR IDENTIFICATION
24          DEPOSITION EXHIBIT 5
25          10:34 a.m.

Page 70

1  BY MR. MAGYAR:
2  Q. This is Exhibit 5.  And it looks like it's a
3     Declaration of Coverage, effective for the 2018 crop
4     year, from Great American Insurance Company to the
5     insured, Great Lakes Grain, LLC.
6          Do you see that?
7  A. Yes, I do.
8  Q. And do you see now where I'm pointing out where Great
9     Lake -- Great American lists its address as Peoria,
10    Illinois?
11 A. I do.
12 Q. Would you expect that your agent, Chris, would --
13    would provide any information you give her to her
14    employer at their main address?
15 A. What was the question?
16 Q. Would your agent send your documents to her -- to
17    Great American?
18 A. I assume so, but that's her job, so I --
19 Q. Right.
20 A. But this is where I came up with Petoskey.  It says,
21    "Main 2/Petoskey, Michigan," on the top there, so --
22 Q. Yep.
23 A. Behind her name.
24 Q. For Spartan Insurance.
25 A. That's why, for some reason, that stuck out to me.

Page 71

1  Q. Yeah, so she's your agent.  She's with a brokerage --
2     or a broker, Spartan in Petoskey, and the parent --
3     the main company is Great Lakes in Illinois --
4  A. Yeah.
5  Q. -- it looks like.
6          Kind of like car insurance, I never go
7     right to like the State Farm main office.
8  A. Yes.
9  Q. Let's see.  So that -- that meeting was in the spring,
10    and it was at your office, I think you said, with the
11    signature --
12 A. Yes.
13 Q. -- at the bottom.
14          What about for Great Lakes Grain -- you
15    said you and Dennis met, and you couldn't remember if
16    it was electronic or not -- do you remember where the
17    meeting was?
18 A. It would have been at the farm office.
19 Q. Okay.  So it would have been at -- okay.
20          And Chris, at that time, as far as you
21    know, still worked for the -- lived around Lansing,
22    worked for the agency out of Petoskey, and where the
23    company is from, Peoria, Illinois --
24 A. Yes.
25 Q. -- right?

Page 72

1          So nothing really different at that --
2  A. No.
3  Q. -- time frame?
4          All right.  And other than potentially who
5     signed, which may have been Nick, does all of this
6     apply the same for New Heights II, in terms of did
7     Chris come at some point to have things signed --
8  A. Yes.
9  Q. -- for the insurance?
10 A. Mmm-hmm.
11 Q. And would that also have been spring, or were you like
12    operating on the same sort of track here?
13 A. Yes.
14 Q. And then she would have met with Nick to get his
15    signature on the application?
16 A. Yes.
17 Q. And that would have been the electronic kind?
18 A. Yes.
19 Q. I guess I can -- assuming --
20 A. Yeah.
21 Q. -- we don't run out of time later, we can -- and I
22    don't think we will -- but I can ask Nick, too, but
23    ...
24          And then, presumably, she would have
25    submitted her -- that information -- Chris would

BOERSEN, STACY
01/15/2020

Pages 73–76

Page 73

1    have -- to the -- to the home office; or she would
2    have sent it to Petoskey, to her agency, and they
3    would have sent it to Illinois, to the company?
4  A. I don't know what her procedure is.
5  Q. Okay. But, ultimately, you would expect that it would
6    have to get to the government that issues the
7    insurance, right?
8  A. I would assume so, but that's what she does. She
9    takes care of that.
10 Q. Yeah, you're hiring her as your agent to --
11 A. Yes.
12 Q. -- handle the expertise in that matter, right?
13 A. Yes.
14 Q. Any other meetings you can think of for strictly
15   relating to getting crop insurance for either Great
16   Lakes Grain or any New Heights entity? Any other time
17   that you met with Chris either in person or -- or
18   otherwise?
19 A. I mean, I had dinner with her this spring. I mean,
20   she's -- yeah. No.
21 Q. But that wasn't for --
22 A. No. No.
23 Q. -- crop insurance reasons?
24       Okay. And can you recall any instance of
25   her saying, "Hey, I need this spreadsheet or financial

Page 74

1    data," or some kind of information that you would have
2    sent via email?
3  A. No.
4  Q. Or mail? No?
5  A. No.
6  Q. Okay. Was there a loan from -- that Great Lakes Grain
7    took for 1.5 million from Boersen Farms, Inc. in May
8    of '18?
9  A. No.
10 Q. I think in both the documents and the discovery
11   responses, it was because of the New Heights entities
12   being so brand-new that they were basically listed as
13   having $10,000 in cash as their own asset. Do you
14   recall that answer?
15 A. Well, that was just what he and I had in our bank
16   accounts separately. I think we opened the checking
17   book -- checkbooks for New Heights I and II with $100
18   cash.
19 Q. Okay. So how was New Heights able to obtain financing
20   with that -- with, you know, being brand-new and
21   having that as the asset?
22 A. So as I alluded to before, ARM is a big lender for
23   new-time farmers, and they are secured with the
24   current crop in the ground. They have a first lien on
25   the crop. And with the crop insurance, they have a

Page 75

1    lien on the crop insurance. So with ARM, they are
2    never going to overloan what your crop is worth with
3    the value of the crop insurance.
4  Q. So would you say the crop insurance was a critical
5    aspect, then, to obtain that financing?
6  A. Yes.
7  Q. How did you get introduced to that lender, the New
8    Heights lender?
9  A. Gosh. I feel like it was something that maybe the old
10   entities went after once before. And then I had a
11   friend that told me about going over to ARM and seeing
12   what they could do with me and Nick together, because,
13   you know, he told me how much he wanted to farm, and
14   that's all he wanted to do.
15 Q. Are they an Illinois-based farm?
16 A. Well, we -- we go right down here in Michigan. What
17   is it? Is it -- I don't know, Charlotte?
18       THE WITNESS: Where is that, Nick?
19       MR. BOERSEN: Richland.
20       THE WITNESS: Richland. Sorry.
21       MR. VANDER VEEN: You have to answer. He
22   can't answer.
23       THE WITNESS: I know. I'm sorry. But him
24   and I went there to sign documents, in Richland,
25   Michigan, and they came out to the farm to meet with

Page 76

1    him and I in the spring.
2  BY MR. MAGYAR:
3  Q. And so they had -- they have a lien on the 2019 New
4    Heights crop, right?
5  A. Mmm-hmm.
6  Q. Whereas Logan had the lien on the 2018 Great Lakes
7    Grain crop?
8  A. Logan also has a lien on the 2019 crop, because he was
9    our crop input provider --
10 Q. Okay.
11 A. -- for 2019.
12 Q. So who has priority between Logan and ARM?
13 A. ARM.
14 Q. ARM. And how would you communicate with ARM? It
15   sounds like there was a Richland meeting that you
16   talked about.
17 A. Richland is where we went to sign the loan documents.
18       I called Scott, and I think his last name
19   is Rueff. He came out and met with Nick and I back in
20   the -- I would say end of February last year, and then
21   told us what they would require as far as doing a
22   loan, which is the crop insurance, and then we had to
23   provide them information regarding to our -- what land
24   we planned on leasing at that point.
25 Q. Where is Scott located out of?

BOERSEN, STACY
01/15/2020

Pages 77–80

Page 77

1  A.   I don't know.
2  Q.   When you provided him the land you planned on leasing,
3       was it a list similar to the one that we've looked at
4       today, or what did you provide him with?
5  A.   No, it was just an Excel spreadsheet.
6  Q.   When we looked earlier at that list that was part of
7       the Great Lakes Grain agreement, do you know -- does
8       the farming that New Heights I and II do, is it on the
9       same or different lands that Great Lakes Grain farmed
10      on?
11 A.   Some of the same.
12 Q.   Some but not all?
13 A.   I would -- maybe -- yeah, maybe all of it.
14 Q.   Does New Heights Farm -- and I'm talking about both in
15      combination -- farm more land than Great Lakes Grain
16      did?
17 A.   Yes.
18 Q.   By how much?
19 A.   Oh, I would say probably 14,000 acres.
20 Q.   Fourteen thousand acres more?
21           MR. VANDER VEEN:  Just to clarify, you
22      referred to New Heights Farm.  Are you talking about
23      New Heights Farm I or New Heights Farm II?
24 BY MR. MAGYAR:
25 Q.   Do you understand who I'm talking about when I say

Page 78

1       "New Heights"?
2  A.   You said both companies, right?
3  A.   Yeah.  New Heights Farm I, LLC.
4  A.   I and II.
5  Q.   Yep.  If I say "New Heights," you understand who I'm
6       talking about?
7  A.   Yes.
8  Q.   I mean, we're not talking about any other New Heights?
9  A.   Right.
10           MR. VANDER VEEN:  Thank you for the
11      clarification.
12 BY MR. MAGYAR:
13 Q.   So when you said 14,000 acres a moment ago, you meant
14      14,000 acres more than what Great Lakes Grain was
15      doing, or 14,000 acres in total?
16 A.   Fourteen thousand -- I would say it's like 12,000
17      acres more than what Great Lakes Grain was doing.
18 Q.   Okay.  So what do you think the total acreage farmed
19      in combination by New Heights I and II are?
20 A.   It was right around 18,000 acres.
21 Q.   Okay.  And then how much of that 18,000 do you think
22      was just New Heights I?
23 A.   Half of it.
24 Q.   Okay.  And so it was split?
25 A.   It was split equally, yes.

Page 79

1  Q.   Okay.  Now, we've talked about -- and I think we'll
2       look at probably some lease agreements where either
3       Great Lakes Grain or -- or a New Heights entity I or
4       II is leasing equipment from a Boersen property.  You
5       understand that?
6  A.   Yes.
7            MR. VANDER VEEN:  A Boersen property, you
8       said?
9            MR. MAGYAR:  A Boersen party.
10           MR. VANDER VEEN:  Okay.  And we're talking
11      about the -- by "Boersen party," the parties listed in
12      the caption still?
13           MR. MAGYAR:  Any Boersen party, either in
14      the caption or as defined, as we've done, in the
15      agreement.
16           MR. VANDER VEEN:  So any -- okay.  In
17      either of the agreements that are exhibits or the
18      caption?
19           MR. MAGYAR:  Any party, any individual, or
20      entity that has the word "Boersen" in it in the
21      world --
22           MR. VANDER VEEN:  Okay.
23           MR. MAGYAR:  -- is what we're talking
24      about.
25           THE WITNESS:  Yes.

