UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HELENA AGRI-ENTERPRISES, LLC,

        Plaintiff,

                                            CASE No. 1:18-cv-963

v.

                                            HON. ROBERT J. JONKER

GREAT LAKES GRAIN, LLC, et al.,

        Defendants.

_____/

## OPINION AND ORDER

### INTRODUCTION

Plaintiff Helena Agri-Enterprises, LLC ("Helena") extended credit to various business entities associated with the Boersen Farming Operation, once a large-scale family run farming business that grew corn and soybean crops in West Michigan. Several members of the Boersen family, including Dennis Boersen, guaranteed the loans that Helena extended to the business entities. Following a poor crop year in 2016, the Boersen operation became delinquent on some of its debts, including those owed to Helena, and Helena subsequently brought this lawsuit seeking to recover those funds. The operation has never disputed that some individuals and entities associated with it are indebted to some degree to Helena. And a Judgment on the non-contested claims in the amount of $14,891,707.23 entered on February 23, 2019. (ECF No. 36).

What the operation does contest is the liability of certain other Boersen family members and new entities they formed that have no direct contractual relationship to Helena. Specifically, for purposes here, the farming operation disputes the liability of Stacy and Nicholas Boersen and their farming businesses, New Heights Farm I, LLC and New Heights Farm II, LLC. Stacy and

Nicholas Boersen are the wife and son, respectively, of Dennis Boersen.  Helena says these Boersen parties should be liable to pay the Judgment too.  These particular parties disagree and argue that Helena has failed to establish any evidentiary basis to support a fraudulent conveyance, veil-piercing, successor liability, or any other theory that makes them liable for the Judgment.  Stacy and Nicholas Boersen, and the entities associated with them, seek summary judgment in their favor on these claims in the Second Amended Complaint.

When Helena filed a Second Amended Complaint bringing Stacy and Nicholas Boersen, and their new farming entities into the case, the two individuals brought counterclaims for what they allege was an abuse of process and intentional infliction of emotional distress arising from the suit against them.  Helena seeks dismissal of the counterclaims and it also requests additional discovery to address the defense summary judgment motion.

The Court finds there has been more than enough time for discovery, and that the moving defense parties are entitled to summary judgment.  The Court further finds that the counterclaims are subject to dismissal.

## BACKGROUND[1]

### 1.  *The Boersen Farming Operation in General*

The Boersen Farming Operation farmed land throughout West Michigan and focused its operations on growing corn and soybeans.  Helena provides agricultural inputs, products, and services such as fertilizer, nutrients, seeds, and financial services to farmers and other operators in the agricultural community.  In 2016 Helena did business with the Boersen Farming Operation.

---

[1] This background is taken from the summary judgment record and the procedural history of the case so far.  Of course, for purposes of evaluating Helena's motion to dismiss the counterclaims, the Court analyzes the motion under the Rule 12(b)(6) standard and accepts as true, for purposes of the motion, the allegations contained in the counterclaim.

The Boersen operation involved multiple family members and was organized under various business entities that were owned by, or who had members consisting of, Boersen family members. Arlan and Sandra Boersen are third generation farmers and took over the business in 1987. *About Us & Our History*, BOERSEN FARMS INC., https://www.boersenfarms.com/about-us.htm (last visited May 4, 2020). They are the parents of two brothers, Dennis and Ross Boersen, both of whom later joined the business. Dennis Boersen is married to Stacy Boersen, and together they have a son, Nicholas Boersen.[2]

As originally contemplated, the Boersen Operation was made up of several "legacy" companies. Boersen Farms Inc., a Michigan Corporation, had Arlan, Sandra, Dennis, and Ross Boersen as its shareholders. Boersen Farms Properties, LLC, a Michigan limited liability company, had Dennis and Ross Boersen as its members. Boersen Farms Ag, LLC, also a Michigan limited liability company, had Arlan, Sandra, Dennis, and Ross Boersen as its members. Finally Boersen Ag Partners, LLC, again a Michigan LLC, had Dennis Boersen as its sole member. All these legacy entities did business with and, to various extents, were indebted to Helena.[3]

At its height, the farming operation grew crops on approximately 100,000 acres of land that it either owned or leased. Most of the land owned by the operation—approximately 20,000 acres—was held by Arlan Boersen, Boersen Farms, Inc., and Boersen Farms Properties.

---

[2] There are other Boersen family members associated with the operation as well; they are not integral to the issues presented in the pending motions.

[3] An additional legacy company—Boersen Farms Grain—also appears to have been a part of the Boersen farming operation. Unlike the other legacy companies, Boersen Farms Grain, a general law partnership, does not appear to have done business with, or at least was not indebted to, Helena.

2. *The Boersen Farming Operation Experiences a Disastrous 2016 Crop Year and the Legacy Companies are Unable to Pay Their Debts.*

In 2016 the Boersen operation—at least in part because of the collapse of crop prices—fell behind on its financial obligations.  Its financial strain was exacerbated when a major secured creditor of the operation, CHS Capital, LLC, refused to extend any further credit and sought to collect on the delinquent debts it contended the operation owed.[4]  CHS Capital, in lieu of foreclosure, required the operation to deed 14,000 acres of land held by the legacy companies to it.  CHS leased some of the land back to the Boersens for the 2017 crop year, but not thereafter. In addition, the Boersen Farming Operation was unable to pay rent to its largest landlord, Ceres Farms, and the landlord obtained judgments of eviction to terminate the legacy entities' leases.  As a result, the operation farmed only 75,000 acres in 2017 and 8,000 acres in 2018.

Meanwhile, the Boersen operation failed to pay its loans on the agricultural inputs—seed, fertilizer and chemicals—it has purchased from Helena for the 2016 and 2017 crop years.  The legacy companies purchased no inputs from Helena in 2018 and the legacy companies ceased doing business in early 2019.

3. *Helena Demands Payment, Files a Complaint, and the Great Lakes Grain Entities Emerge*

On October 23, 2017, Helena sent a written demand letter to the legacy companies and to Arlan Boersen, Sandra Boersen, and Dennis Boersen.  The demand sought payment for obligations under the various financing agreements the operation had entered into with Helena, and which were guaranteed by some Boersen family members.  All told, Helena at the time sought to recover $13,646,695.99 due as of October 16, 2017.  (ECF No. 1-1, PageID.39-41).

---

[4] That portion of the saga is recorded in a separate lawsuit that has since been closed.  *See CHS Capital, LLC v. Boersen Farms Ag, LLC*, No. 17-CV-769 (W.D. Mich. filed Aug. 23, 2017).

On August 27, 2018, Helena filed this action against the Boersen legacy entities, Arlan Boersen, Sandra Boersen, and Dennis Boersen.  (ECF No. 1).  The Complaint also named Great Lakes Grain, LLC as an additional defendant.  Helena averred this entity was formed by Arlan and Sandra Boersen for purposes of running a reduced farming operation without paying all the debts owed to the operation's creditors (including Helena).  The Original Complaint raised claims for Successor Liability against Great Lakes Grains (Count 1); as well as claims for breach of the credit and loan agreements by the legacy defendants, the guarantee agreements by the individual defendants (Counts II through VII), and account stated (Counts VIII through XI).  Finally Count XI brought a claim under Michigan's Uniform Voidable Transaction Act, MICH. COMPL. LAWS § 566.31 *et seq.*, for what Helena says was a voidable transfer of the valuable portion of the Boersen farming operations to the Great Lakes Grain LLC.  On February 23, 2019, a partial judgment entered that resolved Counts II through X.  Only Counts I and XI remained.  (ECF No. 36).