Page 80

1  BY MR. MAGYAR:
2  Q.   And does New Heights I or II or Great Lakes Grain use
3       any equipment that's not leased from any Boersen
4       entity or person?
5  A.   Yes.
6  Q.   And what equipment would that be?
7  A.   New Heights I has a lease with Team Financial, and
8       that is for a planter leased with the option to
9       purchase at the end of the lease.
10           And then earlier in the spring, New Heights
11      II rented a tractor from Ausra Equipment.
12 Q.   Oh, they're from my town, Dowagiac.
13 A.   Mmm-hmm.
14 Q.   All right.  Anything else?
15 A.   Not that I recall right now.
16 Q.   For those leases, where did the finances come to enter
17      into the lease; would it be from the lending from ARM?
18 A.   Yes.
19 Q.   For the leases -- we can look at some individually.
20      But when you would lease equipment from any Boersen
21      entity or individual, how was the rent amount set?
22 A.   I believe in the rent and lease, it was 75,000 per
23      company, per month.
24 Q.   And do you know how that number was derived?
25 A.   It was fair market value, and the fair market value is

BOERSEN, STACY
01/15/2020        Pages 81–84

Page 81

1     within the limits provided by the FSA.

2   Q.   Okay. And do you know whether -- I guess we'll start

3     with Great Lakes Grain made and was current on all of

4     its payments under a lease, equipment leases?

5   A.   I believe so.

6   Q.   And do you know whether you've produced documentation

7     of those payments?

8   A.   I don't know if I produced that or not.

9   Q.   Same for New Heights, do you think you --

10   A.   Yes, I know they have.

11   Q.   -- paid all their leases?

12   A.   Mmm-hmm.

13   Q.   Regardless of who the lessor, whether Boersen or

14     otherwise, those are all paid?

15   A.   So the Ausra Equipment was cash up front, Team

16     Financial is a monthly payment, and then, also,

17     Boersen Farms & Affiliates is a monthly payment.

18   Q.   Okay. And is Boersen Farms & Affiliates the only

19     Boersen entity you have a lease with for equipment?

20   A.   Yes.

21   Q.   Okay. And what is -- what is that entity? What does

22     it do?

23   A.   I don't know.

24   Q.   Boersen, as far as you know, it just owns equipment

25     that it leases?

Page 82

1   A.   I don't know if that's all that entity does.

2   Q.   Do you know where it obtained its equipment that it

3     leases?

4   A.   I do not.

5   Q.   Do you know who the owners are?

6   A.   I do not.

7   Q.   All right. Is it an LLC, I'm sorry, or an Inc.; do

8     you know?

9   A.   I don't know.

10   Q.   Do you know whether any other entity has a security

11     interest in the equipment that you lease from -- what

12     was it called, Boersen --

13   A.   -- Farms & Affiliates.

14   Q.   Boersen Farms & Affiliates.

15     So the equipment that you're leasing from

16     them, do you know if any other entity has a security

17     interest in that equipment?

18   A.   I have no idea.

19   Q.   Okay. Do you know whether Ceres has a security

20     interest in them?

21   A.   I don't know.

22   Q.   Was Dennis involved with you in terms of -- in any

23     capacity: farming, consulting, working for any New

24     Heights or Great Lakes Grain entity -- well, not Great

25     Lakes Grain; he's 10 percent owner -- New Heights I or

Page 83

1     II?

2   A.   No.

3   Q.   We looked at that $70,000 claim payout from the winter

4     wheat for Great Lakes Grain, right? Do you recall

5     that?

6   A.   Yes.

7   Q.   Have you had any other claims for either Great Lakes

8     Grain or New Heights I or II?

9   A.   As far as payouts?

10   Q.   Have you made any claims besides the one we talked --

11     we saw the payout?

12   A.   No.

13   Q.   Okay. Who is Blain Becktold or Down On The Farm?

14   A.   He used to work -- I don't know if he still does, but

15     he is -- used to work and help me with certification

16     of the crops; so he did that for Great Lakes Grain.

17     And then when Nick and I started our own farm, it was

18     just an extra expense, so I learned how to do that on

19     my own.

20   Q.   And that was, I think you were talking about before,

21     is basically collecting the data that's needed for --

22   A.   No. Certifying with the FSA is you go into the FSA

23     office and you look at the farm maps of everything you

24     planted and you put a plant date on it, what you

25     planted.

Page 84

1   Q.   Okay. And so that's why, in some of the documents, he

2     had to be granted, for when he was doing that for you,

3     a power of attorney?

4   A.   Yes.

5   Q.   Okay. And did -- where did, you know -- well, let me

6     back up.

7     Was Blain Becktold the same as Down On The

8     Farm? Was that like his company?

9   A.   Yes.

10   Q.   Okay. And what -- how did you come to know

11     Mr. Becktold? Did he do that work for Boersen Farms,

12     any Boersen entity, or did you know him from somewhere

13     else?

14   A.   He did do that for the old Boersen entities, yes.

15   Q.   And this certification that he was doing, was it

16     involved with applying for crop insurance, or was it a

17     totally separate certification that he would have

18     made?

19   A.   It's totally separate.

20   Q.   Okay. So it doesn't come into play on the application

21     itself or --

22   A.   Not that I know of.

23   Q.   Now, I believe in the answers to interrogatories, when

24     we were talking about the Great Lakes Grain II, III,

25     IV, the ones that couldn't get financing, I think you

BOERSEN, STACY
01/15/2020

Pages 85–88

Page 85

1    had responded that because they never came to
2    fruition, they -- that they were -- there was no APHs
3    done or any kind of documentation done for them in
4    terms of history, right?
5  A.  Correct.  They never farmed.
6  Q.  Okay.  Do you know whether Chris ever submitted
7    anything, in terms of insurance-wise, for those
8    entities?
9  A.  I -- I don't recall.
10  Q.  Okay.  You don't recall signing anything for --
11  A.  No.
12           MR. MAGYAR:  Well, I think we can go off
13    the record.  I may be done.  I'm going to make one
14    more call, but we'll get Ron in time for his meeting,
15    no problem.
16           MR. VANDER VEEN:  Good deal.
17           MR. MAGYAR:  One second.
18           (Off the record at 10:56 a.m.)
19           (Back on the record at 11:03 a.m.)
20  BY MR. MAGYAR:
21  Q.  I think I know the answer to this, but I just want to
22    verify, that Great Lakes Grain, the original, never
23    did any farming before the 2018 crop year?
24  A.  Correct.
25  Q.  Okay.  You were talking earlier about the

Page 86

1    certification process and that you learned to do it
2    yourself.
3  A.  Mmm-hmm.
4  Q.  Do you know whether Great Lakes Grain ever sold any
5    crop, as the seller, that had been certified as the
6    crop of someone else, like a Boersen farming entity?
7  A.  I didn't do the certifications for '18.  Blain did.
8    So I guess I wouldn't know.
9  Q.  So you just don't know one way or the other?
10  A.  No.
11  Q.  Okay.  And then in terms of -- well, let me go back to
12    that question about Great Lakes Grain having never
13    done any farming prior to 2018.
14           It looked like, in some of the acreage
15    reports in 2019, that there's listings for Great Lakes
16    Grain in 2017.  Do you have any understanding how that
17    would happen if that's the case?
18  A.  No.
19  Q.  Staffing-wise, how many employees does New Heights I
20    have?
21  A.  New Heights I has eight employees.
22  Q.  Okay.  Who are they?
23  A.  Who are they?
24  Q.  Yeah.
25  A.  Do you want me to name them all?

Page 87

1  Q.  It's only eight.
2  A.  Let me see.  Randy Barnes.  Lisa Robinson.  I got to
3    really, really stretch to think.  Nolan Ender.  I
4    don't know why I can't just rattle them all off.  Carl
5    Moll.  Carl Brown.  Dave Emelander.  Chris Pace.  And
6    myself, I'm on the employee list, also.
7  Q.  Okay.  For New Heights II, does the list differ in any
8    way?
9  A.  Yes.
10  Q.  Okay.  Are any of the individuals you just named also
11    employees of New Heights II?
12  A.  No.
13  Q.  I guess I can probably wait for these with Nick, but
14    do you know who the employees are for New Heights II,
15    or how many?  Let's start with how many.
16  A.  I believe there's six.
17  Q.  Do you know who they are?
18  A.  Bill Kushmaul.  Michael Carlock.  I really have to
19    think about this.  Cory Tom.  I know -- I don't know
20    who else I'm missing, but Nick would know.
21  Q.  Okay.  Yeah, we can cover that this afternoon.
22           What does Mr. Barnes do for New Heights I?
23  A.  He's a grain manager.
24  Q.  And what about Ms. Robinson?
25  A.  She's HR.

Page 88

1  Q.  And Ender, Nolan Ender?
2  A.  He's a combine -- he's an operator, I guess you would
3    say.
4  Q.  And was it Moore, Carl Moore?
5  A.  Carl Brown?
6  Q.  There were two.  I thought there were two Carls.
7  A.  Oh, Carl Moll, M-o-l-l.  He's an operator, also.
8  Q.  And then Brown?
9  A.  Yes.
10  Q.  What did you say Brown does?
11  A.  He's a truck driver.
12  Q.  And then Dave?
13  A.  Emelander is a truck driver.
14  Q.  Driver.  And then Chris Pace, was it?
15  A.  Yeah.  He's a truck driver, also.
16  Q.  Do you know if any of those employees that we've just
17    named through work for any -- well, did any of them
18    work for Great Lakes Grain?
19  A.  No.
20  Q.  Did any of them work for any Boersen entity?
21  A.  What entity are we talking about?
22  Q.  Any, that you're aware of.
23  A.  Yes.
24  Q.  Who?
25  A.  I did.  Lisa Robinson did.  I mean, they all did, I --

BOERSEN, STACY
01/15/2020

Pages 89–92

Page 89

1    I guess, at some point.
2 Q. All right.  So who did Lisa Robinson work for in terms
3    of the Boersen entities?
4 A. I don't -- I don't recall.
5 Q. Do you recall specifically for any of them, like which
6    Boersen entity she worked for?
7 A. Boersen Farms Grain, I think.
8 Q. How many employees did Great Lakes Grain, the
9    original, have for --
10 A. Great Lakes Grain didn't have employees.
11 Q. Okay.  Who did -- for the 2018 crop year, who did the
12    kinds of things that we've listed off here:  the truck
13    driving, the operating, the HR, the grain?
14 A. We had an employee/employment agreement.
15 Q. Okay.  And who --
16 A. And I believe that -- I'd have to look at it.  I don't
17    remember who it was with.
18 Q. Was it with more than one person you had employment
19    agreements, or --
20 A. It was one agreement with multiple companies, I
21    believe.  I'd have to see the agreement.
22 Q. Okay.  Do you know if that's been produced?
23 A. Yes.
24 Q. It has been produced?
25 A. I believe so.