Meanwhile, several additional Great Lakes Grain entities were formed.  Great Lakes Grain II and III, LLCs were formed on December 19, 2018.  Both entities were formed by Defendant Stacy Boersen.  Then, on March 4, 2019, Stacy Boersen organized Great Lakes Grain IV, LLC. Believing the three entities were formed for the same reasons it believed the original Great Lakes Grain LLC was formed, Helena sought leave to amend its Complaint to add those additional entities as defendants.  (ECF No. 57).  Defendants opposed the motion.  (ECF No. 60).  They argued the Great Lakes Grain entities were organized based on the request of a potential lender who was reluctant to lend to the first Great Lakes Grain, LLC based on its inclusion in the Original Complaint.  Ultimately, however, that financing for the additional Great Lakes Grain LLCs never came through and thus Defendants argued those entities did nothing and had no assets, or revenues

or operations.  On May 23, 2019, the Court granted Helena's motion to file an Amended Complaint, noting that it made sense to bring into the case all entities that might be subject to the same veil-piercing and fraudulent conveyance theories.  (ECF No. 66).  Neither side has moved for relief regarding the Great Lakes Grain entities.

   4.  *Stacy and Nicholas Boersen Form the New Heights Farm LLCs*

As the 2019 crop season approached, both Stacy and Nicholas Boersen formed new farming entities.  On March 27, 2019, Stacy Boersen formed New Heights Farm I, LLC and Nicholas Boersen formed New Heights Farm II, LLC.  Stacy and Nicholas are sole record owners of their respective companies.  Helena asserts that Dennis Boersen is a de facto owner of both companies, despite the legal formalities.

Following the formation of the LLCs, Stacy and Nicholas applied for and obtained a line of credit for their respective companies through a lender, Agrifund LLC.  Agrifund (also known as Ag Resource Management or "ARM"), required both LLCs to obtain crop insurance.  This insurance protects against certain losses in crop yields.  Benefits under the insurance plan depend, in part, on Actual Production History ("APH").  APH is, in basic terms, a record of the prior crop yield of a given parcel for a certain number of years.  New Heights Farm I, LLC used the APH of Boersen Farms Grain, which is not a legacy company indebted to Helena.  Stacy Boersen had previously been a 50% owner of a general partner of Boersen Farms Grain.  New Heights Farm II, LLC used the APH of Boersen Farms Ag, which is a legacy company indebted to Helena.  Nicholas Boersen had previously worked as a laborer for that entity, but had no management or ownership position.

Having secured sufficient new funding,[5] Stacy and Nicholas used the credit to lease land and equipment at market rates, and they began to produce new corn and soybean crops. New Heights Farm I, signed leases to farm approximately 9,037 acres. Some of these leases were for properties owned by one of the legacy companies, including Boersen Farms, Inc. and Boersen Farms Properties. Additional farmland was leased from Arlan Boersen. New Heights Farm II signed leases to farm approximately 8,682 acres. Some of this acreage also was leased from legacy companies. In addition, some of the acreage both LLCs leased was owned by Ceres farms, the company that had previously leased to one of the legacy companies. There is no evidence of record that the leases called for payment of anything less (or more) than market rates.

5. *Helena Amends its Complaint a Second Time*

Helena learned of the existence of the new LLCs during discovery in this case and, on June 7, 2019, Helena filed a motion for leave to file a Second Amended Complaint naming New Heights Farm I, LLC and New Heights Farm II, LLC, in addition to Stacy and Nicholas Boersen, as additional defendants. Helena does not contend that these entities, or Stacy and Nicholas Boersen, are directly indebted to it, or that they have even had previous dealings with each other. Rather Helena avers these defendants are part and parcel of a larger scheme on the part of the Boersen Farming Operation to dodge the over $14,000,000 it owed to Helena and on which Judgment had already entered with respect to the legacy companies and guaranteeing family members. (ECF No. 75). Defendants opposed the motion. (ECF No. 79). They averred Helena's desire to bring these individuals and entities into the case was a futile exercise designed to harass. The Court granted the motion to amend in an Order dated June 28, 2019. The Court noted the

---

[5] In addition to the credit line under Agrifund, both entities also obtained a secured open account for agricultural inputs from Logan Agri-Services, Inc.

liberal standard applicable under Rule 15, and found that Helena had made allegations, subject to Rule 11, that stated a plausible claim or claims for relief.   (ECF No. 80).

The Second Amended Complaint, which is now the operative Complaint, was filed on June 28, 2019.  (ECF No. 81).  It names the four Great Lakes Grain and two New Heights Farm LLCs as well as Stacy and Nicholas Boersen as defendants.  Count I brings a claim for successor liability against the six LLCs, Count II brings a claim under Michigan's Uniform Voidable Transaction Act, and Count III brings a claim for Veil Piercing.

Defendants filed an Answer on August 13, 2019.  (ECF No. 103).  In addition to the Answer, Nicholas and Stacy Boersen both filed a Counterclaim.  Those counterclaims, which are substantively similar, raise claims for abuse of process and intentional infliction of emotional distress against Helena.  In the main, the counterclaims assert that Helena knows that the New Heights Farm entities are not indebted to Helena, and neither are Stacy or Nicholas Boersen.  Furthermore, Stacy and Nicholas Boersen allege that no assets of the legacy companies indebted to Helena were transferred to either Stacy or Nicholas Boersen or to the New Heights Farm LLCs.  Nevertheless, they say, Helena persisted in bringing them into the lawsuit and raised allegations against them that are false in an effort to create pressure on the new entities to contribute to paying off legacy obligations.

### 6.  *Pending Motions*

There are several motions currently pending before the Court.  The first motion, filed by Helena, seeks to dismiss Stacy and Nicholas Boersen's Counterclaims under FED. R. CIV. P. 12(b)(6) for failure to state a claim.  (ECF No. 113).  The second dispositive motion was filed by Stacy and Nicholas Boersen as well as New Heights Farm I, LLC and New Heights Farm II, LLC.

That motion seeks summary judgment under Rule 56.  (ECF No. 139). The Great Lakes Grain LLC defendants did not join in the motion or separately file a dispositive motion.[6]

Helena opposes the summary judgment motion but has also filed several non-dispositive motions all of which are related to its contention that it needs additional discovery about the circumstances under which the New Heights Farm LLCs obtained crop insurance.  Helena says the information gained through this additional discovery would support its voidable transfer claims.  In the first motion, Helena seeks to extend the discovery (which has now closed) to obtain this information and to develop expert testimony.  (ECF No. 127).  Defendants opposed the motion, and Helena filed a motion for leave to file a reply brief to the non-dispositive motion.  (ECF No. 131).  Next, after the defendants filed a motion for summary judgment, Helena moved for permission to extend the time to respond to the motion so that it could first obtain the additional information sought in the first discovery motion.  (ECF No. 139).[7]  Helena then moved for an order requesting the Court compel Defendants to execute the authorizations necessary for the production of documents it had subpoenaed from non-party Great American Insurance Group ("Great American Insurance").  (ECF No. 152).  And, as before, when Defendants opposed the motion, Helena filed a motion for leave to file a reply brief.  (ECF No. 159).

The Court heard argument on the Motion to Dismiss (ECF No. 113) and Motion to Amend the CMO (ECF No. 127) on December 19, 2019, and thereafter took the matters under advisement. The Court subsequently adjourned a hearing that had been scheduled on the motion for summary judgment.  Based on the Courts review of the record, the Court is satisfied that oral argument on

---

[6] The Great Lakes Grain LLC defendants may be defunct.  It does not appear they ever obtained funding or engaged in actual operations.

[7] Helena also filed a timely response to the motion (ECF No. 147) pending the Court's decision on its request for additional discovery.

9

the other pending motions is unnecessary, and that the motions can be resolved on the current written record.

## LEGAL STANDARDS

The Federal Rules provide that a cause of action may be dismissed for "failure to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In determining whether a claim has facial plausibility, a court must construe the complaint in the light most favorable to the plaintiff, accept the factual allegations as true, and draw all reasonable inferences in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430.

Summary Judgment, in turn, is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Summary judgment is appropriate only if, "taking the evidence in the light most favorable to the non-moving party, 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *La Quinta Corp. v. Heartland Props., LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (quoting FED. R. CIV. P. 56). In considering a motion for summary judgment, the Court draws all justifiable inferences in favor of the non-moving party. *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 748 (6th Cir. 2012). On a summary judgment motion, "the ultimate question . . . is whether the evidence presents a sufficient factual disagreement to require submission of a

particular legal claim to the jury or whether the evidence on the claim is so one-sided that [the moving party] should prevail as a matter of law." *Id.* at 748-49.