Page 90

1 Q. To us?
2 A. I believe so.
3 Q. Okay.  So these were independent contractors to get
4    the -- get the work done for Great Lakes Grain?
5 A. Yes.
6 Q. But then with New Heights, it's their own employees?
7    They're employees of the company --
8 A. Yes.
9 Q. -- New Heights I and II?
10 A. Mmm-hmm.
11        MR. MAGYAR:  All right.  Well, I got you
12    20 minutes early, Ron.
13        MR. VANDER VEEN:  Good deal.  Thank you.
14        THE WITNESS:  Well, I thought of another
15    one, if you want to know.  Reed Haverdink.  He's like
16    my company manager, so ...
17 BY MR. MAGYAR:
18 Q. That's New Heights I?
19 A. Yes.
20 Q. And that's company manager.
21        And do you know if he was employed by a
22    Boersen entity?
23 A. Yes.
24 Q. Who?  Which entity?
25 A. Boersen Farms Grain.

Page 91

1 Q. Same role?
2 A. No.  I don't know what his role was there.
3 Q. Okay.
4 A. I mean, I know that I made him manager of my farm.
5        MR. MAGYAR:  Okay.  All right.  Well, then,
6    I don't know if you're planning to stick around or
7    not, but I don't think -- I'm not going to be resuming
8    your deposition at 1:30.
9        THE WITNESS:  Okay.
10        MR. MAGYAR:  We'll just start right off
11    with Nick --
12        THE WITNESS:  Okay.
13        MR. MAGYAR:  -- so depending on if you're
14    traveling separate or together, whatever.
15        THE WITNESS:  All right.
16        MR. VANDER VEEN:  Thank you, Mark.
17        (Deposition concluded at 11:10 a.m.
18        Signature of the witness was requested.)

Page 92

1    HELENA AGRI-ENTERPRISES, LLC,
2    a Delaware limited liability
3    company,
4            Plaintiff,
5        vs.        Case No. 1:18-cv-00963-RJJ-RSK
6                   Hon. Robert J. Jonker
7    GREAT LAKES GRAIN, LLC, a
8    Michigan limited liability
9    company, et al.,
10            Defendants.
11
12
13        VERIFICATION OF DEPONENT
14
15    I, Stacy Boersen, having read the
16    foregoing deposition consisting of my testimony at the
17    aforementioned time and place, subject to the changes
18    in the attached errata sheet, do hereby attest to the
19    correctness and truthfulness of the transcript.
20
21
22
23        _____
24        Stacy Boersen
25        Dated:

**BOERSEN, STACY**
01/15/2020                                                                    Pages 93–94

```
                                              Page 93
1                    ERRATA SHEET

2    PAGE  LINE  READS                 PAGE  LINE  SHOULD READ

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                              Page 94
1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                     ) SS

4    COUNTY OF OTTAWA  )

5

6           I, PEGGY S. SAVAGE, certify that this

7       deposition was taken before me on the date

8       hereinbefore set forth; that the foregoing questions

9       and answers were recorded by me stenographically and

10      reduced to computer transcription; that this is a

11      true, full and correct transcript of my stenographic

12      notes so taken; and that I am not related to, nor of

13      counsel to, either party nor interested in the event

14      of this cause.

15

16

17

18

19

20          _____

21

22          PEGGY S. SAVAGE, CSR-4189, RPR

23              Notary Public,

24              Ottawa County, Michigan.

25   My Commission expires:  7-13-25
```

# Exhibit



**In the Matter Of:**

HELENA AGRI-ENTERPRISES, LLC vs vs GREAT LAKES GRAIN, LLC, ET AL.

NICHOLAS BOERSEN

January 15, 2020

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

**BOERSEN, NICHOLAS**
01/15/2020                                                                                    Pages 1–4

Page 1

```
 1                   UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF MICHIGAN
 3                       SOUTHERN DIVISION
 4
 5    HELENA AGRI-ENTERPRISES, LLC,
 6    a Delaware limited liability
 7    company,
 8                    Plaintiff,
 9         vs.             Case No. 1:18-cv-00963-RJJ-RSK
10                        Hon. Robert J. Jonker
11    GREAT LAKES GRAIN, LLC, a
12    Michigan limited liability
13    company; GREAT LAKES GRAIN II,
14    LLC, a Michigan limited
15    liability company; GREAT LAKES
16    III, LLC, a Michigan limited
17    liability company; GREAT LAKES
18    IV, LLC, a Michigan limited
19    liability company; NEW HEIGHTS
20    FARM I, LLC, a Michigan limited
21    liability company; NEW HEIGHTS
22    FARM II, LLC, a Michigan limited
23    liability company; STACY BOERSEN,
24    individually and as putative
25    member of the Great Lakes Grain
```

Page 2

```
 1    defendants and New Heights Farm I,
 2    LLC; and NICHOLAS BOERSEN,
 3    individually and as putative
 4    member of New Heights Farm II, LLC,
 5                    Defendants.
 6    _____
 7
 8
 9         The Deposition of NICHOLAS BOERSEN,
10         Taken at 321 Settlers Road,
11         Holland, Michigan,
12         Commencing at 1:29 p.m.,
13         Wednesday, January 15, 2020,
14         Before Peggy S. Savage, CSR-4189, RPR.
15
16    APPEARANCES:
17
18    MARK J. MAGYAR
19    Dykema Gossett, P.L.L.C.
20    300 Ottawa Avenue, N.W.
21    Suite 700
22    Grand Rapids, Michigan 49503
23    (616) 776-7500
24    mmagyar@dykema.com
25         Appearing on behalf of the Plaintiff.
```