## DISCUSSION

1. *Helena's Motion to Dismiss Stacy and Nicholas Boersen's Counterclaims (ECF No. 113).*

Helena moves to dismiss Stacy and Nicholas Boersen's counterclaims of abuse of process and intentional infliction of emotional distress. For the reasons set out below, the Court concludes that Helena is entitled to the relief it seeks in the motion.

### A.  Abuse of Process

Stacy and Nicholas Boersen first bring a counterclaim for abuse of process. In the main, the counterclaim alleges that Helena abused the legal process in circumstances related to the filing of the Second Amended Complaint. Helena moves to dismiss the counterclaims. It contends that as a matter of law, the counterclaimants cannot establish either of the two elements making up an abuse of process claim. The Court agrees with Helena.

The parties generally agree on what a party advancing an abuse of process claim in Michigan must demonstrate.[8] The abuse of process tort requires "[f]irst, the existence of an ulterior purpose, and second, an act in the use of the process not proper in the regular prosecution of the proceeding." *Spear v. Pendill*, 164 Mich. 620, 623, 130 N.W. 343 (1911); *see also Stryker Corp. v. Ridgeway*, 1:13-cv-1066, 1:14-cv-889, 2015 WL 5308038, at *13 (W.D. Mich. Sept. 10, 2015). Put differently, a party raising abuse of process "must allege a use of process for a purpose outside of the intended purpose and must allege with specificity an act which itself corroborates the ulterior

---

[8] This is a diversity action, and the parties agree that Michigan law applies.

motive." *Young v. Motor City Apartments Ltd. Dividend Housing Ass'n No. 1 & No. 2*, 133 Mich. App. 671, 681, 350 N.W.2d 790 (Mich. Ct. App. 1984).

Stacy and Nicholas Boersen contend that Helena's "ulterior purpose in pursuing its Second Amended Complaint" was to "interfere" with their ability to produce an income, operate their business, force them to pay debts to Helena they are not obligated to pay, and to prevent them from farming in the future.  (Nicholas Boersen Counterclaim ¶¶ 25, 27, ECF No. 103, PageID.1000; Stacy Boersen Counterclaim ¶¶ 25, 27, ECF No. 103, PageID.1006).   Relatedly, they contend Helena's "ultimate goal" was to "wreak financial ruin" on them. (Nicholas Boersen Counterclaim ¶ 26, ECF No. 103, PageID.1000; Stacy Boersen Counterclaim ¶ 26, ECF No. 103, PageID.1006).

The problem with this argument, however, is that "bad motive alone will not establish an abuse of process." *Bonner v. Chicago Title Ins. Co.*, 194 Mich. App. 462, 472, 487 N.W. 2d 807, 812 (1992) (citing *Vallance v. Brewbaker*, 161 Mich. App. 642, 646, 411 N.W.2d 808 (1987)). And so the ulterior purpose must be shown through some "corroborating act." *Id.*  This means that the mere filing of a Complaint, and service of the Complaint and summons, is not enough to demonstrate the ulterior purpose because an "action for the abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Spear*, 164 Mich. at 623 (internal quotation marks and citation omitted).   Here, Helena filed the Second Amended Complaint to pursue successor liability, fraudulent transfer and veil-piercing claims against the new entities in an overall effort to collect on debts incurred by the Boersen legacy companies and guaranteed by some family members.  The process and the purpose aligned.

Nevertheless Counterclaimants argue there is more than the filing of the Second Amended Complaint to support their claim.  They argue that an ulterior purpose is plain from the procedural history of this case, in which there had already been extensive discovery before the Second

Amended Complaint.  Furthermore they contend that Helena knew, from their earlier filing actions against the Great Lakes Grain entities that simply filing a complaint against an LLC associated with the Boersen Farming Operation would be enough to squelch new financing options for the new businesses.  And without sufficient credit, Stacy and Nicholas Boersen would be unable to make a living for themselves, at least in the farming industry, which was Helena's alleged goal.

None of this, however, alleges more than bad motive; it does not allege a plausible theory of ulterior purpose for an abuse of process.  Courts find ulterior purpose where a party used "a proper legal procedure for a purpose collateral to the intended use of that procedure." *Bonner*, 194 Mich. App. at 472.  "The requirement of a collateral purpose is . . . not met if the allegedly ulterior purpose is consistent with the purpose of the action." *Stryker Corp.*, 2015 WL 5308038, at *14. The alleged conduct by Helena—adding Stacy and Nicholas Boersen and their new entities—is entirely consistent with Helena's purpose of collecting lawful debts.  Helena asserted under Rule 11 that Stacy and Nicholas Boersen were liable as organizers of business entities that, according to Helena, received assets from the legacy companies and are liable under a successor theory, fraudulent conveyance, or veil-piercing analysis.  Stacy and Nicholas Boersen may vigorously disagree with the merits of such a claim.  Indeed, as set out below the Court finds the moving defendants are entitled to summary judgment in their favor.  But any recourse that might be applicable lies elsewhere, not in an abuse of process claim.

The cases cited by the counterclaimants are distinguishable.  *Parr v. Parr*, No. 319765, 2015 WL 1880209 (Mich. Ct. App. Apr. 23, 2015), primarily dealt with a property dispute that had been dismissed at summary disposition and on which the Michigan Court of Appeals affirmed the lower court's decision.  Evidently the defendants' counterclaims—including one for abuse of process—proceeded to a jury trial.  But the Court of Appeals dealt with the abuse of process claim

only on narrow damages issues.  *Id.* at *7-*8.  It did not consider the elements of an abuse of process claim.  In *Lawrence v. Burdi*, 314 Mich. App. 203, 886 N.W.2d 748 (2016), the Michigan Court of Appeals found the plaintiff had properly pled an abuse of process claim.  The underlying case related to a property dispute over a prescriptive easement.  During the litigation, the defendant served a request to admit regarding the plaintiff's previous convictions and ability to pass the Character and Fitness portion of the Michigan Bar Examination.  The Court of Appeals found these requests to admit concerned "an area that was never previously in controversy" and, for that reason, allowed the abuse of process claim to advance.  *Id.* at 214.  Finally, in *Three Lakes Ass'n v. Whiting*, the Michigan Court of Appeals found a collateral purpose apart from the underlying suit.  The plaintiff in the case was a non-profit corporation that opposed the corporate defendant's condominium project and filed suit to enjoin the project.  The defendant filed a separate action against the plaintiff, alleging various torts related to the plaintiff's opposition.  The plaintiff, in turn, filed an abuse of process claim.  Finding that the plaintiff had stated a cause of action, the Court of Appeals noted that the plaintiff had alleged the defendant "had no intention of accomplishing the ostensible purpose of the suit (to recover damages) but rather intended to use [the tort action] as a means to coerce plaintiff to give up entirely all opposition to the condominium project."  *Three Lakes Ass'n v. Whiting*, 75 Mich. App. 564, 570, 255 N.W.2d 686, 689 (1977). *Three Lakes,* like *Lawrence*, found an inconsistency in purpose that is lacking here. Counterclaimants have failed to state a *Twombly* plausible claim with respect to the first element of an abuse of process claim.