Page 3

```
 1    RONALD J. VANDER VEEN
 2    Cunningham Dalman, P.C.
 3    321 Settlers Road
 4    Holland, Michigan 49423
 5    (616) 392-1821
 6    rjvv@cunninghamdalman.com
 7         Appearing on behalf of the Defendants.
 8
 9    ALSO PRESENT:
10    Stacy Boersen
11    Amanda Crouch (via telephone)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                   TABLE OF CONTENTS
 2
 3    WITNESS                         PAGE
 4    NICHOLAS BOERSEN
 5
 6    EXAMINATION BY MR. MAGYAR            5
 7    EXAMINATION BY MR. VANDER VEEN      54
 8
 9                       EXHIBITS
10
11    EXHIBIT                         PAGE
12    (Exhibits not offered.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BOERSEN, NICHOLAS
01/15/2020                                                                    Pages 5–8

Page 5

1   Holland, Michigan
2   Wednesday, January 15, 2020
3   1:29 p.m.
4
5                   NICHOLAS BOERSEN,
6   was thereupon called as a witness herein, and after
7   having first been duly sworn or affirmed to testify to
8   the truth, the whole truth and nothing but the truth,
9   was examined and testified as follows:
10                  EXAMINATION
11  BY MR. MAGYAR:
12  Q.   Good afternoon, Nick. You were here earlier, so I'll
13       just introduce myself again.
14  A.   Yeah.
15  Q.   Mark Magyar for Helena. And I believe you were here
16       when I went over the ground rules --
17  A.   Yep.
18  Q.   -- of a deposition?
19  A.   Yep.
20  Q.   Did you understand everything?
21  A.   Yep. Yep.
22  Q.   And have you ever been deposed before?
23  A.   Nope.
24  Q.   Okay. So I understand you're the owner of New Heights
25       II, LLC; is that -- New Heights Farm II, LLC; is that

Page 6

1        right?
2   A.   Yep.
3                   MR. VANDER VEEN: Let me, as a preliminary
4        matter, also just state on the record that -- that
5        Nick reserves the right to review the transcript and
6        sign off on it.
7                   MR. MAGYAR: Okay.
8   BY MR. MAGYAR:
9   Q.   Nick, have you ever owned a business before?
10  A.   No, I have not.
11  Q.   And you were here. We talked earlier with your mom
12       about your prior work experience from at least the age
13       of 14 for the family --
14  A.   Yep.
15  Q.   -- farming, right?
16  A.   Yep.
17  Q.   Any other employment history besides that?
18  A.   Nope.
19  Q.   Okay. So would it be fair to say that everything
20       you've learned, giving you the ability to run New
21       Heights Farm II, LLC was based on working through the
22       family --
23  A.   Yep.
24  Q.   -- farming business?
25                  And we went over a little bit with your mom

Page 7

1        about what your job duties entailed prior to New
2        Heights II. But is there anything that you wanted to
3        add to that --
4   A.   No.
5   Q.   -- or clarify?
6                   Okay. Were there ever any management roles
7        involved with --
8   A.   No.
9   Q.   Okay. And your mom mentioned the six employees for
10       New Heights II -- Farm II.
11  A.   Yep.
12  Q.   Was that accurate, or were there any --
13  A.   Yeah. That's Cory Tom, Brian Goodrich, Mike Carlock,
14       and then, yeah, Bill Kushmaul, and that's my six --
15       or that's -- I think the only one she kept out was
16       Brian Goodrich for mine, so ...
17  Q.   And do they report directly to you?
18  A.   Yeah, to me.
19  Q.   Okay. Is your dad involved in New Heights Farm II,
20       LLC?
21  A.   Nope.
22  Q.   What does he do for employment now?
23  A.   My dad?
24  Q.   Yeah.
25  A.   I don't really know. Couldn't really tell you. He's

Page 8

1        not around a whole lot.
2   Q.   Okay. Now, you heard that a lot of the discussion
3        this morning with your mom had to do with crop
4        insurance; you recall that?
5   A.   Yep.
6   Q.   And my understanding, based on some of the documents
7        filed in this action, is that you applied for crop
8        insurance as a beginning farmer or --
9   A.   Yep, young farmer.
10  Q.   Young farmer, okay.
11                  Is there a difference between young farmer
12       and beginning farmer in terms of getting crop
13       insurance, or is it just --
14  A.   That would be something you'd have to ask Chris.
15       That's not something I'd know off the top of my head.
16  Q.   So your understanding is it's called a young farmer --
17  A.   Yep.
18  Q.   -- program?
19                  And is that based on -- when you say
20       "young," being like your age of 19, or young in terms
21       of not having been a farmer before or having your own
22       farming business before?
23  A.   I couldn't be specific, but I think it has something
24       to do with both.
25  Q.   All right. And you heard the testimony earlier, but

BOERSEN, NICHOLAS
01/15/2020

Page 9

1    do you have a specific recollection of meeting with
2    Chris to sign crop insurance application materials for
3    New Heights Farm II?
4  A. Yep.
5  Q. And I think the testimony was that that was in the
6    spring of '19?
7  A. Yep.
8  Q. Okay.  And your mom testified -- well, was that the
9    same meeting where you and your mom were present with
10   Chris --
11 A. Yep.  Yep.
12 Q. -- or were they different meetings?
13 A. Yeah, same meeting.
14 Q. Okay.  And so did you electronically sign?  Was it a
15   tablet?
16 A. I think -- I think it was a piece of paper.
17 Q. You recall --
18 A. Yeah.
19 Q. -- paper?
20 A. Yeah.
21 Q. And when you say "a piece," was there more than one
22   sheet or was it one sheet?
23 A. I can't remember.
24 Q. Did you have to sign more than one time?
25 A. I can't remember.

Page 10

1  Q. Was it a voluminous package?
2  A. Like I said, I -- it was so long ago, I can't
3    remember.
4  Q. Well, so was it March of '19; is that -- when we say
5    "spring," was it March?
6  A. Yeah.  I'd say sometime around March or the first of
7    April.
8  Q. So about nine months ago?
9  A. Yep.
10 Q. And you're pretty sure it was paper, not electronic?
11 A. Yep.
12 Q. Okay.  And you don't recall it being some big, hefty
13   package?
14 A. No.
15 Q. Okay.  You heard the testimony earlier, so I'm sorry
16   if it's going to seem repetitive, but we need to get
17   your own personal recollection of things.
18       When -- when we talk about Chris being the
19   insurance agent, were you -- similar to the testimony
20   your mom gave -- basically expecting Chris to handle
21   that piece of, you know, getting crop insurance?
22 A. Yes.
23 Q. So you were authorizing Chris, as the agent of New
24   Heights Farm II, LLC, to submit what she deemed the
25   appropriate paperwork to obtain crop insurance for the

Page 11

1    2019 crop year?
2  A. Yep, that's correct.
3  Q. And did Chris, at any time, make requests of you for
4    documentation that, you know, she said she would need
5    for submitting the application?
6  A. Not that I can recall.
7  Q. Okay.  And do you have an idea of what information is
8    needed to -- to apply under a young farmer program for
9    crop insurance?
10 A. No, I do not.  That's kind of why I put the ball in
11   her court on this, and she's taking care of it.
12 Q. Okay.  So you put the ball in her court?
13 A. Yep.
14 Q. And then she didn't ask you for anything?
15 A. Basically, yeah.
16 Q. Okay.  But you just know that you called Chris, and
17   she got insurance?
18 A. Yep.
19 Q. Okay.  What is your understanding of how the new --
20   the young farmer program works?
21 A. From what Chris has mentioned to me, it just gives me
22   a few more benefits and maybe some deductions in some
23   prices, but nothing specific.
24 Q. Okay.  Do you have any knowledge of what kinds of
25   information that are necessary to obtain crop

Page 12

1    insurance, what the insurer needs to see to provide a
2    policy for a young farmer?
3  A. No, I do not.
4  Q. Okay.  What assets did New Heights Farm II, LLC have
5    in, I guess, March through May of 2019?
6  A. Nothing.
7  Q. We heard testimony earlier from your mom that the
8    lending for New Heights I was based on the expected
9    crop and having a lien on the crop, as well as there
10   being crop insurance, among other things she may have
11   testified about, but those are two things I remember.
12   Would you agree with that in terms of for New Heights
13   II?
14 A. Yeah, I would say it's closely the same.
15 Q. Did you ever have any discussions -- I think your mom
16   talked about you two met when you decided to start
17   your own company -- about using Great Lakes Grain II,
18   III, or IV as opposed to creating a new New Heights
19   entity?
20 A. No.
21 Q. You just came up with -- decided to just start --
22 A. Yeah.  I actually came to her and decided that I
23   wanted to start my own business, and she wanted to be
24   a partner with me and move forward, and we came up
25   with a whole new thing and ...

Page 13

1  Q.  Okay.  Have you ever seen the APH for New Heights Farm
2      II, LLC?
3  A.  Not that I can think of.
4  Q.  I think we discussed with your mom, but tell me if I'm
5      wrong or if you have a different understanding, but
6      that the farmland that New Heights Farm II, LLC farms
7      on is land that has previously been farmed on by some
8      entity having Boersen in the title, right?
9  A.  Yes.
10 Q.  Okay.  And have you worked -- even when you were an
11     employee, not an owner -- in the family business on
12     some of these same lands that --
13 A.  Yep.
14 Q.  Okay.  What was your participation, if any, with Ceres
15     in terms -- in terms of the leases for the farmland
16     for New Heights II?
17 A.  Basically, Brandon -- we talked to Brandon and,
18     basically, took on the leases he had available for us,
19     the leases he brought to us.
20 Q.  And that's Brandon -- I think it's Zwick?
21 A.  Yep.  Yep.
22 Q.  Okay.  Did you have any dealings with Steve Cardinal?
23 A.  Nope.
24 Q.  And do you know if any of the land that you're now
25     leasing for New Heights Farm II that is owned by Ceres

Page 14

1      was ever previously owned by a Boersen entity?
2  A.  I can't tell you for sure off the top of my head
3      without seeing a list.
4  Q.  Do you think it's possible, though?
5  A.  No.
6  Q.  No.
7  A.  I don't know them all.
8  Q.  But do you think Ceres owns some properties that were
9      formerly owned by Boersen entities that -- when you
10     worked for -- there as an employee?
11 A.  No.
12 Q.  No.  So you think it's all different farmland that
13     Ceres owns and leases to --
14 A.  Yes.
15 Q.  Okay.  Who from -- is it ARM that is the lender?
16 A.  Yep.
17 Q.  Who was your contact with ARM?
18 A.  At first, we talked to Scott Rueff.  That was the
19     first person we came in contact with when setting up
20     the applications.  And then when we signed, Dan Grube
21     is who we talked to.
22 Q.  Dan who?
23 A.  Grube.
24 Q.  Grube?
25 A.  Yep.

Page 15

1  Q.  Is that like G-r- --
2  A.  G-u- -- or G-r-u-b-e.
3  Q.  Okay.  And do you know where either of those gentlemen
4      reside, in terms of like where their offices are at?
5  A.  Their office is in Richland, but they travel all over.
6  Q.  Okay.  And what about the company itself, is it more
7      than just Richland or --
8  A.  Yep.  Yep.
9  Q.  Where are they out of?  Do you know where they're
10     located?
11 A.  I have no idea.  It's more than Richland.  I just
12     don't know where.
13 Q.  Is it more than Michigan; do you know?
14 A.  I think so, but I couldn't tell ya.
15 Q.  Have you ever looked at -- I know you were here when I
16     asked your mom, but -- any crop insurance handbooks?
17 A.  Nope, I have not.
18 Q.  Okay.  So New Heights Farm II, then, the first year
19     that they would have ever been insured would have been
20     just a one-time -- I'm not talking 2020, but 2019
21     would have been the first year --
22 A.  Yep.
23 Q.  -- of getting any crop insurance, right?
24         Do you know whether part of submitting for
25     the insurance, as a young farmer, that there had to

Page 16

1      still be some production reports from -- or historical
2      reports from farming the land even prior to the
3      existence of New Heights II?
4  A.  I'm not sure.
5  Q.  Okay.  Were you -- did you ever work for Great Lakes
6      Grain in any capacity?
7  A.  I really don't know where the companies kind of fell
8      in line.  I stopped getting paid after Boersen Farms
9      Ag, basically.  So I don't really know where the
10     companies ever switched hand, because I never kept
11     track of that.
12 Q.  Did you farm crop in 2018, or the winter wheat, I
13     guess, into 2019?
14 A.  Like farm or help out or --
15 Q.  Yeah, just --
16 A.  I helped out, but I went to college last year, so --
17     part-time.
18 Q.  Okay.  Where at?
19 A.  College?
20 Q.  Yeah.
21 A.  GRCC.
22 Q.  Were you starting like farm related?
23 A.  I was just starting business --
24 Q.  Business and agriculture?
25 A.  -- and then was going to transfer somewhere.

BOERSEN, NICHOLAS
01/15/2020

Page 17

1  Q.  Okay.  Who told you -- or how did you learn, I guess,
2      that you'd be submitting for crop insurance under
3      this -- under young farmer?
4  A.  Chris notified me --
5  Q.  Chris?