Even if counterclaimants could state a *Twombly* plausible claim on the first element, they have not done so with respect to the second element, which requires an improper act. Counterclaimants argue that "[t]he lack of any prior relationship between the parties, the lack of

14

any due diligence, the lack of support for the allegations, the delays in discovery and the allegations are the improper acts used in the process." (ECF No. 115, PageID.1122). These are not improper acts designed to further a collateral or ulterior objective. "Michigan cases have made it clear that an "action for abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Stryker Corp.*, 2015 WL 5308038, at *16 (quoting *Friedman v. Dozorc*, 415 Mich. 1, 315 N.W.2d 585 (1981)). A claim for abuse of process is not meant for situations "based merely on an allegation that the complaint [is] false." *Id.* The only alleged act pled by counterclaimants that arguably goes beyond the Second Amended Complaint itself is the overall discovery process in this case. Michigan Courts have left "open the possibility that, under certain circumstances, discovery abuses could support a cause of action for abuse of process." *Adell Broadcasting Corp. v. Panagos*, No. 230405, 2002 WL 31955126, at *3 (Mich. Ct. App. Dec. 17, 2002). The Court does not find such circumstances present on the allegations here. The scope of discovery in this case has been contested, but disputes have been brought to the Magistrate Judge, or to this Court, and on this record the Court fails to see anything in this case that amounts to an improper act.

Accordingly, the Court concludes counterclaimants fail to state a *Twombly* plausible abuse of process claim.

### B. Intentional Infliction of Emotional Distress

The second and final counterclaim brought by Stacy and Nicholas Boersen is for intentional infliction of emotional distress. Assuming *arguendo* that such a claim is cognizable under Michigan law,[9] counterclaimants' claim here fails.

---

[9] The Michigan Supreme Court has not formally recognized the tort of intentional infliction of emotional distress. *See Melson ex rel. Melson v. Botas*, 497 Mich. 1037, 863 N.W.2d 674 (2015) (Markman, J., dissenting) (noting "Michigan is one of only two states whose highest court has not

To state a claim for intentional infliction of emotional distress, counterclaimants must show that Helena intentionally or recklessly engaged in "extreme or outrageous" conduct causing them severe emotional distress. *Duran v. Detroit News, Inc.*, 200 Mich. App. 622, 630 (1993). Extreme and outrageous conduct is conduct that transcends "all possible bounds of decency" and is "utterly intolerable in a civilized community." *Early Detection Ctr., P.C. v. New York Life Ins. Co.*, 157 Mich. App. 618, 625-26 (1986). This standard is an onerous one, and Michigan courts have rejected intentional infliction claims even in egregious situations. *See, e.g., Meek v. Mich. Bell Tel. Co.*, 193 Mich. App. 340, 346-47 (1991) (summary judgment for employer where employee was subjected to repeated sexual and religious harassment); *Khalifa v. Henry Ford Hosp.*, 156 Mich. App. 485, 499-500 (1986) (summary judgment for employer where employee was subjected to repeated national origin discrimination and workplace harassment). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe v. Mills*, 212 Mich. App. 73, 91, 536 N.W.2d 824, 833 (1995).

Counterclaimant's cause of action for intentional infliction of emotional distress is based on their claim that (1) neither Stacy Boersen, Nicholas Boersen, New Heights Farm I, LLC, nor New Heights Farm II, LLC owe a debt to Helena; (2) none of these individuals and entities received

---

dispositively addressed the establishment, and the contours, of the tort of intentional infliction of emotional distress (IIED)."). In *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594 (1985), the Court assumed, but did not decide, that Michigan law recognized such a claim. *Id.* at 602-03. Michigan Courts of Appeals subsequently have recognized the claim, *see, e.g., Kamalnath v. Mercy Memorial Hosp. Corp.*, 194 Mich. App. 543, 555 (1992), but this Court must analyze and apply state law in accordance with the decisions of the state's highest court. *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Because there are no controlling Michigan Supreme Court decisions on this issue, this Court normally would attempt to ascertain how the Michigan Supreme Court would rule if faced with this claim today. *See id.* However, because Stacy and Nicholas Boersen's intentional infliction of emotional distress fails to state a *Twombly* plausible claim under the test set out in *Roberts*, this Court need not answer the question of whether the Michigan Supreme Court would recognize the claim under different facts.

a transfer of assets from other individuals or entities in the Boersen Farming Operation; (3) Stacy

and Nicholas Boersen operate their companies for their own benefit; and (4) Helena seeks to wreak

financial ruin on Stacy and Nicholas Boersen by bringing this lawsuit against them.  (Nicholas

Boersen Counterclaim ¶ 30, ECF No. 103, PageID.1001; Stacy Boersen Counterclaim ¶ 30, ECF

No. 103, PageID.1007).  Even taking this version of the facts at face value, they do not demonstrate

that Helena's alleged conduct transcended "all bounds of decency . . . in a civilized community."

*See Meek*, 193 Mich. App. 346.  The allegations counterclaimants raise as evidence of outrageous

conduct all relate to the filing of what they say was a frivolous lawsuit.  In *Early Detection Center,*

*P.C.*, the Michigan Court of Appeals examined a similar argument and concluded that it failed to

rise to the level of an Intentional Infliction of Emotional Distress claim:

> Plaintiffs allege that the outrageous conduct on the part of the
> defendants was the filing of a "groundless" suit. However, this
> amounts to nothing more than an assertion of legal rights in a
> permissible way. Furthermore, even if not privileged, we cannot
> agree that such conduct is "of such an extreme degree as to be
> characterized as outrageous and atrocious." *Hajciar v. Crawford &*
> *Co.,* 142 Mich. App. 632, 639, 369 N.W.2d 860 (1985). Rather, by
> resorting to a court of law for the resolution of its dispute with
> plaintiffs, defendant NYLIC followed what a civilized society
> would consider the most appropriate form of conduct.

*Early Detection Center, P.C.*, 157 Mich. App. at 626-27.

Counterclaimants assert that they have alleged conduct that "goes beyond a mere insult or

mere filing of this case."  (ECF No. 115, PageID.1126).  But the conduct they point to—that Stacy

and Nicholas Boersen did not have a relationship with Helena or guaranteed the legacy companies

debts—only shows their belief that the claims are groundless, and fails to persuasively distinguish

*Early Detection Center, P.C.*  Neither does their reliance on *Parr*, a case that did not evaluate the

elements of an abuse of process claim and dealt only with emotional damages as part of an abuse

of process claim.

17

Accordingly, Counterclaimants have failed to state a *Twombly* plausible claim with respect to the second and final counterclaim as well.

### C.   Leave to Amend

Counterclaimants request that, if the Court were to grant Helena's motion, that they be permitted to amend their Counterclaims.  (ECF No. 115, PageID.1126).  The Court discerns no reason to permit an Amended Counterclaim here.  Under Rule 15(a)(2), courts are to "freely give leave to amend" when justice so requires.  FED. R. CIV. P. 15(a)(2).  Justice does not so require here.  Both counterclaims are premised on two underlying assertions: (1) Helena has filed a Second Amended Complaint that contains groundless claims against Stacy and Nicholas Boersen, and (2) the Second Amended Complaint will "wreak financial ruin" on Counterclaimants.  For the reasons detailed above, the Court has found that this basic position fails to state a *Twombly* plausible claim as to both Counterclaims.  Nothing in the briefing suggest that there is anything beyond this basic position for Counterclaimants to advance.

### 2.   Stacy Boersen, Nicholas Boersen, New Heights Farm I, LLC, & New Heights Farm II, LLC's Motion for Summary Judgment (ECF No. 139).

The second of the two pending dispositive motions is the motion for summary judgment brought by Stacy and Nicholas Boersen, New Heights Farm I, LLC, and New Heights Farm II, LLC.[10]  The Second Amended Complaint contains three Counts: Successor Liability (Count I); a Voidable Transaction under Michigan's Uniform Voidable Transaction Act (Count II); and Veil Piercing (Count III).  (ECF No. 81).  All three claims contemplate the same fundamental premise: namely, that the legacy companies indebted to Helena transferred something of value to the Defendants to keep those assets from Helena.  In doing so, Helena says, the legacy companies

---

[10] The Great Lakes Grain entities have not moved for summary judgment.

diminished their value and frustrated Helena's ability to collect on the legacy company's obligations.  If there were an evidentiary basis to support these factual allegations, Helena would have a good basis to defeat summary judgment.  But discovery has not uncovered anything so far.  Any legacy assets the new entities are using are subject to market value leases, and the new entities are paying the market value with entirely new financing and crop sales.  The Court can understand that Helena is frustrated to see revenue generated by the new farming companies that does it no practical good.  But that does not establish a claim of fraudulent conveyance, successor liability or veil-piercing.   As long as the new companies are operating within the required corporate formalities, and paying fair value for any legacy assets they use, there is nothing that obligates the new businesses to pay for the legacy debts just because the new farmers are Boersens.