6  A.  -- that I could get benefits being a young farmer.
7  Q.  Okay.  So is it fair to say -- or is there any other
8      source of information or knowledge you have about that
9      than --
10 A.  No.
11 Q.  -- besides Chris?
12 A.  No.
13 Q.  Okay.  When -- so I know there was this meeting with
14     the signature in like March or spring of 2019.
15             When did the process start for getting crop
16     insurance in terms of -- or how did the process start
17     for New Heights II?
18 A.  Before we even got to the signature part?
19 Q.  Yeah.
20 A.  I mean, starting a farm and getting a business and
21     getting a line of credit, that's a necess- --
22 Q.  Correct.
23 A.  -- necess- -- I can't even pronounce it --
24 Q.  No, I hear you.
25 A.  -- you know what I'm saying, to even get the line of

Page 18

1      credit, so ...
2  Q.  So, I guess, when was the first time any discussion
3      about needing crop insurance happened?
4  A.  It had to have been anywhere from the last week of
5      January to the first week of February.
6  Q.  And that discussion would have been between you and
7      your mom or you and Chris or --
8  A.  Me and my mom.
9  Q.  Okay.
10 A.  Me and my mom, that would be when we started talking
11     about starting the business, so ...
12 Q.  Okay.  And did that discussion involve that there was
13     this case going on in any way?
14 A.  (Shook head.)
15 Q.  No?
16 A.  I had no idea.
17 Q.  And did that discussion involve getting -- I mean,
18     tell me what was discussed other than the fact that
19     you needed crop insurance, or was that the extent of
20     the first conversation?
21 A.  I mean, like I said, just to get our line and get
22     everything lined up the way we needed to run our
23     business, we -- you have to have crop insurance to
24     farm.
25 Q.  Okay.  So then -- so we've got this end of

Page 19

1      January/beginning of February first conversation, and
2      we know that the signature happens sometime the
3      spring, maybe March.
4  A.  Yep.
5  Q.  What happens -- how many discussions were there in
6      between?  Do you then contact Chris or --
7  A.  Yeah, we went to Chris --
8  Q.  Okay.
9  A.  -- contacted her.
10 Q.  And that was a phone call?
11 A.  Yeah, just a phone call.
12 Q.  Okay.  And what was that?  Did you contact her
13     together about both New Heights?
14 A.  Yeah.  Yep.
15 Q.  And that was -- how did that phone call go, or what
16     was the discussion?
17 A.  I mean, I can't even really remember.  I think that my
18     mom did most of the talking, that I can remember.
19 Q.  And how soon after that initial discussion between
20     just you and your mom where you realized we need crop
21     insurance until you call Chris?
22 A.  Can you repeat that again?
23 Q.  Yeah-yeah.  So you've got the initial conversation --
24 A.  Yep.
25 Q.  -- is like the end of January --

Page 20

1  A.  Yep.
2  Q.  -- beginning of February, and then a phone call to
3      Chris.
4  A.  Yep.
5  Q.  How much lag time in between?  Was it right away?  You
6      called her right away?
7  A.  No, there was probably some lag time, because we still
8      had a -- we had a lot of stuff going on that we had to
9      figure out on getting the business initially even
10     started, so ...
11 Q.  But do you think it would have been in February of '19
12     that you reached out to Chris?
13 A.  It had to have either been February or the first of
14     March.
15 Q.  Okay.  And then -- so you reach out.  And if I'm
16     understanding your testimony, she basically says,
17     "Okay, I'll take care of it"?
18 A.  Yep.
19 Q.  Does she say, "I need X, Y, and Z from you"?
20 A.  Nope.  Not that I can remember.
21 Q.  Okay.  But you would have at least supplied her with
22     basics about like the company name and --
23 A.  Yep.
24 Q.  -- formation date and --
25 A.  Yep.

BOERSEN, NICHOLAS
01/15/2020                                                    Pages 21–24

Page 21

1   Q.   -- who the members were?
2   A.   Yep.
3   Q.   And how was that communicated to -- to Chris?
4   A.   Through, I guess, however we emailed it to her.
5   Q.   Email?
6   A.   Yep.
7   Q.   Okay.  Do you know whether you produced any emails or
8        correspondence you had with Chris or anybody at Great
9        American?
10  A.   Nope.
11  Q.   And then -- all right.  So you have the phone call,
12       presumably in February, maybe the beginning of March,
13       saying you need crop insurance.  She says, "I'll take
14       care of it."  Then you send her, in some fashion, the
15       information we just talked about?
16  A.   Yep.
17  Q.   Was there any other time before the signature that you
18       talked with Chris in any way about crop insurance?
19  A.   Not that I can remember.  Not me, personally.
20  Q.   So how did the meeting come about for her to come to
21       Zeeland and meet personally so that you can sign the
22       application?
23  A.   She contacted me and my mom through -- I think it was
24       a group text, or maybe even gave me a call, and said,
25       "We're meeting on this date, and we'll sign for the

Page 22

1        crop insurance."
2   Q.   How soon before that meeting would that contact have
3        come, basically, just to arrange the --
4   A.   I would say probably a week in advance.  I don't know.
5        I can't remember --
6   Q.   Okay.
7   A.   -- exactly.
8   Q.   So from start to finish, end of January/beginning of
9        February to signing in March, there were maybe two to
10       four instances of communication?
11  A.   Yeah.
12  Q.   And the only thing you can remember sending her was
13       basic information about the newly-formed --
14  A.   Yep.
15  Q.   -- New Heights II?
16  A.   Yep.
17  Q.   Okay.  And did she, at any time, share with you what
18       she was providing in terms of an application to Great
19       American?
20  A.   Not a whole lot.
21  Q.   Did she give you a copy for your file of what -- of
22       the application?
23  A.   I wouldn't know that.  That's something my mom would
24       know.
25  Q.   Does your mom hold a position in New Heights II?

Page 23

1   A.   No, she does not.
2   Q.   Like secretary?  Treasurer?
3   A.   No.
4   Q.   All right.  But any records that New Heights II has
5        with respect to its file or its application would have
6        been produced; is that --
7   A.   Yep.
8   Q.   -- your understanding?
9             Okay.  So if I understand correctly, that
10       you're kind of juggling the balls at the same time;
11       that you're trying to get the crop insurance, but
12       you're also trying to get the fund -- or the
13       financing --
14  A.   Yep.
15  Q.   -- at the same time, right?
16  A.   That's correct.
17  Q.   How many meetings did you have with -- I'm going to
18       forget their names -- is it Scott and Mr. Grube?
19  A.   Yep.
20  Q.   How many meetings did you have with them?
21  A.   We had two.
22  Q.   Both at your office?
23  A.   One at our office and then the final one at theirs
24       when we signed.
25  Q.   To do like a closing?

Page 24

1   A.   Yep, closing.
2   Q.   Okay.  And those were in person.  Did you have emails
3        and phone calls with them besides those two?
4   A.   Not that -- not a whole lot that I can think of.  I
5        think we had a phone conference with them maybe one or
6        two times, just asking on the timeline of the line and
7        when it would get open.
8   Q.   Okay.  And what is the overall time frame from the
9        very first communication with any of them, with the
10       lender, to closing; is it similar like we talked about
11       the crop insurance, like January or February until --
12  A.   No.  It probably started -- I think it was the end of
13       February, first of March, and we didn't close until
14       probably -- it had to have been the first or second
15       week of May.
16  Q.   Okay.  And was it them that communicated to you the
17       requirement of getting crop insurance in order for
18       them to be able to get into a lending relationship --
19  A.   Yep.
20  Q.   -- with you?
21            At what point was that communicated to you
22       in terms of the discussion?
23  A.   Just somewhere along the lines of in the -- in that
24       timeline I just stated.  It would just be something
25       that came up as a requirement.

BOERSEN, NICHOLAS
01/15/2020

Page 25

1  Q.  And then you, through Chris, obtained the crop
2      insurance.  In what way was that communicated to ARM,
3      the lender?
4  A.  Through Chris.
5  Q.  Do you know if she, on your behalf, had forwarded a
6      copy of the application materials to the lender?
7  A.  I -- I don't know.
8  Q.  But in some way, you believe Chris communicated to ARM
9      that New Heights II had procured crop insurance for
10     2019?
11 A.  Yep.
12 Q.  Okay.  Or else the closing wouldn't have happened --
13 A.  Yep.
14 Q.  -- correct?
15 A.  Yep.
16 Q.  When Chris met with you in the spring of '19 to sign
17     the application, did you read it?
18 A.  Yeah, briefly.
19 Q.  And you thought it was a small-ish document in terms
20     of not being too voluminous?
21 A.  Yeah.  Like I said, I can't remember exactly, but ...
22 Q.  Did you understand who would be receiving that
23     information once you signed it and Chris sent it out
24     for you?
25 A.  Yep.

Page 26

1  Q.  Which is who?
2  A.  It would be Great American.
3  Q.  Okay.  And what about the federal government?
4  A.  Yep.
5  Q.  Did you know Chris -- I know that you were new to New
6      Heights II and to crop insurance from that entity, but
7      had you known Chris prior from her relationship with
8      the family company?
9  A.  Yeah, I met her prior.  She's boughten some of my 4-H
10     animals from the fair, livestock auction.
11 Q.  What type of insurance did New Heights II purchase in
12     terms of what was covered, what was under the policy?
13 A.  I don't know.
14 Q.  For 2019, did you start collecting production history
15     information for New Heights II?
16 A.  In 2019?
17 Q.  Yeah.
18 A.  At the end of the season?
19 Q.  Yep.
20 A.  Yep.
21 Q.  Okay.  And how is that done?
22 A.  Through GPS and our combines' GS-3 screens, and then
23     transferred onto a computer.
24 Q.  And so you store that data now on the --
25 A.  Yep.

Page 27

1  Q.  -- on a computer?
2      And will you use that going forward in
3      terms of future applications for insurance?
4  A.  We -- I'm pretty sure we don't use our own for our
5      insurance, so no.
6  Q.  What information do you use?
7  A.  Well, they'll go off of -- well, they'll take our --
8      basically, our averages.
9  Q.  But do you think now that you've started --
10 A.  I'll use that information for myself.
11 Q.  Do you think that will be used to figure out averages,
12     though, in the future now that you have --
13 A.  A year under our belts?
14 Q.  -- information for 2019?  Yeah.
15 A.  Yes.
16 Q.  But you don't know what, if any, information was used
17     for years prior to 2019?
18 A.  No.
19 Q.  Do you know what role, if any, APH plays into this
20     young farmer program for being able to obtain crop
21     insurance?
22 A.  No, I do not.
23 Q.  The information that we were just talking that you now
24     are capturing, now that you've got operations, you've
25     got a year under the belt, will that information get

Page 28

1      sent to Chris at any point?
2  A.  I don't know yet.
3  Q.  Has she asked for it?
4  A.  Nope.
5  Q.  Have you started applying for insurance for 2020?
6  A.  Nope.
7  Q.  Do you plan to proceed in 2020 under New Heights Farm
8      II?
9  A.  Yep.
10 Q.  Have you discussed any new entity for 2020 --
11 A.  No.
12 Q.  -- with anyone?
13     Do you know what happens if a grower does
14     not have APH for the farms?  You know, for -- like,
15     for instance, if you -- if you don't think New Heights
16     Farm II had an APH when it was created, then what
17     happens from there?
18 A.  No, I do not.
19 Q.  I think we already covered that you're not sure
20     whether the program that was referenced to you as a
21     young farmer is the, quote, beginning farmer and
22     rancher program?  Do you know if that's the program?
23 A.  It could be.
24 Q.  But you've not undertaken an independent review of the
25     rules that apply to that --

BOERSEN, NICHOLAS
01/15/2020

Page 29

1  A.  No.
2  Q.  -- program?
3  A.  No.
4  Q.  Or any program?
5  A.  No.
6  Q.  Okay.  We talked a little bit that Chris said to you
7      that by getting that program, it gives you some added
8      benefits, right?
9  A.  Yep.
10 Q.  Forgive me if you already said what they were, but do
11     you have an understanding or did she communicate to
12     you what some of those benefits specifically are?
13 A.  Like I said, it was very little.  She just mentioned
14     those two little things to me.
15 Q.  Which were?  I'm sorry, what were the two?
16 A.  You can get some -- a deduction off your insurance
17     price because of your age and just being it's your
18     first year as a farmer.
19 Q.  Okay.
20 A.  It's just what she briefed me on.
21 Q.  Have you ever heard of anything called "new producer
22     rules"?