The main purported asset that Helena has latched onto is the Actual Production History ("APH") that Stacy and Nicholas Boersen used when applying for crop insurance to cover their New Heights Farm companies.  In a series of motions Helena seeks more time and additional discovery relating to the crop insurance applications.  But even assuming the APH histories of legacy companies was used as part of crop insurance applications for new entities, the Court believes this would be insufficient as a matter of law to create a basis for successor liability, fraudulent conveyance, or veil-piercing.[11]  APH is just a collection of reports of historical crop

---

[11] For this reason, the Court **DENIES** the discovery motions filed by Helena.  The first motion (ECF No. 127) sought an extension of various dates in the CMO.  This extension was requested because Helena's review of then recent information suggested that Stacy and Nicholas Boersen (the successor defendants) "may have collaborated with the Judgment Defendants to obtain crop insurance to meet the conditions of the Successor Defendants' lender(s)."  (ECF No. 128).  The second motion (ECF No. 143) sought additional time to respond to the pending motion for summary judgment until after Helena had reviewed the structure of a new Boersen entity, as well as to receive and review crop insurance documents.  The third motion (ECF No. 152) requests the Court compel Defendants to execute authorizations that are required for the production of crop insurance documents currently held by a non-party insurance carrier.

yields tied to particular land tracts.  APH is not an asset that can be monetized for the benefit of a creditor.  The only question may be whether the government will treat this new operator as sufficiently connected to the former yields to use the historical APH, rather than start from scratch. That may mean lower premiums or other benefits for the new operator.  And that potentially means the new operation might earn more than it otherwise would.  But without something more that creates a genuine issue of fact about whether this potential help for the new entities was the consequence of some uncompensated transfer from the legacy companies or their owners to the new operators, there is no basis to assign that value to Helena or other legacy creditors.  And on this record, there is nothing more.

The Court has reviewed the motion papers and concludes oral argument is not necessary to resolve the motion for summary judgment that is now fully briefed.  There is obviously an

---

Because all three motions are non-dispositive, the local rules do not permit the filing of a reply brief.  Helena has thus filed two motions seeking to file briefs in reply to the Defendants' briefs in opposition.  (See ECF Nos. 131 & 159).  Those motions are denied because they add nothing that was not already raised in the original discovery motions.  Indeed, in one of the documents Helena states "As Plaintiff demonstrated in its Brief in Support . . . " (ECF No. 131-1, PageID.236).

With respect to the discovery motions themselves, proportionality matters.  FED. R. CIV. P. 26(b)(1) sets out the general rule of the scope of discovery:  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]"  Id.  Helena had over four months under the terms of the Third Amended CMO, and over seven months since it avers it first learned of the New Heights Farm LLCs' existence during a deposition to delve into the relationship between the new entities and the legacy operation.  They have identified none of the traditional badges of fraud, like below market leases; dead-of-night asset moves; cash intermingling; neglect of corporate or other entity formalities. The potential additional information regarding APH and crop insurance is not enough, standing alone, to support the substantive theories asserted.  And for that reason, further time and money in discovery on this issue would not be proportional to the needs of the case.

This is especially true considering that even if Helena could ultimately prevail on one or more of its theories, it might succeed in putting the next generation of Boersen farmers out of the farming business, but would not generate any practical financial value for Helena anyway.  The proceeds of prior crop years have already been disbursed to new creditors who financed the new crops. Future crops won't be financed if Helena, or other legacy creditors, are entitled to these proceeds.

ongoing set of family relationships amongst the individuals and entities—new and old—associated with the Boersen Farming Operation.  It is a multi-generational family farm, after all.  But on this record there is nothing beyond potentially the APH to which Helena points as an improper transfer of assets, income or other value.  Nor is there anything that suggests the New Heights Farm entities are abusing their LLC entities.  There is no record basis to collapse the new entities into the legacy operation, and no basis to conclude that the legacy companies transferred any assets to the new operations, other than in exchange for fair value.

The basic question that this dispute comes down to is whether Stacy and Nicholas Boersen—or any other Boersen—will ever be able to generate a new annual crop, or whether everyone in the Boersen family has to get out of farming unless or until they can pay the legacy obligations to Helena.  On Helena's theory, the Boersen family has to sit out of farming until they pay all the legacy creditors, regardless of whether new Boersens and businesses ever dealt with Helena.  In the Court's view, the law does not require that.  As long as the new Boersen farmers pay fair value and market rates for any legacy assets; honor the corporate formalities; and otherwise proceed as permitted by law, nothing permits a new Boersen generation from staying in the farm business.  And on the present record, there is no genuine issue of fact but that the moving defendants are entitled to summary judgment.

### A.  Count 1 – Successor Liability

Count 1 of the Second Amended Complaint avers that the New Heights Farm entities were "developed to continue the Boersen Defendants farming businesses[.]"  (Second Amended Compl. ¶ 44, ECF No. 81, PageID.855).  The conduct behind the formation of these companies, Helena claims, "amounts to a consolidation or merger of the Boersen Defendants, and, thus, . . . the New Heights Entities are the successors to the Boersen Defendants and are fully liable for the Boersen

Defendants' Judgment[.]" (*Id.* at ¶ 46, ECF No. 81, PageID.855).  The New Heights Farm entities seek summary judgment because Helena has not created a question of fact under any potentially applicable successor liability theory.  The Court agrees with the moving defendants.

Michigan follows the traditional rule of successor liability and both sides cite to the case of *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 509 (Mich. 1999), for the applicable rule.  Under *Foster*, courts are to "examine[] the nature of the transaction between predecessor and successor corporations.  If the acquisition is accomplished by merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities.  However, where the purchase is accomplished by an exchange of cash for assets, the successor is not liable for its predecessor's liabilities unless one of five narrow exceptions applies."  *Id.*  Both sides further operate from the position that the New Heights Farm entities cannot be found liable for the legacy companies' liabilities, if at all, unless one of the five exceptions mentioned in *Foster* applies.

The five exceptions to the general rule of non-liability are: "1) express or implied assumption of liability; 2) de facto consolidation or merger; 3) fraud; 4) transfer lacking good faith or consideration; and 5) mere continuation or reincarnation of the old corporation."  *C.T. Charlton & Associates, Inc. v. Thule, Inc.*. 541 F. App'x 549, 551 (6th Cir. 2013).  Here the parties focus on the second and fifth exceptions.[12]  The fifth exception consists of two separate categories, one for "mere continuation," and the other for "continuity of the enterprise."  Because this is not a products liability case, only the "mere continuation" theory is available.[13]

---

[12] Defendants discuss another possible exception to the traditional rule on successor liability, that of an alter-ego theory of liability.  (ECF No. 140, PageID.1281-1282).  Helena does not discuss this theory with respect to Count 1 in its brief, nor does it appear to rely on this theory in the Second Amended Complaint, and so the Court need not consider it.

[13] In examining Michigan law on the matter, the Sixth Circuit Court of Appeals has found that the mere continuation and continuity of enterprise doctrines "are best understood as two independent exceptions, motivated by different policy concerns and applied in difference circumstances."

The mere continuation and de facto consolidation or merger exceptions are closely related. *See* Timothy J. Murphy, *A Policy Analysis of a Successor Corporation's Liability For Its Predecessor's Defective Products When the Successor Has Acquired the Predecessor's Assets for Cash*, 71 MARQ. L. REV. 815, 821 n.36 (1988). And on these facts the same analysis applies to both exceptions. Helena has not presented a triable issue on either exception.