23 A.  Nope.
24 Q.  Is your -- was your insurance for 2019, for New
25     Heights Farm II, did it cost less, I guess, in

Page 30

1      premiums than New Heights I?
2  A.  I don't know.
3  Q.  Would you expect it to?
4  A.  I'm not really sure.
5  Q.  Well, wouldn't that be one of the benefits?
6  A.  I mean, I guess you could expect it to.
7  Q.  Because I think we heard your mom testify earlier that
8      New Heights I was not going under that program, right?
9  A.  But there could be a lot of different factors into
10     that, too, because she could farm more acres, too.
11 Q.  Well, didn't she say that New Heights Farm I and II
12     split 15,000 --
13 A.  Yeah, they're basically split, but I'm just saying, it
14     could be.
15 Q.  But knowing -- knowing only what we've talked about,
16     unless there is some other information that you know
17     and want to tell me, that doing the equal number of
18     acres and under similar policies, you should have a
19     more affordable premium --
20 A.  Yes.
21 Q.  -- payment based on --
22 A.  Yep.
23 Q.  -- the young farmer program?
24 A.  Yep.  Exactly.
25 Q.  Okay.  Do you know what -- any discrepancies in -- or

Page 31

1      differences in what was covered in terms of policies
2      between --
3  A.  No, I do not.
4  Q.  Do you know if New Heights II had a band policy?  I
5      think we talked about that ARMtech, or whatever it was
6      called, that additional policy that --
7  A.  Yes, I think we do.  Yes, we have the additional
8      ARMtech and then the band policy.
9  Q.  Which is the ARMtech, right?
10 A.  Yeah.
11 Q.  And did you execute personal guarantees for the New
12     Heights Farm II loan?
13 A.  Yep.
14 Q.  I believe your mom did the same for New Heights I,
15     right?
16 A.  Yep.
17 Q.  Does New Heights Farm II have any leases with any --
18     any entity with the name Boersen in it for leases of
19     equipment?
20 A.  Yes.
21 Q.  What equipment?
22 A.  What equipment?
23 Q.  Yeah.
24 A.  So combines, tractors.
25 Q.  And that's the same kind of stuff that you operated

Page 32

1      before you were an owner, right?
2  A.  Yep.
3  Q.  All right.  Is any of the equipment the actual same --
4  A.  No.
5  Q.  -- combine or tractor?
6  A.  Not one piece.
7  Q.  No?  What happened to those other pieces?
8  A.  It all got repossessed.
9  Q.  By --
10 A.  I don't know.
11 Q.  -- Ceres?  Somebody else?
12 A.  I have no idea.
13 Q.  Okay.  Do you know how, whatever Boersen is leasing
14     under your -- under the New Heights Farm II lease, how
15     they were able then to obtain this equipment to lease?
16 A.  I don't know.
17 Q.  A balance sheet for New Heights Farm II, dated
18     March 27th of '19, says 10,000 in cash.  Was that just
19     your own personal funds, or yours and your mom's?  I
20     think maybe she testified earlier it was just personal
21     savings or whatever?
22 A.  Yep.
23 Q.  So it looks like your equipment services agreement,
24     the Boer-- -- we keep talking about a Boersen entity.
25     It looks like it's Boersen Farms & Affiliates, LLC.

BOERSEN, NICHOLAS
01/15/2020

Page 33

1      Does that sound right?
2  A.  **Yep.**
3  Q.  And do you know who the members of that LLC are?
4  A.  **I do not.**
5  Q.  Who was your contact person from Boersen Farms &
6      Affiliates, LLC?
7  A.  **That would be my dad.**
8  Q.  Okay.  So do you think at least he is a member of
9      Boersen Farms --
10  A.  **I'm not very sure.**
11  Q.  You don't know any of the members?
12  A.  **Nope.  I don't know any of them.**
13  Q.  But the only person that you talked to for the
14      equipment services agreement from the other
15      contracting party was your dad?
16  A.  **Yep.**
17  Q.  And it looks like the fee for that agreement was
18      $75,000 per month --
19  A.  **That is correct.**
20  Q.  -- on or before the first day of each month commencing
21      May 1, 2019.
22            Do you know how that figure was reached,
23      the 75,000?
24  A.  **Fair market value on all the equipment.**
25  Q.  Do you know how the fair market value was calculated?

Page 34

1  A.  **Through the FSA.**
2  Q.  And is New Heights II current on those payments?
3  A.  **Yep.**
4  Q.  And I take it that was through the funding from the --
5      from ARM --
6  A.  **Yep.**
7  Q.  -- that you're able to make those?
8           And that's the same funding that paid for
9      the farmland lease --
10  A.  **Yep.**
11  Q.  -- with Ceres, right?
12  A.  **Yep.**
13  Q.  Okay.  And so I would assume -- but I guess that's why
14      we're here is to ask the questions -- Boersen Farms &
15      Affiliates, LLC has some kind of security or
16      repossession right on the equipment, like if you don't
17      pay?
18  A.  **Yep.**
19  Q.  Okay.  And do you know whether any other entity has
20      any security interest in that equipment, such as a
21      creditor of Boersen Farms & Affiliates --
22  A.  **I have no idea.**
23  Q.  -- LLC?
24           And you don't know where your dad got
25      those --

Page 35

1  A.  **No.**
2  Q.  -- that equipment?
3  A.  **No.**
4  Q.  Okay.  Well, it sounds like we figured out the answer
5      to one of the earlier questions, what does your dad do
6      now:  He gets at least $75,000 a month to his company
7      in your lease, right?
8  A.  **I don't know if it's his company or not.**
9  Q.  Well, you didn't talk to anyone else from that
10      company, right?
11  A.  **No.**
12  Q.  Okay.  And is that who New Heights I has a lease with
13      for its equipment?
14  A.  **I believe so.**
15  Q.  Under the same financial arrangement:  $75,000 a
16      month, I think is what we talked about earlier?  Is
17      that right?
18  A.  **Yep.**
19  Q.  Okay.  Do you know when Boersen Farms & Affiliates,
20      LLC was established?
21  A.  **No idea.**
22  Q.  Those $75,000 payments, how are they made?  Is there a
23      direct deposit or do you write a check?
24  A.  **I assume it's direct deposit.**
25  Q.  And do you know whether the payment -- the payment

Page 36

1      information or documentation has been produced?
2  A.  **I have no idea.**
3  Q.  For Boersen Farms & Affiliates, LLC, the State of
4      Michigan website says it's organized November 1, 2016.
5      Is that consistent with your understanding --
6  A.  **I don't know.**
7  Q.  -- a resident agent of Dennis Boersen?
8           Well, you just -- you already testified
9      that's just the only person you've dealt with from
10      that organization, right?
11  A.  **(Nodded head.)**
12  Q.  Right?
13  A.  **Yep.**
14  Q.  How many pieces of equipment are you leasing from
15      Boersen Farms & Affiliates, LLC?
16  A.  **I can't tell you off the top of my head.**
17  Q.  More than two?
18  A.  **Yep.**
19  Q.  More than five?
20  A.  **I don't know about more than five.**
21  Q.  Somewhere in the neighborhood of two to five pieces?
22  A.  **I couldn't be specific.  I don't know off the top of**
23      **my head.**
24  Q.  Well, does the price vary from 75,000 a month
25      depending on what you're using?

BOERSEN, NICHOLAS
01/15/2020

Pages 37–40

Page 37

1   A.   No.
2   Q.   So that fair market value has in mind very specific
3        pieces of equipment, however many they are, right?
4   A.   Yep.
5   Q.   Do you know whether Boersen Farms & Affiliates, LLC
6        does anything besides lease farming equipment?
7   A.   I have no idea.
8   Q.   So you don't know whether it farms?
9   A.   Nope.
10  Q.   Now, it looks like you also have a lease with Boersen
11       Farms, Inc.?
12  A.   That's correct.
13  Q.   And what is that lease for?
14  A.   Land.
15  Q.   Okay.  So you're farming land:  some owned by Ceres;
16       some owned by Boersen Farms, Inc.?
17  A.   Yes, and some third parties.
18  Q.   So you have leases with, basically, anybody --
19  A.   Yep.
20  Q.   -- you're farming with; that if it's not you -- does
21       New Heights Farm II own any --
22  A.   Nope.
23  Q.   No?
24  A.   Don't own anything.
25  Q.   So for 2020 -- or I'm sorry.  Coming due on March 15,

Page 38

1        2020, you have a note -- or New Heights Farm II has a
2        note with Agrifarm -- or ARM for a little over four
3        million.  Is that the loan amount?
4   A.   Yep.
5   Q.   And is the 2019 crop, is that what is expected to
6        pay -- you know, sale of that crop is what's expected
7        to be able to make that payment?
8   A.   Yep.  That, and crop insurance.
9   Q.   Are you expecting to meet that obligation this year?
10  A.   Yep.
11  Q.   And are you expecting or have you had to make a claim
12       to the insurance to meet that?
13  A.   Yep.
14  Q.   What was the -- what was the claim?
15  A.   I couldn't tell you off the top of my head.
16  Q.   When was the claim made?
17  A.   I can't -- couldn't tell ya.
18  Q.   Did you do it or did someone else do it?
19  A.   No, I did it.
20  Q.   Would it have been in the last 15 days, in 2020?
21  A.   No.
22  Q.   In the fall?
23  A.   No.
24  Q.   In the spring?
25  A.   No.  It'd be -- it'd be probably around the first of

Page 39

1        the month.
2   Q.   Of this month?
3   A.   Yep.
4   Q.   Okay.  And the purpose of the claim would be that the
5        growing season is over and it didn't yield as
6        anticipated --
7   A.   Yep.
8   Q.   -- or what the --
9   A.   Correct.
10  Q.   Who prepared and filed the documents to -- to make New
11       Heights II exist with the State, as a company?
12  A.   Me and my mom did.
13  Q.   Did Ceres make any sort of -- well, no, you paid Ceres
14       up front for the entire crop year, right?
15  A.   Yep.
16  Q.   I think that's what Steve Cardinal testified.  As soon
17       as you got the loan back in May, you paid like 3-1/2
18       million, or something like that --
19  A.   Yep.
20  Q.   -- right, to Ceres?
21  A.   (Nodded head.)
22  Q.   Do you know whether the property you leased from
23       Boersen Farms, Inc., is available for this year to --
24       to farm again?
25  A.   I do not yet.

Page 40

1   Q.   Okay.  Are you aware that there have been several
2        notices within the last couple of months of
3        foreclosures --
4   A.   Nope.
5   Q.   -- on Boersen properties?
6             So you don't know whether this one is one
7        of them or not?
8   A.   Nope.
9   A.   I shouldn't say one.  Maybe you should clarify for me
10       how much property New Heights II leases from Boersen
11       Farms, Inc.
12  A.   I couldn't be exact.
13  Q.   It looks like Exhibit A to the lease talks about farm
14       number 8533, approximately -- almost 150 acres in
15       Eaton County.
16  A.   Yep.
17  Q.   Does that sound -- does that sound right?
18  A.   Yep.
19  Q.   So you're assuming -- is it fair to say that you're
20       assuming that whatever requirements there may be that
21       you've not reviewed in terms of any new beginning
22       farmer/rancher for some crop insurance would have been
23       followed by Chris --
24  A.   Yep.
25  Q.   -- the agent, right?

**BOERSEN, NICHOLAS**
01/15/2020

Page 41

1   A.   Yep.
2   Q.   Did Ceres ever have any discussions with you,
3        comments, or questions at all about this lawsuit when
4        you were, you know, seeking to lease land as -- under
5        New Heights -- for New Heights II?
6   A.   Not that I'm aware of.
7   Q.   Not that you were personally involved in?
8   A.   No.
9   Q.   Okay.  What about ARM?
10  A.   Nope.
11  Q.   Was ARM aware of this lawsuit?
12  A.   Nope.
13  Q.   Did you ever make them aware?
14  A.   Nope.
15  Q.   Do you know if whether your mom did or your dad did?
16  A.   I'm not sure.
17  Q.   Do you think it would have made a difference to ARM if
18       they'd have known about this lawsuit in terms of the
19       financing for the 2019 crop year for New Heights Farm
20       I or II?
21  A.   I'm not sure, but, yeah, probably would have made a
22       big impact.
23  Q.   In what way do you think?
24  A.   Probably a very negative way.
25  Q.   Like they -- they wouldn't have lent the money?

Page 42

1   A.   Yep.
2   Q.   Has ARM since become aware of the lawsuit?
3   A.   I'm not sure.
4   Q.   You haven't talked to anyone from there about it?
5   A.   Nope.
6   Q.   I previously, I think it was early last May, took the
7        deposition of Mr. Kushmaul.  But other than that, I'm
8        not familiar with your other employees.
9             Did any of them, besides Mr. Kushmaul --
10       well, let me back up.
11            Mr. Kushmaul has worked for Boersen
12       entities before working for New Heights II, right?
13  A.   Yep.
14  Q.   Any of the other employees?
15  A.   Yes.
16  Q.   Who?
17  A.   It'd be Brian Goodrich -- well, basically, all of them
18       I named right there, including Bill.
19  Q.   What -- did they have the same positions as they had
20       with New Heights II as what they had with prior --
21       legacy Boersen entities?
22  A.   Ah, no.
23  Q.   Different?
24  A.   Yeah.
25  Q.   What did -- what did each of them do before versus

Page 43

1        what they're doing now?  You can take them one by one.
2   A.   I guess just probably, as a whole, it just is a whole
3        different company and a whole different structure.