Both "mere continuation" and "de facto merger" require proof of continuity of the ownership, managerial and operational levels. The record does not create a triable issue on this key element. The owners of the new entities include a new generation of the Boersen family. The financing is from a new lender. Any use of legacy assets is under written agreements at market rates. Undoubtedly the general accumulated wisdom and experience of multiple generations of Boersen farmers will be of practical assistance to the new operation. But that is true of every family business in America, and the record here does not in any way suggest that the new entities and owners are operating puppets of older generations; to the contrary, the new owners and operators are making independent decisions, entering into their own contracts and paying legacy companies market rate for any assets they are using.

A "prima facie" case of mere continuation exists where:

> (1) there is continuation of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations of the predecessor corporation; (2) the predecessor corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible;

---

*C.T. Charlton & Associates, Inc.*, 541 F. App'x at 551; *see also Saginaw Property, LLC v. Value City Dept. Stores, LLC*, No. 08-13782-BC, 2009 WL 3536616, at *9 (E.D. Mich. Oct. 30, 2009) ("The continuity of enterprise theory, however, has only been applied in the context of products liability."); *Commonwealth Land Title Ins. Co. v. Metro Title Corp.*, 315 Mich. App. 312, 315, 890 N.W.2d 395, 397 (2016) ("The continuity-of-the enterprise exception only applies to products-liability cases and cases with similar public-policy concerns[.]"). Since this is not a products liability case, the mere continuation, rather than continuity of the enterprise, is the one exception that might be applicable.

> and (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation.

*Foster*, 597 N.W.2d at 510.  Additionally, courts consider whether "the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation."  *Id.*  In evaluating this exception, courts look at the totality of the circumstances, but as both sides recognize, they will do so "only if the 'indispensable' requirements of common ownership and a transfer of substantially all assets are met first."  *C.T. Charlton & Associates*, 541 F. App'x at 554 (quoting *Stramaglia v. United States*, 377 F. App'x 472, 475 (6th Cir. 2010)).

The de facto consolidation or merger exception contains similar requirements.  Both sides cite to *Craig v. Oakwood Hosp.*, 471 Mich. 67, 684 N.W.2d 296 (2004), as setting out the elements of the exception.  That case found that a de facto merger may be found where:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation

*Id.* at 314-15 (internal footnotes omitted).

Looking at the record in the light most favorable to Helena, there is no genuine issue of material fact regarding whether the New Heights Farm entities are the mere continuation or

de facto consolidation or merger of the legacy companies.  They are not.  Both the legacy companies and the New Heights Farm entities are in the business of farming, to be sure.  And the new entities include members of the Boersen family, including a representative of a new generation of farmers.  But the new owners and operators have formed new entities and honored legal formalities to do so.  There is nothing of record to suggest that legacy companies or guarantors are actually running or calling the shots at the new operations, or that they are benefiting in any untoward way.  No legacy guarantor is an officer or member of the new entities.  No legacy guarantor is employed by the new entities.  Any legacy assets are leased or otherwise paid for at market rates.  The lending arrangements are entirely new.  Just having the name "Boersen" and deciding to farm in West Michigan is not enough to meet this element of successorship.

Helena contends that it meets this element because the farming operation has been passed from one generation to the next.  (ECF No. 148, PageID.1627).  It cites *Woodridge Hills Ass'n v. Williams*, No. 310940, 2013 WL 5762990 (Mich. Ct. App. Oct. 24, 2013), in support.  That case found successor liability between two companies, Redford, and DWW, but it is plainly distinguishable from the present case.  In *Woodridge* predecessor and successor companies were formed by the same individual, defendant Williams, who was the sole shareholder of both entities. The predecessor company, Redford, was sued after performing substandard roofing work in a condominium development, and a judgment of $182,975 was entered against it.  Shortly thereafter Redford filed for bankruptcy protection, and Defendant Williams created the successor entity, DWW.  Defendant Williams, furthermore, used many of his former company's assets to run his new company.

But this type of commonality is lacking in the instant case.  The corporate structure and membership of the various business entities in this case is complicated to say the least, but Stacy

and Nicholas Boersen have consistently maintained that they had no organizational role in the legacy companies and that they are the sole officers of their respective New Heights Farm LLCs. And, more importantly for purposes of summary judgment, Helena has not disputed this basic position, at least at it relates to who the technical owners and organizers of New Heights Farm I, LLC and New Heights Farm II, LLC are. Helena believes the person actually in control of both entities is Dennis Boersen, but the summary judgment record does not create a triable issue on that front.  In an affidavit, Dennis Boersen swears that he does not manage, consult, or control either New Heights Farm entity. (Dennis Boersen Aff. ¶ 19, ECF No. 140-13, PageID.1444).  Stacy and Nicholas Boersen have each filed affidavits as well stating the same thing.  (Nicholas Boersen Aff. ¶ 26, ECF No. 140-14, PageID.1449; Stacy Boersen Aff. ¶ 32, ECF No. 140-16, PageID.1459). Helena has not come forward with record evidence to rebut that.  The Court understands the suspicion.  But more than suspicion is needed to defeat a Rule 56 motion.

The thrust of Helena's contentions is that the Court should closely scrutinize transactions between family members when the rights of creditors are involved.  (ECF No. 148).  True enough. That's what discovery was for.  And after discovery, Helena has found nothing to suggest the actual ownership is anything different than the stated ownership.  Family ties, standing alone, are not enough.  Courts in other jurisdictions have found no common ownership element even where ownership actually overlaps substantially more than is present here.  *See Jordan v. Ravenswood Aluminum Corp.*, 193 W. Va. 192, 195, 455 S.E.2d 561, 564 (1995) (no common identity of ownership where six brothers and father constituted board of directors of former corporation and purchasing corporation was made up of one of the family members, but other directors were wholly separate).  Accordingly, the Court finds no triable issue on this key element of both a mere continuation and de facto consolidation or merger exception.

26

Nor is there a genuine issue of material fact with respect to a transfer of the legacy company's assets.  Once again, the affidavits of the defense assert no asset transfers occurred. And once again, Helena has failed to create a triable issue on the matter.  There are a number of legacy assets the new entities are using, but they are paying market rates for the privilege of doing so.[14] Without anything else of substance on this element, Helena focuses on the APH information that the New Heights Farm entities used to obtain crop insurance. While the transfer of an intangible asset might, in certain circumstances, amount to a transfer of substantially all of a predecessor company's assets, the Court is satisfied this is not one of those circumstances.  The Boersen Farming Operation, at its height, farmed 100,000 acres of land, using all the production equipment and resources necessary for such an operation.  Plainly, this required more by way of assets than the APH for a few parcels—assuming APH is even a transferable asset at all.  Even assuming the new entities used historical APH for some tracts of legacy parcels, it would not constitute a transfer of "substantially all" the assets of the legacy companies that were indebted to Helena.  *See C.T. Charlton & Associates*, 541 F. App'x at 554.

Moreover, in this case, there is even less reason to use this fact against the defense. Agrifund LLC required the New Heights Farm entities to obtain crop insurance before it would extend credit to the two businesses.  Part of the application for this insurance includes the APH for

---

[14] Helena states in cursory fashion that "the summary judgment evidence proves the legacy Boersen entities transferred (by lease) land and equipment to the [Great Lakes Grain] defendants. Whether these assets are fully encumbered is a question of fact, especially given the ever-changing nature of the Judgment Boersen's equity in their land and equipment."  (ECF No. 148, PageID.1628).  The Great Lakes Grain defendants, however, have not moved for summary judgment.  Helena, furthermore, does little to explain, and the Court fails to see how the leases that Great Lakes Grain entered into, or even those executed by New Heights Farm, amount to a transfer of assets for purposes of the two exceptions.  Helena does not contend that any assets of the Boersen legacy companies are being liquidated or otherwise used by New Heights Farm either to make payments on the leases.  Nor does it dispute that the successor entities are paying the fair market value of the use of the land and equipment.

past years.  By way of background, under the Federal Crop Insurance Act, 7 U.S.C.  § 1501, *et. seq.*, crop insurance policies are offered through private approved insurance providers (AIPs), which in turn are reinsured and regulated by the Federal Crop Insurance Corporation.  The FCIC is itself operated by the Risk Management Agency.  One of the insurance plans available to farms is yield protection coverage, which is determined, in part, by the APH information the applicant submits.  In broad view, the greater the APH, the more yield coverage is available to the farmer. *See Ausmus v. Perdue*, 908 F.3d 1248, 1249-1250 (10th Cir. 2018) (setting out the basic statutory and regulatory structure).