4   Q.   All right.  So Kushmaul, for example, what is he doing
5        for --
6   A.   Well, he's still doing the same.
7   Q.   Which is what?
8   A.   He's -- he is my groundamist [sic].
9   Q.   Grounds.
10  A.   And the other two guys are truck drivers.  One is a
11       truck mechanic.
12  Q.   And those guys are who?
13  A.   The two truck drivers would be Brian Goodrich and Cory
14       Tom, and then Mike Carlock is my truck mechanic.
15  Q.   Okay.  And what did they do -- so I think what you
16       just said is what they do for you now, right?
17  A.   They -- right now, they drive truck for me.  Before,
18       they used to operate machinery, I guess.  I couldn't
19       tell you exactly what they did, because I didn't work
20       with all them guys all the time.
21  Q.   Okay.
22  A.   I was only part-time.
23  Q.   Fair enough.  You were with us earlier.  You heard the
24       testimony with your mom about who Blain Becktold was
25       and the Down On The Farm Company.  Do you remember

Page 44

1        that?
2   A.   I don't know who that is.
3   Q.   Did he ever do any certifications, or has it always
4        been your mom or someone else for the -- for the New
5        Heights II crop?
6   A.   It's been my mom and myself.
7   Q.   Okay.  And I forget what your mom said, so -- I
8        honestly don't remember, but was there something
9        that -- some kind of certification that has to be
10       gained to be able to do that, or you just have to
11       learn how to do it?
12  A.   Just learn how.
13  Q.   Okay.  The claim you just talked about -- or that you
14       filed that you think was roughly around the first of
15       the year but you don't remember for how much, is it
16       fair for me to assume that's the only insurance claim
17       you've ever made?
18  A.   Yep.
19  Q.   Okay.  Do you know whether the documents for that
20       claim have been produced?
21  A.   I do not know.
22  Q.   And you said Chris made the claim for you?
23  A.   She did not make the claim.  I made the claim.
24  Q.   Right.  I'm sorry, you said that, you made the claim.
25            What was -- what did it entail to make the

BOERSEN, NICHOLAS
01/15/2020

Page 45

1 claim; was it a form that you had to fill out?
2 A. Yeah.
3 Q. And then you mailed that?
4 A. Yeah. Yep. Yep.
5 Q. And you mailed it to where: your agent in the
6 Petoskey area?
7 A. Yeah, it would be Chris.
8 Q. Directly to Chris?
9 A. She's the -- all in all, she's the middleman, so --
10 Q. Okay. So then --
11 A. -- as you could call her.
12 Q. So then she would determine --
13 A. Yep.
14 Q. -- to send it on --
15 A. Yep.
16 Q. -- to Great American --
17 A. Yes.
18 Q. -- or something?
19        Okay. And you expected that she sent that
20   to her home office --
21 A. Yep.
22 Q. -- her employer?
23 A. Yep.
24 Q. And then have you received -- well, I guess not if you
25   don't know -- if you don't remember the payment.

Page 46

1        You haven't received the payout on that?
2 A. Nope.
3 Q. Or have you even received a determination from the
4   insurer, like a --
5 A. Not that I'm aware of.
6 Q. But you're expecting that it will be covered and paid?
7 A. Hopefully.
8 Q. Yeah. And then if I understand the way this works
9   correctly, then that will be turned right over to ARM
10   to make up the rest of this promissory note payment
11   coming due three months from now -- or two months from
12   now, March 15th, right?
13 A. (Nodded head.)
14        MR. VANDER VEEN: You have to answer
15   verbally.
16 THE WITNESS: Yep.
17 BY MR. MAGYAR:
18 Q. Anywhere else those funds are earmarked for or
19   directed to?
20 A. Nothing specific.
21 Q. Because everything else, if I'm understanding, is paid
22   off already in terms of rent -- leases, equipment
23   leases?
24 A. Yep. Yep.
25 Q. So besides equipment leases and land leases, what

Page 47

1 other sort of expenses of operation do you have?
2 A. It would be my seed and fertilizer costs.
3 Q. And that's Logan?
4 A. Yep.
5 Q. And are they paid off?
6 A. They will get paid off after ARM does.
7 Q. Okay. All right. So, yeah, we talked about that with
8   your mom.
9 A. Yep. Yep.
10 Q. And that will be part of -- also, that will -- will
11   their payment be covered if you get -- if your claim
12   is fulfilled, if your insurance claim --
13 A. I assume so.
14 Q. -- you'll have enough money for everybody?
15 A. I would assume so.
16 Q. All right. And then you probably have, besides all
17   those, your employees' wages, right?
18 A. Yep.
19 Q. Anything else?
20 A. No. Not that I'm aware of.
21 Q. When equipment needs repair or upkeep or gas or
22   whatever, is that all covered as part of the lease?
23   Like as long as you're paying the --
24 A. I'd have to look at the lease.
25        MR. MAGYAR: All right. I think this is a

Page 48

1 good time for a break, and I'm going to see what that
2 missed call was and also speak with Amanda, and then
3 we'll see how much more we've got here.
4        MR. VANDER VEEN: Sounds good. Thank you.
5        (Off the record at 2:27 p.m.)
6        (Back on the record at 2:44 p.m.)
7 BY MR. MAGYAR:
8 Q. All right. I don't think we'll be here much longer,
9   like when I took that break for your mom. I guess a
10   few just follow-ups on some of the things we talked
11   about.
12        I didn't ask you earlier, but are you doing
13   anything else in terms of employment besides running
14   New Heights II?
15 A. No.
16 Q. That's full-time?
17 A. Yep.
18 Q. How many hours a week do you think?
19 A. During harvest season, it was anywhere from 80 to 100,
20   and now it's back down to about 40.
21 Q. Just like a normal person?
22 A. Yep. Yep.
23 Q. And were you going to do more with GRCC in terms of
24   the business degree, or now you're just focused solely
25   on New Heights II?

BOERSEN, NICHOLAS
01/15/2020

Page 49

1  A.  Basically, I mean, I went to GRCC a full semester, and
2      it just wasn't -- I mean, college just wasn't for me.
3      I just like being more hands-on --
4  Q.  Got it.
5  A.  -- kind of a worker.
6  Q.  Have you ever been involved -- or, I guess, I should
7      limit it to New Heights II. We talked earlier that
8      there's the claim and the lien and that funds will go
9      towards Logan and ARM.
10         Have you ever been part of any crop-sharing
11     arrangement?
12 A.  Nope.
13 Q.  Like where you farmed land owned by someone else --
14 A.  No.
15 Q.  -- and share in the profits?
16 A.  No.
17 Q.  Or you don't -- you don't have anyone else come in and
18     farm and share profits with them --
19 A.  No.
20 Q.  -- for New Heights II?
21         Okay. This may sound like a silly
22     question, but I just -- because it sounds like there's
23     a long-standing relationship with Chris, the agent, is
24     she family in any way --
25 A.  No.

Page 50

1  Q.  -- or just a friend?
2  A.  Just a friend.
3  Q.  Okay. Who does New Heights II, at least for 2019 -- I
4      guess that's the only crop year there's been -- who
5      are the end customers or the buyer of the crop?
6  A.  It'd be Carbon Green.
7  Q.  What is that?
8  A.  That's in Ionia.
9  Q.  Okay. What was it? Carve?
10 A.  Carbon Green.
11 Q.  Oh, Carbon Green?
12 A.  Yep.
13 Q.  And what does Carbon Green do?
14 A.  They're an ethanol plant, a buyer of the corn, if
15     that's the -- is that what you're asking?
16 Q.  Yeah, it is. Yep.
17         Are they the sole customer? Everything you
18     produce goes to them?
19 A.  Basically. We sell some to The Andersons, but ...
20 Q.  Who are The Andersons?
21 A.  Ethanol plant, as well.
22 Q.  Oh, like Andersons, Inc.?
23 A.  Yep.
24 Q.  Okay. Is corn the only crop you do for New Heights
25     II?

Page 51

1  A.  Corn and a little bit of soybeans.
2  Q.  But both are used for that purpose, for those --
3  A.  Yep.
4  Q.  -- end users?
5          And in terms of your claim, your insurance
6      claim, the pending claim, would it be accurate to say
7      that if you had yielded more corn and soybean, they
8      would have purchased it, and there is just a lack of
9      yield that resulted in the claim?
10 A.  It depends what -- what the claim's on.
11 Q.  What was this claim?
12 A.  I couldn't tell ya off the top of my head.
13 Q.  But you -- you did the claim? I guess let me back up.
14         What I'm trying to figure out is: Would
15     Carbon Green and/or The Andersons have purchased more
16     crop if there was crop?
17 A.  I can't say that.
18 Q.  But did you have contracts with them?
19 A.  Yeah, we had contracts with Carbon Green.
20 Q.  Do you know whether those have been produced?
21 A.  I have no idea.
22 Q.  Do you know the terms of those contracts?
23 A.  No, I do not.
24 Q.  Do you know if it's a requirements contract?
25 A.  Nope, I do not.

Page 52

1  Q.  So in some fashion, you had a shortfall, or else
2      there'd be no claim, right?
3  A.  Yep.
4  Q.  But you don't know if that's because of an inability
5      to meet the customer demand or contract or --
6  A.  Oh, that ain't -- no, that ain't because we can't meet
7      the customer contract, no.
8  Q.  It's because yield didn't match the expectation?
9  A.  Yep.
10 Q.  Okay.
11 A.  Exactly.
12 Q.  All right. And if it had met the expectation, I mean,
13     there would have been more crop, right?
14 A.  Yeah.
15 Q.  Then you presumably would have been able to sell it to
16     one of these customers?
17 A.  Correct.
18 Q.  Now, I think as we've mentioned, we're working through
19     other sources like the government and Great American
20     to obtain more documents regarding crop insurance.
21         But from what we've obtained so far, it
22     looks like there is some data for actual production
23     history provided for New Heights Farm II, LLC from
24     prior to 2019. Do you know where that would have come
25     from?

Page 53

1  A.  No.
2  Q.  Would you have had any involvement in preparing that?
3  A.  Nope.
4  Q.  Any communications with Chris about that?
5  A.  Nope.
6  Q.  Do you expect that it was wherever she pulled the data
7      from, it would have been Chris doing that?
8  A.  For what?
9  Q.  For production history for the land that New Heights
10     Farm II farms on --
11 A.  Yep.
12 Q.  -- prior to 2019.
13 A.  No, because I have nothing prior to 2019.
14 Q.  So data pulled for that purpose would have been pulled
15     by Chris?
16 A.  Prior to 2019?
17 Q.  Yeah.
18 A.  I don't know.
19 Q.  Okay.  Because, I mean, the land existed.  It might
20     have been farmed.  It just wasn't --
21 A.  Yeah, I don't know.
22         MR. MAGYAR:  All right.  An hour and ten
23     minutes.  That's pretty painless, right?
24         THE WITNESS:  Yeah.
25         MR. MAGYAR:  I'm done, unless you've got

Page 54

1      any.
2          MR. VANDER VEEN:  I have a couple of
3      questions just to clarify a couple of things.
4                  EXAMINATION
5  BY MR. VANDER VEEN:
6  Q.  Nick, you had indicated that you had filed a crop
7      insurance claim.
8          Do you recall going out and measuring the
9      crop?
10 A.  Yep.
11 Q.  Okay.  And when you -- you signed a form after that?
12 A.  Yep.
13 Q.  Was that a claim form or a crop measurement form?
14 A.  It was a crop measurement form.
15 Q.  Okay.  And after we talked about it during the break,
16     do you recall signing a claim form yet?
17 A.  No, I do not.
18 Q.  Okay.  Just the measurement form?
19 A.  Yep.
20 Q.  Okay.  Dates you have given for talking to Chris,
21     talking to others, do you have those committed to
22     memory or are those guesstimates or what?
23 A.  Just a guesstimate.
24 Q.  And other than the employees that you mentioned, you
25     had mentioned to me that you have contract workers at

Page 55

1      times?
2  A.  Yep, part-time guys that come in in the fall.
3  Q.  Okay.  Some in the spring, too?
4  A.  Spring, too.
5  Q.  For planting?
6  A.  Yep.
7  Q.  Okay.  The ones that you've used -- obviously, you
8      only have one season of production under your belt?
9  A.  Yep.
10 Q.  The ones that you used as contract workers, did they
11     work for the old Boersen entities before?
12 A.  Only one.
13 Q.  Okay.
14 A.  There's about three to five others, depending on the
15     weekend.
16         MR. VANDER VEEN:  Okay.  I have no other
17     questions.
18         MR. MAGYAR:  The only other thing I want to
19     say for the record is -- I didn't repeat myself, but
20     just so there's no confusion, the same thing I put on
21     the record at the very beginning of the day with
22     Stacy's applies to this deposition, as well, in terms
23     of perhaps seeking the right to redepose if we get
24     some records that are still under requests of Great
25     American, as well as the issue of having both

Page 56

1  deponents in the room.  So I just want to make that
2  clear that it applied to both.
3          MR. VANDER VEEN:  Sure.  And we disagree
4  with you on both, but --
5          MR. MAGYAR:  Right.
6          MR. VANDER VEEN:  -- we talked about that
7  already.
8          MR. MAGYAR:  Yep.  All right.  That's it.
9  Thank you.
10         (Deposition concluded at 2:52 p.m.
11      Signature of the witness was requested.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**BOERSEN, NICHOLAS**
01/15/2020

Page 57