Elsewhere the briefing has demonstrated that the insurer in this case is Great American Insurance.  Stacy and Nicholas Boersen purchased insurance from this company through Chris Shellenbarger and both relied on Ms. Shellenbarger to obtain the insurance.   Stacy Boersen's application used the APH of Boersen Farms Grain, the partnership she had an ownership interest in through her membership in one of the LLC partners, and Nicholas Boersen used the APH of one of the legacy companies, Boersen Farms Ag, LLC, a company he had previously worked for. Both defendants contend that they were permitted to use the APH of the respective Boersen entities under the regulations governing the crop insurance program.   (ECF No. 140, PageID.1284). Furthermore, they contend that this is information that is tied to farming history, and is impossible for the legacy companies to monetize.   Helena's response is two-fold.  It insists, first, that something of value, an asset, was transferred to the New Heights Farm entities.  Second, it contends that the use of the APH was not proper under the regulations.

The Court is unconvinced by Helena's argument.  With respect to the first response, the APH may be valuable to applicant seeking insurance, but that is not the same thing as transferring something of value from the legacy companies to the New Heights Farm entities that would

otherwise have been available to Helena or other creditors.  Helena has, elsewhere, cited to Section 1507 of the Crop Insurance Handbook (ECF No. 144, PageID.1470) which provides for the Transfer of APH information.  *See* Fed. Crop Ins. Corp., USDA, FCIC, 2020 Crop Insurance Handbook § 1507 239 (Nov. 2020), https://www.rma.usda.gov/-/media/RMAweb/Handbooks/Coverage-Plans---18000/Crop-Insurance-Handbook---18010/2020-Crop-Insurance-Handbook.ashx.  This section, and those sections surrounding it, closely regulate when and how APH information may be transferred or otherwise used.  Defendants aver these sections are inapplicable because, when the New Heights Farm entities applied for insurance, the legacy defendants did not carry insurance.  Thus there was, they say, no transfer.  But even if Helena is correct that there was a "transfer" as contemplated by the handbook, the handbook plainly states that it is the approved insurance provider ("AIP"), not the predecessor entity, that transfers the AIP.  *See id.* ("When all the following requirements are met, an AIP may transfer certain APH database actual/assigned yields of an insured to another person who is taking over all or part of an insured farming operation.").  The AIP is not a part of this suit.

Furthermore, those courts that have found transfer of intangible assets sufficient for purposes of successor liability have dealt with situations far different than those here.  For example, in *Stramaglia*, the predecessor's "most valuable asset," the right to operate a water park, was transferred to the successor entity.  *See Stramaglia*, 377 F. App'x at 475 (citing cases from Arizona and Vermont).  This case, however, does not contemplate the type of exclusive right that was at issue in *Stramaglia*.  None of the cases cited by Helena relating to APH, furthermore, dealt with the question of whether the use of a predecessor's APH could be a basis for successor liability.  *Ausmus v. Perdue*, 908 F.3d 1248 (10th Cir. 2018), was a challenge under the Administrative Procedure Act to the USDA's denial of the APH Yield Exclusion for the 2015 winter wheat crop.

29

*Atkins v. Silverman*, 899 F.3d 395 (5th Cir. 2018), dealt with a similar challenge.  Finally, *Bush v. AgSouth Farm Credit, ACA*, 816 S.E.2d 728, 735 (Ct. App. Ga. 2018), involved a suit by an insured against his insurance agent for negligence, negligent misrepresentation, and fraud related to what the insured said was substandard performance by the agent in improperly calculating the APH. While these cases may demonstrate the utility of APH in obtaining crop insurance, they carry little persuasive value in establishing successor liability.

Helena's contentions that New Heights Farms did not follow the regulations in applying for insurance fares no better.  At most this argument might establish a basis for tort, either against the applicants, *see William J. Mouren Farming, Inc. v. Great American Ins. Co.*, No. CV F 05-0031 AWI LJO, 2005 WL 2064129, at *3 (E.D. Cal. Aug. 24, 2005) (noting that an insurer determines APH based on forms the insured submits under penalty of perjury) or against the insurance agent. *Bush*, 816 S.E.2d at 736 ("It is for a jury to decide whether Meeks' alleged failure to ask Bush for records to support the APH and her alleged failure to use written verifiable records to calculate the APH constituted negligence and/or negligent misrepresentation.").  But it does not demonstrate a transfer of assets or otherwise support successor liability.

For all these reasons then, the Court agrees with Defendants that, on summary judgment review, Helena cannot establish a triable issue on the mere continuation or de facto merger theories of successor liability.  Accordingly, Helena's successor liability claim fails as a matter of law, and the moving Defendants are entitled to summary judgment with respect to Count 1 of the Second Amended Complaint.

### B.  *Count II – Uniform Voidable Transaction*

The Michigan Voidable Transactions Act (previously Uniform Fraudulent Transfer Act), Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡꜱ § 566.31 *et seq.*, permits a creditor to avoid a transfer that is fraudulent, "to

the extent necessary to satisfy the creditor's claim." MICH. COMP. LAWS § 566.37(1)(a). Michigan

recognizes "two types of fraudulent transfers. One focuses on the transferor's actual intent, and

the other focuses on the economic realities of the transfer, or constructive fraud." *Swirple v. MGM*

*Grand Detroit, LLC*, No. 345284, 2020 WL 561904, at *2 (Mich. Ct. Ap. Feb. 4, 2020).

> The first encompasses transfers made "[w]ith actual intent to hinder,
> delay, or defraud" a creditor made either
> before or after the creditor's claim arose. The second, commonly
> called "fraud in law" or constructive fraud, deems certain
> transactions fraudulent regardless of the debtor's ability to prove
> the debtor's actual intent. It applies only to transfers made after the
> creditor's claim arose. Three elements of proof are required: (1) the
> creditor's claim arose before the transfer, (2) the debtor was
> insolvent or became insolvent as a result of the transfer, and (3) the
> debtor did not receive "reasonably equivalent value in exchange for
> the transfer...."

*Dillard v. Schlussel*, 308 Mich. App. 429, 446; 865 N.W.2d 648 (2014) (internal citations omitted).

In the Second Amended Complaint, Helena raises both types of alleged fraud.

The underlying requirement of either type of fraud is that there be a transfer of some sort

of property or asset. Indeed the Act "is designed to prevent debtors from transferring their property

in bad faith before creditors can reach it." *Dillard*, 308 Mich. App. at 466. The transfers that

Helena has identified include equipment leases that the two New Heights Farm entities entered

into in 2018 and 2019 with Boersen Farms & Affiliates. Boersen Farms & Affiliates is controlled

by Dennis Boersen, though the entity itself is not one of those entities indebted to Helena or a party

to this suit. Both New Heights Farm entities are paying $75,000 per month to lease the equipment.

All told, Helena avers that Boersen Farms & Affiliates has gained over $5 million in revenue from

the equipment leases. (ECF No. 148). Helena also points to payments that the New Heights Farm

entities have paid to their landlord, totaling $3.5 million dollars. It observes that rent was paid up

front, and only months after the entities were formed. The entities, Helena further alleges, are

making payments that the legacy companies also owe to the same landlord, but it has provided no evidentiary support for this claim.