```
 1   HELENA AGRI-ENTERPRISES, LLC,
 2   a Delaware limited liability
 3   company,
 4              Plaintiff,
 5        vs.          Case No. 1:18-cv-00963-RJJ-RSK
 6                     Hon. Robert J. Jonker
 7   GREAT LAKES GRAIN, LLC, a
 8   Michigan limited liability
 9   company, et al.,
10              Defendants.
11
12
13              VERIFICATION OF DEPONENT
14
15        I, Nicholas Boersen, having read the
16   foregoing deposition consisting of my testimony at the
17   aforementioned time and place, subject to the changes
18   in the attached errata sheet, do hereby attest to the
19   correctness and truthfulness of the transcript.
20
21
22
23   _____
24        Nicholas Boersen
25        Dated:
```

Page 58

```
 1              ERRATA SHEET
 2   PAGE  LINE  READS              PAGE  LINE  SHOULD READ
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 59

```
 1              CERTIFICATE OF NOTARY
 2   STATE OF MICHIGAN )
 3                    ) SS
 4   COUNTY OF OTTAWA  )
 5
 6        I, PEGGY S. SAVAGE, certify that this
 7   deposition was taken before me on the date
 8   hereinbefore set forth; that the foregoing questions
 9   and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20
21        Peggy S. Savage
22        PEGGY S. SAVAGE, CSR-4189, RPR
23        Notary Public,
24        Ottawa County, Michigan.
25   My Commission expires:  7-13-25
```