But Helena is not contending that the lease of equipment from Boersen Farms & Affiliates or the lease of land from a third party to the New Heights Farm entities is a fraudulent transfer from the legacy companies.  Nor is it immediately apparent on its face how they could be, where both lessors that Helena has identified are not debtors of Helena.  Rather, as with successor liability, Helena focuses on the New Heights Farm entities' crop insurance application that used other entities' APH information.  The thrust of Helena's argument is that "the only payment that could have been used at the time was financing and insurance, which New Heights Farm I LLC and New Heights Farm II LLC obtained by using other entities' APH."  (ECF No. 148, PageID.1635).   In other words, Helena contends that the new financing the New Heights Farm entities received is the monetary equivalent of the value of the APH, or at least something like tainted funds, because New Heights Farm LLCs would not have received the funding without the crop insurance, and the crop insurance depends on using the APH.

For the reasons discussed above with respect to successor liability, the Court finds this argument unavailing.  The statute provides some helpful guideposts.  "Transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset."  MICH. COMP. LAWS § 566.31(q).   The term "asset" is generally defined as the "property of a debtor."  MICH. COMP. LAWS § 566.31(b). And property is further defined to mean "anything that may be the subject of ownership."  MICH. COMP. LAWS § 566.31(l).   Ownership means "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others."  *Ownership*, BLACK'S LAW DICTIONARY (8th ed. 2004).  There is no triable issue here.  There is no record evidence that the APH of a legacy

company indebted to Helena was *conveyed* from the legacy companies, or an insider, to the New Heights Farm entities, or that it legally could be conveyed by the legacy companies, as opposed to the AIP.  The New Heights Farm entities, or their insurer, may have used APH information of the legacy companies, but there is nothing to indicate that a bundle of rights over the APH moved from a legacy debtor to the New Heights Farm entities.  *C.f. Amjad Munim, M.D., P.A. Azar*, 648 So.2d 145, 153 (Fla. Dist. Ct. App. 1994) (finding transfer of goodwill could support fraudulent transfer claim "if the result harmed [the creditor] by eliminating from the [predecessor] its means of earning revenues to pay the judgment.").  Here, even assuming a transfer occurred, there is nothing to indicate that the use of the APH associated with some of the acreage once farmed by Boersen Farms Grain or Boersen Farms Ag, eliminated the legacy debtors' means of earning revenues to pay the judgment owed to Helena, or was the transfer that left the legacy companies insolvent.

Without an identified transfer, the Court concludes that there is no genuine issue of material fact on actual intent or constructive fraud.  Accordingly, the Court finds that Defendants are entitled to summary judgment with respect to Count II of the Second Amended Complaint.

### C.  Count III – Veil Piercing

In its final claim against the New Heights Farm entities, Helena seeks to pierce those entities' corporate veil.  Under Michigan law, there is a presumption that the corporate form will be respected.  *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995).  Piercing the corporate veil is not an independent cause of action, but is rather an equitable remedy that permits a court to disregard that corporate form in certain circumstances for purposes of imposing liability on an underlying cause of action.  *Kostopoulos v. Crimmins*, No. 299478, 2011 WL 6848354, at *3 (Mich. Ct. App. Dec. 29, 2011).  These circumstances are narrow, and the corporate veil generally

"may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some overriding public policy.'" *Seasword*, 537 N.W.2d at 224 (alteration in original) (quoting *Wells v. Firestone Tire & Rubber Co.,* 364 N.W.2d 670, 674 (Mich. 1984)).   The parties agree that in order to pierce a corporate veil, the complaining party must show (1) the corporate entity is a mere instrumentality of another individual or entity; (2) the corporate entity was used to commit a wrong of fraud; and (3) the plaintiff suffers an unjust injury or loss. *Florence Cement v. Vettraino*, 292 Mich. App. 461, 469, 807 N.W.2d 917, 922 (2011) (per curium).

The summary judgment record fails to demonstrate a triable issue with respect to piercing the New Heights Farm entities' corporate veil.  Based on the briefing (ECF No. 148, PageID.1636-1640), the Court does not see Helena as seeking to pierce the corporate veil of the legacy companies that it has obtained a judgment against.  Nor is it seeking to pierce the corporate veil of the successor entities (Great Lakes Grain and New Heights Farm) to impose liability on Stacy and Nicholas Boersen.  The only argument Helena has advanced is to seek to pierce the corporate veil of the successor entities (Great Lakes Grain and New Heights Farm) to impose liability on Dennis Boersen.  It is not all that clear that veil piercing is a proper procedural vehicle where no judgment has first entered, or cause of action established, against the challenged corporate entity.  *Cf. Gallagher v. Persha*, 315 Mich. App. 647, 661-662, 891 N.W.2d 505, 513 (Mich. Ct. App. 2016) (new veil piercing action permissible where judgment had already entered against the corporation).  It is also not clear why Helena believes veil piercing to impose liability and reach the assets of Dennis Boersen (or other Boersen family members who guaranteed the legacy companies' debts) is necessary when it has already obtained a judgment against those individuals.  (*See, e.g.,* Judgment ¶ 6, ECF No. 36, PageID.344).  Presumably Helena is hoping to establish that Dennis

34

Boersen is the grand puppeteer of all the Boersen family businesses so that any revenues generated by any of the entities should be available to creditors of Dennis Boersen. Perhaps veil-piercing—or a close cousin alter ego theory—could support such sweeping equitable relief on a proper factual record. But there is no such record here. There is plenty of understandable suspicion, but precious little evidence.

Even if veil-piercing is the proper vehicle here, the Court concludes this claim fails in any event. In the principal case relied on by Helena, *Foodland Distribs. v. Al-Naimi*, 559 N.W.2d 379 (Mich. Ct. App. 1996), the Michigan Court of Appeals found veil piercing warranted against a de facto owner / operator (Al-Naimi) of a successor entity nominally organized and controlled by Al-Naimi's relatives. There was record evidence in that case that the successor entity increased its secured debt from $233,000 to $625,000 without receiving adequate consideration, while Al-Naimi's personal debt shrank as part of the series of transactions that Al-Naimi undertook to restructure his debt. The Michigan Court of Appeals found "an abundance to evidence to" demonstrate that the successor entity was a "mere instrumentality" of Al-Naimi.

Helena has established nothing like the factual record in *Al-Naimi.* There is no evidence that Dennis Boersen—the supposed beneficiary of the overall scheme—has received anything, directly or indirectly, other than fair market value payments on assets leased to the new businesses. Unlike *Al-Naimi*, there is no record evidence to suggest that Dennis Boersen is pulling the levers from behind the curtain while Stacy and Nicholas Boersen function as mere figureheads. Nor has Helena demonstrated how the New Heights Farm entities were used to commit a fraud or a wrong. It observes only that these entities were created at a time when the legacy debtors' "own financial future was very uncertain." (ECF No. 148, PageID.1640). But the record establishes the new entities were created and are actually operated by Boersens other than Dennis. Moreover, to the

extent the new entities used any assets from the legacy companies, they were paid market value under written leases. The APH information, once again, is all Helena can really cite. But for reasons already recited, the record does not create a triable issue or need for more discovery on that. The use of APH may well have been perfectly proper under the convoluted rules of the crop insurance program. But even if the new entities should not have been able to use the APH, it does not amount to a fraud or wrong against Helena.

For all these reasons, therefore, the Court concludes Defendants are entitled to summary judgment on the third and final claim in the Second Amended Complaint.

## CONCLUSION

**ACCORDINGLY, IT IS ORDERED:**

1. Helena's Motion to Dismiss Counterclaims under Fed. R. Civ. P. 12(b)(6) (ECF No.113) is **GRANTED.**

2. Helena's non-dispositive motions seeking additional discovery (ECF Nos. 127, 143, and 152) are **DENIED.** The motions to file a reply brief (ECF Nos. 131 and 159) are also **DENIED.**

3. Defendants Stacy Boersen, Nicholas Boersen, New Heights Farm I, LLC, and New Heights Farm II, LLC's Motion for Summary Judgment (ECF No. 139) is **GRANTED.**

4. This matter shall proceed on the remaining claims against the Great Lakes Grain defendants on the schedule set out in the Third Case Management Order.

Dated:     May 7, 2020           /s/ Robert J. Jonker
                                         ROBERT J. JONKER
                                         CHIEF UNITED STATES DISTRICT JUDGE